UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE,<br>        Plaintiff,<br><br>v.<br><br>AMHERST COLLEGE, CAROLYN MARTIN,<br>JAMES LARIMORE, TORIN MOORE,<br>SUSAN MITTON SHANNON and<br>LAURIE FRANKL,<br>        Defendants. | | CIVIL ACTION<br>No. |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.      This lawsuit arises out of a miscarriage of justice: the expulsion of the plaintiff from Amherst College ("Amherst" or "the College") in December 2013.  The plaintiff is a first generation Asian-American, admitted to Amherst in reliance on substantial financial aid.  In the Fall of his senior year, he was accused of having committed rape when, as a sophomore, he had engaged in consensual sex with a female student who now claimed to have withdrawn her consent during the course of the sexual conduct.  The disciplinary action was undertaken during a period of relentless and well-publicized accusations against Amherst for failing to protect female students from sexual assault, and while the College was under intense pressure to demonstrate that it was now willing and capable of prosecuting sexual assailants.

2.      In the just six weeks from the date the complaint was filed against him, the plaintiff found himself held guilty of assault, expelled from the College, ejected from the campus and branded a sex offender, with his entire future in ruins.  The actions taken by the defendants resulted from a deeply flawed investigatory and disciplinary process during which the plaintiff

was denied the most rudimentary elements of fairness promised to him by Amherst in its *Student Handbook*.

3.       Worse, after the disciplinary process had run its short course, the plaintiff discovered, and submitted to the College, irrefutable documentary evidence—text messages previously concealed by the complainant—which disclosed that the very night the sexual encounter occurred, the complainant had admitted that not only had she consented to the sex, but that she was its moving force.  Nevertheless, Amherst has refused to take any action to correct or remediate the wrong committed against plaintiff.  By this action, the plaintiff seeks to right these grievous wrongs, complete his education, salvage his reputation and restore his emotional and psychological well-being.

## JURISDICTION AND VENUE

4.       This action arises out of the College's breach of its contractual and other obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) and 42 U.S.C. § 1981.

5.       The plaintiff is a resident of New York, and the defendants are residents of Massachusetts.  The amount in controversy is over $75,000.

6.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

7.       Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

8.       The plaintiff, identified here as John Doe ("plaintiff" or "John Doe"), resides in New York and was formerly a full-time student at Amherst College.[1]  John Doe is the son of Asian-American immigrants.  He was improperly expelled in December of 2013, while in his senior year at the College.  The plaintiff matriculated at Amherst in the fall of 2010 after

---

[1] The plaintiff has filed separately a motion to proceed under a pseudonym.

graduating from a private high school in New York which he attended with a substantial scholarship.  He received numerous awards in academics and athletics in high school, including a National Merit Letter of Commendation, and he also received awards during his time at Amherst.

9.     The defendant Amherst College ("Amherst" or "the College") is a federally-funded, private liberal arts college located in Amherst, Massachusetts, with approximately 1,800 enrolled undergraduates.

10.     The defendant Carolyn "Biddy" Martin has been the President of the College since June 2011.

11.     The defendant James Larimore was, at the time of the events at issue, the Dean of Students at Amherst College, and he presided as chair at the disciplinary hearing relating to the plaintiff.

12.     The defendant Torin Moore was, at the time of the events at issue, Assistant Dean of Students and the Director of Residential Life at Amherst College.  Mr. Moore served as plaintiff's faculty adviser during his disciplinary hearing.

13.     The defendant Susan Mitton Shannon was, at the time of the events at issue, the Interim Dean of Student Conduct and the Deputy Title IX Coordinator at Amherst College.

14.     The defendant Laurie Frankl was, at the time of the events at issue, the Title IX coordinator at Amherst College.

## FACTS

### The Climate at Amherst College for Sexual Misconduct Discipline

15.     This case arose at the climax of a period of unprecedented and intense pressure upon Amherst College to take action and produce results concerning sexual assaults by male students against female students on campus.  Amherst had been accused of mistreating sexual

3

assault victims, not protecting students, and doing nothing to identify and punish perpetrators of sexual misconduct on its campus.  At all material times, the nature of the climate was such that Amherst officials would have known, and feared, that any decision not to expel John Doe, or any decision to reopen the proceedings against him, on any ground, would be met with widespread and furious protest.

16.     On April 2, 2011 the Office of Civil Rights of the U.S. Department of Education ("DOE") issued a "guidance letter" to colleges and universities in the United States, known as the "Dear Colleague" letter.  The letter advised recipients that sexual violence constituted sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et. seq. and its regulations, directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," and listed specific disciplinary procedures said to be required by Title IX.

17.     In the wake of the "Dear Colleague" letter, the DOE commenced numerous investigations against colleges and universities, with the underlying threat that all federal funding could be withdrawn.  In addition, at Amherst, students protested against the College's failure adequately respond to complaints of sexual misconduct.  A "Title IX committee" was assigned to recommend substantial changes in its disciplinary procedures in sexual misconduct cases, and these changes were adopted and made effective in September 2012.

18.     On October 17, 2012, Angie Epifano, a former member of the College's class of 2014, wrote an essay that was published in *The Amherst Student* that referenced her own experience with rape on campus and was primarily focused on the College's response.  Ms. Epifano's essay was highly detailed and critical of how the College had responded to her severe emotional distress following a sexual assault on campus.  She complained of how "rapists are

4

given less punishment than students caught stealing," and that she had been discouraged from prosecuting the man who assaulted her because it would be difficult "to prove he raped you." The student newspaper website crashed as a result of the overwhelming response to Ms. Epifano's article.

19.     The very next day, defendant President Martin issued a statement, stating that "[c]learly, the administration's responses to reports have left survivors feeling that they were badly served.  That must change, and change immediately."  She announced that she was investigating the handling of the Epifano incident and that "[t]here will be consequences for any problems we identify, either with procedures or personnel."  By the next day, the school's sexual assault counselor, who had been criticized by Ms. Epifano, had resigned.

20.     Ms. Epifano's essay sparked a firestorm of media coverage, both local and national.  *The New York Times* published a story discussing the on-campus response to Ms. Epifano's essay on October 26, 2012.  *The Huffington Post* also published a series of articles that fall, largely critical of the College's handling of sexual misconduct on campus.  Numerous media outlets picked up on and covered the controversy, including *The Boston Globe*, *USA Today*, *Bloomberg* and NPR radio.

21.     Following the publication of Ms. Epifano's essay, there were further on-campus demonstrations and meetings in which student activists called for the College to take action against and to punish perpetrators of sexual assault against women.   The increased media and campus-wide attention led to a flood of statements by present and former students that their complaints of sexual abuse had not been taken seriously, new complaints at Amherst and elsewhere, and multiple investigations nationwide by the Department of Education.

22.     On October 31, 2012, the College formed a Special Oversight Committee on Sexual Misconduct to review the College's atmosphere, sexual educational programs, and policies relating to sexual misconduct.  The Committee was comprised of five members of faculty/staff, two trustees and two students, including LR, a sexual assault victims advocate and later a witness against John Doe.

23.     On November 2, the College cancelled all classes and offices for a "day of dialogue and reflection" to consider the issues raised by Ms. Epifano.

24.     In January 2013, the Committee published its report, recommending that Amherst focus on "empowering victims."  Days before the report was released, defendant President Martin flew to Alabama to meet with Epifano to advise her of its contents.

25.     After the Committee issued its report, the College conducted a second overhaul of its *Student Handbook*, adding two new appendices which set out specific, additional procedures to address allegations and investigations regarding sexual harassment and sexual misconduct. These policies and procedures went into effect in May 2013.  The College Sexual Misconduct Policy (Appendix B to the *Student Handbook,* hereinafter "*Sexual Misconduct Policy*" or *Policy*) and the Procedures for Addressing Sexual Misconduct Complaints Under the Student Conduct Process (Appendix C to the *Student Handbook,* hereinafter "*Sexual Misconduct Procedure*" or *Procedure*), which were in effect at all times material to this case are found in Exhibit 1.

26.     On November 14, 2013, Ms. Epifano and another Amherst student filed Title IX complaints against Amherst with the U.S. Department of Education.  They coordinated their filings with six female students at Vanderbilt University who filed similar Title IX complaints against that institution, all as part of a nationwide campaign to bring attention to this issue. These complaints caused another round of national media coverage.

### Sandra Jones's Complaint

27.     The proceeding against John Doe began on October 28, 2013, just prior to the filing of Ms. Epifano's Title IX complaint against Amherst, with a complaint which charged a sexual offense which allegedly occurred almost two years earlier.  On the evening of February 4-5, 2012, as a sophomore, John Doe had a sexual encounter with a female classmate, Sandra Jones,[2] after he had been drinking to the point of incapacitation.  The woman John Doe had been dating, EK, was away for the weekend, and her roommate, Sandra Jones, led (and virtually carried) the plaintiff back to their room late that evening.  She performed oral sex on the plaintiff.

28.     Sandra Jones took no action for one year and nine months after the event.  Then on October 28, 2013, she filed a complaint with the College alleging she had been raped by the plaintiff.  Sandra Jones filed her complaint at the urging of LR, a leading on-campus victim's advocate and member of the College's Special Oversight Committee on Sexual Misconduct.  LR offered to testify that John Doe had admitted to her that he had sexually assaulted Sandra Jones (a statement that would later be found to lack credibility by the College investigator), and she advised Sandra Jones that Jones could, therefore, win at a disciplinary hearing.  On information and belief, it was LR who physically filed Sandra Jones's complaint form with the College. Sandra Jones's complaint was the first to be investigated and heard under the College's new procedures.

29.     On November 1, 2013, defendant Mitton Shannon, Deputy Title IX Coordinator, notified John Doe that he was the subject of a complaint.  The case was put on a fast track. Mitton Shannon informed him that he had less than a week to provide a response and to find an

---

[2] Sandra Jones is a pseudonym being used to protect this student's privacy.  Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of initials, in order to protect their privacy.

advisor, who, under College written policy, could only "guide" and "accompany" the student, but could not "advocate."  Defendant Mitton Shannon informed Doe that he was not permitted to have legal counsel as an advisor.  She informed Doe that the plan was to hold the hearing before the Thanksgiving break.  In this and further meetings, she told him that the process was confidential; that he must not speak to anyone about the allegations against him unless he obtained prior authorization from the College's investigator; and that he could provide a list of relevant witnesses to the investigator, but that relevant witnesses would only be people who were directly involved in the event.

### The College Conducts a Grossly Inadequate Investigation

30.     The College retained an attorney, Allyson Kurker, to conduct an investigation and report on her conclusions.  The investigator was charged with interviewing Jones, Doe "and any other individual who may have information relevant to the determination," (*Policy,* ¶VIII(4)), including "any witness identified by the partie," (*Procedure,* (ix)(4)); with gathering, among other things, "documents, communications between the parties and other electronic records as appropriate," (*Policy,* ¶VIII(4); *Procedure,* (ix(4)); and to make a report summarizing and analyzing the relevant facts.  (*Procedure,* (ix)(C)(1)).  A true and correct copy of the investigative report is attached hereto as Exhibit 2.[3]

31.     Both Sandra Jones and John Doe provided a list of witnesses to the events.  The investigator thereafter interviewed both of them and the witnesses they had identified, namely, LR and JM, named by Sandra Jones, and EH, EK, NK and RM, named by John Doe.  All of the interviews, except one, were conducted on a single day, November 11, 2013.

---

[3] The publicly filed report and exhibits attached hereto contain redactions of all student names, with "John Doe" and "Sandra Jones" being used for the plaintiff and the disciplinary complainant, respectively, and initials being used to identify other students, to protect their privacy.

32.     When Sandra Jones was interviewed by the investigator on November 11, just two weeks after filing her written claim, she fundamentally changed her story.  While her October 28 written complaint alleged that the oral sex with the plaintiff in February 2012 had been nonconsensual throughout, (Ex. 2 at Ex. B thereto), and a written account she gave to the investigator at the time of the interview made the same claim, (Ex. 2 and Ex. C thereto), during her interview Sandra Jones admitted that she had begun to perform oral sex *willingly* on the plaintiff, and that it only *became* nonconsensual "on a break" during the sex act.  *See* Ex. 2 at p. 3.

33.     Sandra Jones also told the investigator that she "did not email, text or otherwise reduce what had happened with [John Doe] to writing."  *See* Ex. 2 at p. 6.

34.     The investigator interviewed John Doe on the same day.  Doe told the investigator that he had experienced a blackout and did not remember his interaction with Sandra Jones.  He insisted, however, that he was not capable of forcing a woman to have sex.  *See* Ex. 2 at p. 6, 8-9.

35.     The investigator interviewed LR, the individual who had precipitated Sandra Jones's complaint.  LR claimed that John Doe had admitted to her that he had sexually assaulted Sandra Jones in February 2012.  *See* Ex. 2 at p. 11.

36.     The investigator also interviewed EK, Sandra Jones's roommate in February 2012.  EK reported that when she returned to campus, Sandra Jones told her only that she and Doe had kissed.  *See* Ex. 2 at p. 10.  EK informed the investigator that she had heard that Sandra Jones had exchanged text messages with another student and Residential Counselor at the dorm, DR, after her sexual interaction with John Doe.  The investigator, however, never interviewed DR.

37.     The investigator did not collect any text messages from Sandra Jones or anyone else who had exchanged text messages with her at or about the time of the relevant events.  The

investigator failed to ask Sandra Jones to identify any individuals she saw or communicated with immediately after the sexual encounter with John Doe and, accordingly, neither interviewed any such persons or identified them in her report.

38.     John Doe, by contrast, supplied electronic messages between him and EK, Sandra Jones's roommate in 2012, and between himself and RM, a friend of Sandra Jones who had been present in the dormitory's common room on February 4-5, 2012 and had seen Sandra Jones lead John Doe to her dorm room.  In an electronic message from RM to Doe, RM referred to Sandra Jones having "hooked up with another guy after [John Doe] left that same night."  The investigator did nothing to identify this "[]other guy" or to obtain any relevant evidence from him relating to his interactions with and observations of Sandra Jones subsequent to her sexual interaction with John Doe.

39.     The investigator prepared a report summarizing her interviews.  The report attached only the electronic messages supplied by John Doe, including electronic Facebook messages between John Doe and RM.  The report did not mention EK's statement that Sandra Jones had exchanged text messages with another student, DR, about her sexual encounter with John Doe immediately after the event.

40.     The investigator's report offered no conclusion as to whether John Doe had forced Sandra Jones to engage in oral sex.  The investigator found that John Doe's account was consistent and credible insofar as he stated that he had experienced a total blackout and could recall nothing of his evening with Sandra Jones.

41.     The investigator did not credit the testimony of LR, who claimed that John Doe had admitted to sexually assaulting Sandra Jones.

### John Doe is Provided with No or Incompetent Advice

42.     John Doe was provided a faculty adviser, defendant Torin Moore, Assistant Dean of Students and Director of Residential Life, who had little training or experience with the new procedures.  In fact, no one at Amherst had any experience with these procedures, and, on information and belief, no one was brought in from outside Amherst to counsel the College, or anyone involved, on how to implement the procedures adopted by the College.

43.     Doe was never advised by any agent of the College that he could, or should, investigate the facts himself.  He was never told he could, much less that he should, interview potential witnesses.  On the contrary, he was led to believe that the policy of confidentiality prohibited him from doing so.

44.     Moreover, John Doe was ill-equipped to investigate the facts, defend against the charge, and advocate on his own behalf.  He had no training or skills in investigation; he had no knowledge or familiarity with procedural or evidentiary rules or how to elicit testimony from witnesses.  Further, John Doe was emotionally distraught over being charged with sexual assault. He was isolated from all sources of support—with whom he was forbidden to discuss his predicament—and he was overwhelmed by the challenge of defending himself in the short time allowed, which happened to fall in the midst of his final exam period.  Advised that he could not have the assistance of legal counsel, Doe had only a faculty adviser who, as noted, under the *Sexual Misconduct Procedure*, was forbidden to act as "advocate for the student."

45.     Doe was advised that under the College *Sexual Misconduct Procedure*, in order to call any witness or offer any document at the hearing which had not been previously submitted to the investigator, he must, no later than three days prior, submit a list of the evidence to the board Chair, and obtain the Chair's determination that there is "sufficient justification" to permit its

11

use.  (*Procedure,* (x)(B))(3)(b) and (c)).  As he prepared for the hearing, John Doe was aware of RM's message that she had heard that Sandra Jones had another sexual encounter in the early morning hours of February 5, 2012, although Doe was unaware of the identity of the other student.  He consulted Moore, his faculty adviser, as to whether he could present any evidence relating to the interaction between Sandra Jones and this other student.  In response, he was then advised by either defendant Moore or defendant Mitton Shannon that this evidence would be inadmissible at the hearing and that he should not pursue it.  Relying on this advice, he did not do so.

46.     The advice John Doe received and relied upon was incorrect under the *Student Handbook*'s own guidelines.  Those guidelines exclude evidence of _prior_ sexual activity of the complainant, but not *subsequent* sexual activity.  (*Procedure,* (x)(B))(3)(c)(2)).  Moreover, these advisers completely ignored and failed to advise John Doe that this other student might have independently relevant evidence, including Sandra Jones's state of mind and demeanor in the hours after she was allegedly "raped" by John Doe.

### A Deeply Flawed Hearing is Held, In Which Jones' Text Messages are Not Produced

47.     John Doe's disciplinary hearing was held on December 12, 2013, just six weeks after the complaint was filed.  The expedited schedule placed the hearing in the middle of the reading period for Fall final exams and left John Doe with inadequate time to learn how to defend himself and to prepare his defense.

48.     The hearing was chaired by defendant Larimore, Dean of Students.  It was attended by: Sandra Jones; her faculty adviser; another senior student acting as an assistant to Sandra Jones; John Doe; his faculty adviser; the hearing board members; defendant Frankl, the Title IX Coordinator; defendant Shannon, the Title IX Coordinator; Amherst's General Counsel;

the investigator and witnesses (who were present only during their own testimony): LR, the sexual assault victim's advocate; EK, Sandra Jones's former roommate; NK, John Doe's former roommate; and RM, Sandra Jones's friend.  A true and correct copy of a transcript made from the hearing tape, reflecting the presence of these individuals, is attached hereto as Exhibit 3.[4]

49.     A physical barrier was erected and maintained to prevent Doe and his accuser from seeing one another.

50.     At the outset of the hearing, Dean Larimore outlined the procedure to be followed and reiterated that "no legal representation is allowed to be present."  Ex. 3 at p. 2.

51.     There was no dispute at the hearing that the sexual encounter had taken place between 1:00 and 2:00 a.m. on February 5, 2012; the issue was whether Sandra Jones had been coerced.

52.     The investigator was the first witness.  She summarized her investigation and fact-finding.  She reported that "Ms. [Jones] did not tell anyone immediately thereafter about what had happened with Mr. [Doe].  . . . [S]he didn't keep a journal or send emails about it."  Ex. 3 at p. 16.

53.     Sandra Jones testified that although she and plaintiff had engaged in consensual oral sex, at some point during the event she no longer wished to continue and told him to stop, but he went on nonetheless, holding her head until he finished.  *See* Ex. 3 at 43.  She said that the assault was "terrifying and traumatic for me and took me a long time to name, let alone tell anyone about it."  Ex. 3 at p. 42.

54.     One of the board members asked Sandra Jones to relate everything that took place between the time John Doe left her dorm room and 6 a.m. on February 5.  She responded that she

---

[4] The publicly filed transcript attached hereto contain redactions of all student names, with "John Doe" and "Sandra Jones" being used for the plaintiff and the disciplinary complainant, respectively, and initials being used to identify other students, to protect their privacy.

was feeling "alone and confused" and "realized that [she] did not want to be alone," so she had "texted a friend to come over to talk to [her] and spend the night." *See* Ex. 3 at p. 45. No one asked Sandra Jones to identify the friend; the friend had never been identified by the investigator and was not called to testify.

55.     John Doe testified that he had experienced a total blackout and had no memory of his interactions with Sandra Jones at all. His defense was that, despite his lack of memory, he would never force a woman to have sex. Ex. 3 at p. 62-63, 71.

56.     During the course of the hearing, two references were made to text messages sent by Jones after her encounter with Doe. Until this point, Jones had not revealed the existence of any such communications and had affirmatively denied that she sent any messages about her encounter with Doe, and Doe was completely unaware of their existence. First, as noted above, in response to a question, Jones testified that she sent a message asking an unidentified friend to come over because she felt "alone and confused." Ex. 3 at p. 45-46. Next, toward the end of the hearing, the last witness, EK, stated that she had learned from DR that Jones had texted him and said that "she had like done something bad." Ex. 3 at p. 128. EK explained that she had understood this to mean that "they hadn't had sex but that other things had happened." Ex. 3 at p. 129. At the very end of the hearing, a board member asked Jones about the content of that text message. Downplaying its significance, Jones said:

> "I think I did say like . . . something . . . about well doing a bad thing. . . . I didn't want to address what had happened to me and I was in no position yet to accept that it had been rape. So in my text messaging to [DR] I only said things about the hook-up as if it had been consensual."

Ex. 2 at 135-36. No one asked her to produce either text, or asked her to state exactly what she had said, or asked her to explain why she had failed to disclose the messages before.

14

57.     There was no procedure set forth in the College procedural policy to obtain evidence the existence of which was disclosed only at the hearing.  In any event, Doe was confounded, overwrought and without competent advice as to how to respond to testimony and facts which emerged at the hearing.

### The College Acts with Enormous Speed to Expel
### John Doe, Eject Him from the Campus, and Destroy His Reputation

58.     Plaintiff received the hearing board's decision the day after the hearing, on December 13, 2013.  A true and correct copy of the decision is attached hereto as Exhibit 4.[5] The hearing board found John Doe "**responsible**, by a preponderance of the evidence, for violating *the Statement on Respect for Persons* specifically the *Sexual Misconduct Policy: Sexual Assault*" (emphasis in original).  *Id.* at p. 1.  The decision stated that John Doe was "expelled from Amherst College effective immediately"; that John Doe's transcript would identify the expulsion with the words "Disciplinary Expulsion"; and John Doe could no longer be on campus. *Id.*  The decision indicated that the hearing board found it "credible" that John Doe was "blacked out" but that "[b]eing intoxicated or impaired by drugs or alcohol is never an excuse."  *Id.* at p. 2. The hearing board found Sandra Jones's account of withdrawing consent during the sexual act to be "credible and supported by a preponderance of the evidence."  *Id.*

59.     The decision notified John Doe of his right to appeal within seven (7) days.  *See* Ex. 4 at p. 2.

60.     Doe was required to vacate his on-campus housing immediately, being given less than an hour to pack his belongings, just as he had been preparing to take his fall final exams and days before the conclusion of the academic semester.  With no family nearby and no money to

---

[5] The publicly filed hearing board decision attached hereto contain redactions of all student names, with "John Doe" and "Sandra Jones" being used for the plaintiff and the disciplinary complainant, respectively, and initials being used to identify other students, to protect their privacy.

pay for a sudden housing expense, Doe moved into an off-campus fraternity house with the permission of the other residents so that he could remain close enough to Amherst to file his appeal.  Even this was not far enough for the on campus activists, and the AC Voice—run by LR and others—published a piece in January 2014 in which student activists, critical of the College and the fraternity, expressed their outrage that the plaintiff was permitted to remain in close proximity to campus.  One such person, quoted in the piece, referred to the situation saying, "This is scarily reflective of how rapists are able to thrive in our communities because there are always people willing to protect them".  It was apparent that these activists and their followers, active throughout the disciplinary process, would not be satisfied until the plaintiff was driven out of town.

61.    At the time of his appeal, John Doe still did not have access to the evidence that he later uncovered.  His appeal was summarily denied by Amherst.

62.    On January 16, 2014, after John Doe's appeal was denied and a week before spring classes were scheduled to begin, Amherst sent a campus-wide electronic notification with the subject line, "Sexual Misconduct Hearing Outcome (Content Warning)".  The announcement stated that following a December 2013 hearing, a hearing board had found, "by a preponderance of evidence, that an Amherst College student violated Amherst College's Sexual Misconduct Policy by committing sexual assault."  The announcement further notified the entire community that the student had been expelled and was not allowed on campus.  Although the announcement did not identify John Doe by name, it was widely known on campus that he was the student referenced.  On information and belief, this was in part because LR violated her confidentiality obligation and openly discussed the hearing with numerous people on campus.  The campus-

wide announcement reporting John Doe's offense and sanction was not authorized by any written policy and was unprecedented in Amherst history.

### John Doe's Discovery of Crucial Exculpatory Evidence - Text Messages Concealed by the Complainant

63.     After Doe was expelled and his appeal was denied, he retained counsel and sought to obtain evidence that had been unavailable at the hearing.  He obtained the identity of the person who had joined Sandra Jones after he had left her room -- ML, another student.  He then obtained from ML and DR the text messages that Jones had exchanged with them during the night in issue, but had failed to produce during the investigation or at the hearing.

### Sandra Jones's Texts and Interactions with ML

64.     The ML texts consisted of a series of exchanges in which she invited him to her room for sexual activity.  They are attached to an affidavit, also provided by ML and found in Exhibit 4.  Significantly, and contrary to her testimony that she invited her "friend" because she felt "alone and confused" the texts show that she had begun her efforts to get him over at 5:00 pm the evening before.  Then, she redoubled her efforts immediately after Doe had left the room:

| | |
|---|---|
| Sandra Jones: | I mean I happen to have my room to myself this weekend, if you wanted to come over and entertain me . . . . |
| ML: | I'm not a very good singer despite all the rumors. |
| Sandra Jones: | Who said anything about singing?… |
| Sandra Jones: | I thought you had a military-trained bod? |
| ML: | …which is sore from working out so sexily today. |
| Sandra Jones: | Wow just one workout wears you out? |
| ML: | Wow, let's keep attacking my manliness. |
| Sandra Jones: | Well you could just prove me wrong by coming overrr |

ML:                     U sound desperate.  Three "r's in that over.

65.     ML's affidavit states that he had been invited by Sandra Jones to her dorm room around 1:15 a.m. on February 5, 2012, and that he arrived at her room around 2:45 a.m.  She appeared "friendly, flirtatious, and spirited" when he arrived and did not appear "anxious, stressed, depressed, or otherwise in distress" at any time during the hours he spent with her that evening.  *See* Exhibit 5.[6]

### Sandra Jones's Text Messages with DR

66.     DR was an upperclassman Residential Counselor who was friendly with Sandra Jones.  Jones began to exchange text messages with him at approximately 1:14 a.m., just after John Doe left her room after she had performed oral sex on him.  The text exchanges are attached in Exhibit 6.  They disclose the following:

| | |
|---|---|
| Sandra Jones: | Ohmygod I jus did something so fuckig stupid |
| DR: | What did you do |
| Sandra Jones: | Fucked [John Doe].  .  .  .  FUCK |
| DR: | No you didn't . . . . |
| Sandra Jones: | official story is he puked and I took care of him but yes.  Yes I did.  FUCK |
| DR: | [Sandra] what are you doing???????? |
| Sandra Jones: | Oh and apparently [ML]s coming over so nothing happened everything's fine . . . |

67.     Jones went on to express her fear of the fallout when her roommate, EK, and others found out that she had had sex with EK's boyfriend, especially since, "I'm pretty sure

---

[6] The publicly filed affidavits attached hereto contain redactions of all student names, with "John Doe" and "Sandra Jones" being used for the plaintiff and the disciplinary complainant, respectively, and initials being used to identify students who are so identified in this complaint.  The names of students who are not identified in this complaint in any way have simply been redacted to protect their privacy.

[John Doe] was too drunk to make a good lie out of shit." She said that if EK were to find out, "[S]he would literally never speak to me again." DR then suggested that Sandra Jones "put all the blame on [John Doe]." Sandra Jones responded that "[EK] knows me it's pretty obvi I wasn't an innocent bystander." They agreed that they both "hate[d]" John Doe. Sandra Jones then wondered that since she and John Doe "didn't technicallyyyy have sex…[is it] not quite as bad?"

68.    The text messages between Sandra Jones and DR continued even during Sandra Jones's interactions with ML, who arrived during Jones's extended texted conversation with DR. In her messages to DR after ML arrived, Sandra Jones complained, "why is he just talking to me." She described how she was doing her best to seduce him: "Like, hot girl in a slutty dress. Make. Your. Move. YEAH." In the late morning of February 5, 2012, Sandra Jones sent the following text message: "Ohmygod action did not happen til 5 in the fucking morning." *See* Ex. 6.

69.    EK also supplied an affidavit, in Exhibit 7,  in which she revealed that, prior to the events of February 5, 2012, she had "direct knowledge of [Jones'] regular weekend practice meeting men and having brief sexual encounters with them[, which she] would report to [EK] with dramatic detail."

70.    In sum, the evidence obtained after the hearing showed that in the immediate aftermath of Jones' sexual encounter with Doe:

- Jones described the encounter, in writing, in language that unmistakably conveyed her agency as far more than passive consenter and rather as initiator and active participant. *She* "*did* something." Something that was "*stupid*." *She* "fucked" *him*. This language casts a whole new light on her account of the event, and on her belated acknowledgement of the existence of the message exchange, and her characterization of its contents.

19

- Jones, within minutes of having sex with Doe, invited ML to her room to "entertain" her and then, while he was there, gave a running and graphic account to DR of her seduction of him ("Like, hot girl in a slutty dress") as well as her impatience with his slowness in response.  Contrary to her testimony that she had him over because she felt "alone and confused" the texts show that she had begun to work on getting him over well before Doe had become part of the picture and she only continued after he left.  And, indisputably, the communications disclosed that she was anything but terrified and traumatized by her encounter with Doe, as she testified.

- Jones' sole distress was fear of what her roommate, EK, would think.  She discussed covering it up with a Residential Counselor, who suggested that she "blame" it on Doe.  Her only objection to that strategy was that it would be obvious to EK who "knows" that she "wasn't an innocent bystander."  In other words, she was motivated and willing to lie, but was concerned only that it would not work.

- Jones realized that Doe was intoxicated to the point of incoherence:  "too drunk to make a good lie out of shit."

- Jones' denial to the investigator that she had made any written communication about her encounter with Doe and her testimony that it took "a long time to name, let alone tell anyone about it" were conscious and deliberate falsehoods.  The contents of that text showed that she clearly remembered that communication:  the language of the text, when disclosed, corresponded almost exactly with her belated testimony that she had written to DR that she had done "something bad."

- Jones's testimony to the hearing board about what she did in the hours after her interaction – that she texted "a friend" to "come over to talk" − was likewise utterly dishonest.

71.    This evidence – of what Jones did, said, and how she said it – was not available at the hearing, but would likely have been a real factor in the deliberations of the hearing board had it been admitted.  There is, at the very least, a substantial likelihood that the board would have reached a different conclusion.

### Amherst Refuses to Reopen Its Expulsion of John Doe

72.    Through counsel, John Doe presented the affidavits and attached text messages to the College on April 16, 2014, and he requested that he be reinstated or that the matter be reopened.

20

73.     Amherst has refused to reopen either the hearing or the investigation.  Upon information and belief, it has not even asked Sandra Jones to respond to the new evidence.  It has no legitimate explanation or justification for its refusal.

### Amherst's Discrimination Against John Doe on Account of Gender and Race

74.     At all material times, the College has given preferential treatment to Sandra Jones because she is a female.  In particular, it was undisputed − even on Sandra Jones's own account − and the hearing board found, that at the outset Sandra Jones willingly engaged in sex with John Doe while he was "blacked out," that is, while he was incapacitated and thus incapable of giving consent.  Under the College's *Student Handbook*, on these facts Sandra Jones—and not John Doe—was guilty of sexual misconduct.

75.     Furthermore, by no later than April 16, 2014, when Sandra Jones was still a student and under the jurisdiction of the College, Amherst had possession of evidence that Sandra Jones had not only initiated the sexual interaction but was the moving force (in her own words, she "fucked [him]"), not only at the outset, but throughout.  The College also knew that John Doe was incapacitated.  In other words, the College had evidence that Sandra Jones, *and only Sandra Jones*, was guilty of an offense.  The College also had evidence that Sandra Jones had lied to the investigator and lied at the hearing, clear violations of the College Honor Code.  Despite all of this evidence, Amherst did not review or investigate or even consider whether Sandra Jones should herself be the subject of a complaint.  Nor, did the College take steps to reopen the proceedings against John Doe, leaving him in the position of having been expelled for an offense committed by Sandra Jones, while Sandra Jones was allowed to graduate.

76.     On information and belief, prior to John Doe's expulsion, Amherst had not expelled any student for sexual assault for at least 20 years.  In the period leading up to John

21

Doe's disciplinary hearing, Amherst was under intense pressure from both external and campus elements to do so.

77.     After the College adopted its new policies and procedures regarding sexual misconduct in May 2013, it aggressively began to prosecute alleged perpetrators.  On information and belief, in doing so, the College targeted male students of color.  In particular, on information and belief, the only students who have been sanctioned with separation from the College (forced leave, suspension, or expulsion) as a result of allegations of sexual misconduct have been male students of color.  The College proceeded in this fashion in spite of the Special Oversight Committee on Sexual Misconduct's observation in its January 2013 report that the College had a prior reputation for taking "a more punitive attitude toward non-white perpetrators, especially if the victim is white."

<u>**Count I**</u>
<u>**Breach of Contract (v. College)**</u>

78.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

79.     John Doe had a contract with the College, pursuant to which he was entitled to receive a four-year undergraduate education and a degree provided he met all the requirements for graduation, including those imposed under the *Student Handbook*.

80.     With respect to disciplinary matters, John Doe and Amherst had mutual expectations, and the contract required, that the College would follow its own rules, provide a fair and reliable fact-finding procedure, and not act arbitrarily or capriciously.  The *Student Handbook* specifically provided certain rights to students, including to a fair and unbiased hearing, a "fair and impartial evaluation and resolution" of sexual misconduct complaints, and an investigation "committed to maintaining fairness for all parties".  Ex. 1 p. 3, 27, 46-51.  Under Doe's contract with Amherst, unless it was proved that he had committed sexual misconduct,

within the meaning of the College policies, in a fact-finding and decision-making process that met all of the above criteria, then he was entitled to remain at Amherst, complete his education and thereafter receive an Amherst degree.

81.     The *Student Handbook* also guaranteed to John Doe the right to be free from discrimination, including gender and race and national origin discrimination, in connection with his association with the College.  The *Sexual Misconduct Policy* required the College to investigate *all* reports of sexual misconduct and to ensure "consistent applications of the policy to all individuals."  Ex. 1 p. 40.

82.     Amherst breached all of these obligations.

                    Insufficiency of the Evidence and Findings of the Board

83.     Assuming the broadest plausible interpretation of Amherst's policy, the complainant must have proven by a preponderance of the evidence at least:  (a) that the respondent knew that the complainant did not consent; or (b) that he knowingly used force beyond that necessary to perform the sexual act; or (c) that he knew that the complainant was incapacitated and was unable to consent.  The complainant was not incapacitated, so there was no question of (c).  As for (a) and (b), Doe *was* incapacitated, and thus could not be found to have had the knowledge necessary for either theory of liability.   The evidence clearly showed and the board found that Doe was "blacked out."  He therefore could not have had the requisite knowledge.  Although the board noted that "b]eing intoxicated or impaired by drugs or alcohol is never an excuse," a "blackout state" is specifically recognized by the Sexual Misconduct Policy as "a state *beyond drunkenness*," in which the person "do[es] not actually have conscious awareness." (Emphasis added).  Without conscious awareness there cannot be knowledge. Finally, in respect to (b), there was no credible evidence of force beyond what was necessary for

the sexual act, as Doe's movements, according to Doe's testimony, were consistent with the type of sexual conduct involved alone, without greater force.

### Failure to provide a fair or reliable investigative and fact-finding process

84.    As set forth above, there was not a fair or reliable investigative and fact-finding process and Amherst did not follow its own rules.  Without limitation, the complainant lied about and concealed material exculpatory evidence; the investigation was totally inadequate and incompetently performed.  The hearing process was flawed.  Doe was rushed into the hearing, where he was physically quarantined and treated as presumptively responsible.  There was no attempt, nor was there even any procedure, for him to obtain material evidence not disclosed by the complainant until the hearing.  He was denied the advice of a trained lawyer or a competent advisor, and he was not trained or counseled on how to, or in any way in a position to, competently defend himself.

### Discrimination

85.    Amherst was required by its *Sexual Misconduct Policy* to address the undisputed evidence that Jones committed misconduct by knowingly engaging in sex with Doe, who was incapacitated and incapable of giving consent. In expelling Doe, while not even investigating the clear misconduct committed by Jones, Amherst discriminated against Doe because of his gender and his race and national origin.

### Refusal to Reopen

86.    Perhaps worst of all, the refusal of Amherst, once confronted with the suppressed evidence, to take any action to vacate the finding, or to reopen the proceedings or even to reinvestigate, was grossly unfair, arbitrary, and capricious.

87.     As a result of these failures, the plaintiff has suffered a multitude of injuries. Without limitation, he was expelled from the College and denied the opportunity to complete his education and receive his degree.  His reputation has been destroyed: he was publicly labeled a sex offender, declared a pariah too dangerous to be allowed to remain on campus even during the ten days allowed to prepare his appeal, and his academic transcript was permanently marked. His academic and employment prospects—indeed, his entire future prospects—have been drastically limited.   He has suffered and continues to suffer extreme emotional distress.

### Count II
### Breach of Covenant of Good Faith and Fair Dealing (v. College)

88.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

89.     Every contract in Massachusetts contains an implied covenant of good faith and fair dealing, as did the contract between the plaintiff and the College as set out herein.

90.     The College has breached its obligation of good faith and fair dealing in its investigation and response to Sandra Jones's allegations, in its hearing and sanction of the plaintiff, and in its response to the new evidence presented by the plaintiff, which he discovered in the months after the hearing and appeal had concluded.

91.     As a result of the College's breach of the covenant of good faith and fair dealing, the plaintiff has suffered multiple forms of damage, as set forth above.

### Count III
### Tortious Interference With Contract (v. Individual Defendants)

92.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

93.     The individual defendants were aware of the contractual relationship between plaintiff and Amherst as set out above, which encompassed the obligations of each under the *Student Handbook*.

94.     The individual defendants intentionally and maliciously interfered with plaintiff's contractual relationship with Amherst as set out above, including by failing to ensure that the plaintiff received a fair, unbiased, and non-discriminatory investigative and disciplinary process. As a result of the conduct of the individual defendants, Amherst severed its relationship with plaintiff by expelling him from the College.

95.     As a result of the individual defendants' wrongful conduct, the plaintiff has suffered multiple forms of damage, as set forth above.

## Count IV
## 20 U.S.C. § 1681 (Title IX) (v. All Defendants)

96.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

97.     Pursuant to Title IX of the Education Amendments of 1972, plaintiff has a right not to be subjected to university discipline where sex is a motivating factor in the decision to enforce the Honor Code and to impose sanctions.

98.     Title IX requires that federally funded colleges, like Amherst, adopt and follow grievance procedures that provide for "prompt and equitable" resolution of Title IX complaints. *See* 34 CFR §106.8(b).  The U.S. Department of Education advised Amherst and other educational institutions in at least April 2011 that their "prompt and equitable" procedures must provide, at a minimum, certain protections, including "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence."  The Department also advised that throughout an investigation, including at the hearing, "the parties must have an equal opportunity to present relevant witnesses and other evidence."

99.     As described above, the College violated plaintiff's rights when it failed to apply "equitable" procedures to the plaintiff and selectively enforced provisions of the Honor Code

against the plaintiff, in violation of the requirements of Title IX, in spite of evidence that the allegations against him were not credible and, in fact, in spite of the evidence that *Sandra Jones* had violated the Honor Code both in making a false statements, concealing material evidence and in knowingly engaging in sexual activity with the plaintiff when he was incapable of forming consent due to incapacitation.  Amherst declined even to consider or investigate whether Sandra Jones had violated the Code.

100.    Even after the plaintiff presented the exculpatory evidence, the College refused to reopen the investigation and hearing and further refused to report or to investigate whether the plaintiff had been the victim of sexual assault by a female student, on account of gender.

101.    The College has failed to remediate its discriminatory actions against the plaintiff.

102.    As a result of the College's actions and omissions, the plaintiff has suffered multiple forms of damage, as set forth above.

### Count V
### 42 U.S.C. § 1981 (v. All Defendants)

103.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

104.    Under 42 U.S.C. § 1981, plaintiff has a right to enjoy all the benefits, privileges, terms, and conditions of his contractual relationship with Amherst free of discrimination on the basis of race.

105.    As discussed herein, Amherst, with the assistance and participation of the individual defendants, discriminated against the plaintiff, a first-generation Asian-American and son of immigrant parents, on the basis of race in its performance of its contractual obligations to plaintiff, including through its discriminatory enforcement of and/or performance under the *Student Handbook* through its handling of Sandra Jones's complaint, the investigation and the hearing, and through its treatment of plaintiff after the hearing.

106.    Amherst also discriminated against the plaintiff through its failure to report or to investigate Sandra Jones for violations of the *Student Handbook*, including after plaintiff provided evidence that required the College to take action at least by the spring of 2014, while Sandra Jones was still a student at Amherst.

107.    The College has failed to remediate its discriminatory actions against the plaintiff.

108.    As a result of the College's actions and omissions, the plaintiff has suffered multiple forms of damage, as set forth above.

### Count VI
### Massachusetts Civil Rights Act (G.L. c. 12, §§ 11H, 11I) (v. All Defendants)

109.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

110.    The plaintiff has the right to an education through Amherst, a federally funded school, free from discrimination on the basis of race or gender.  This includes the right to an investigatory and disciplinary process that is free from discrimination.

111.    As discussed above, from October 2012 through the date of plaintiff's expulsion from Amherst, the College was under intense and threatening, intimidating and coercive pressure from student activists and through on-campus demonstrations and vigils to identify and to expel a male student for sexually assaulting a female student.

112.    LR was involved in and led several of these efforts.  As a result of her activism, LR was placed on the Special Oversight Committee on Sexual Misconduct.  She precipitated and supported Sandra Jones's complaint to the point of giving false testimony that John Doe had admitted to sexually assaulting Sandra Jones.

113.    The College and the individual defendants capitulated to and gave effect to the threats, intimidation and coercion by conducting an unfair, inadequate, discriminatory and biased investigation and hearing into allegations that John Doe had engaged in sexual misconduct with

28

Sandra Jones.  In doing so, the College and the individual defendants interfered in John Doe's rights.

114.    The defendants further capitulated to and gave effect to the threatening, intimidating and coercive elements on campus when they issued the all-campus notification in January 2014, which violated plaintiff's right to privacy in revealing enough substantial detail so as to make plaintiff easily identifiable as the student who reportedly engaged in sexual misconduct and was expelled from Amherst.

115.    The conduct described herein was in violation of the Massachusetts Civil Rights Act, G.L. c. 12, §11H.

116.    As a result of the violations of the statute, the plaintiff has suffered multiple forms of damage, as set forth above.

**Count VII**
**Defamation (v. All Defendants)**

117.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

118.    On January 16, 2014, the defendants published a campus-wide electronic notification, which stated that "after a full hearing on the matter in December, a hearing board found, by a preponderance of evidence, that an Amherst College student violated Amherst College's Sexual Misconduct Policy by committing sexual assault.  As a result of this finding, the Hearing Board determined that the student be expelled from Amherst College."

119.    The published notification also stated, "Expulsion means the permanent termination of student and degree-candidate status at Amherst College.  Expelled students are not allowed on campus."

120.    Although the electronic notification did not identify John Doe by name, it was widely known on campus that this notice was of and concerning John Doe.

121.     The statements in the alert were false and defamatory, and held John Doe up to scorn and ridicule in his community.

122.     The statements in this notification were republished outside of Amherst, including in the Mount Holyoke News.  The student paper cited the electronic notification, reporting that it stated the student was "accused of sexual misconduct, found guilty by a hearing board and sanctioned with expulsion from the school."  Even people at Mount Holyoke knew this was of and concerning John Doe, as one of his friends from that school contacted John Doe after reading the story to inquire about the incident.

123.     Further, the defendants marked John Doe's transcript with the words, "Disciplinary Expulsion"—referencing John Doe's expulsion for sexual assault.  This transcript has been published to College employees and others, and it will follow John Doe throughout his life, preventing him from having meaningful educational or employment opportunities.

124.     The finding that John Doe had committed sexual assault was the product of an investigation and disciplinary process that was so flawed that none of the defendants could reasonably rely upon it to arrive at anything close to the truth.

125.     The defendants' reliance on the investigation and disciplinary process to publish the defamatory statements was negligent and/or in knowing or reckless disregard of the truth.

126.     As a result of this false and defamatory publication, the plaintiff has suffered multiple forms of damage, as set forth above.

**Count VIII**
**Intentional Infliction of Emotional Distress (v. All Defendants)**

127.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

30

128.   The conduct of the defendants, as described above, was extreme, outrageous and beyond the scope of common decency and were intended to cause plaintiff severe emotional distress.

129.   As a result of the defendants' conduct, plaintiff has suffered severe emotional distress for conduct which no reasonable person should be expected to endure.

### Count IX
### Negligent Infliction of Emotional Distress (v. All Defendants)

130.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

131.   Alternatively, the defendants acted negligently in breach of duties of care owed to the plaintiff as set out above.

132.   The defendants' negligence caused the plaintiff emotional distress with physical manifestations, distress which any reasonable person would have suffered under the same circumstances.

### Count X
### Injunctive Relief (v. College)

133.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

134.   As set out above, the plaintiff is likely to prevail on his claims against the College.

135.   The investigation and hearing was fundamentally flawed.  Further, the evidence uncovered by the plaintiff undercuts the College's finding that plaintiff engaged in sexual misconduct by a preponderance of the evidence and it requires, as a matter of equity, that the College be ordered to remove the "Disciplinary Expulsion" notation from the plaintiff's transcript, that the College restore the plaintiff to his prior status and permit plaintiff to complete his studies and receive his degree, and that the College take all appropriate action to correct

31

statements published by the defendants stating or implying that John Doe had committed sexual assault.

**WHEREFORE**, plaintiff John Doe respectfully requests that the Court grant him the following relief:

1.    Enter the requested permanent injunction against the College;

2.    After trial, enter judgment for the plaintiff on each Count of the complaint and award him damages in an amount determined at trial, including attorney's fees, costs and interest; and

3.    Grant such other relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiff John Doe hereby demands a trial by jury on all claims so triable.

JOHN DOE,

By his attorneys,

/s/ Max D. Stern
Max D. Stern (BBO #479560)
mstern@toddweld.com
Megan C. Deluhery (BBO #655564)
mdeluhery@toddweld.com
Hillary A. Lehmann (BBO #683657)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

Dated: May 29, 2015

4821-5713-6164, v. 2

32