# AUDIO TRANSCRIPTION CENTER

Division of The Skill Bureau



129 Tremont St. • Boston, MA 02108 • Tel: 617-423-2151
AUDIOTRANSCRIPTIONCENTER.COM

## CERTIFICATE

I, Patrick Emond, do hereby certify that the following 145 pages embody a true and accurate transcript. Prepared in the Audio Transcription Center to the best of our abilities, they comprise the requested portions of the CD-ROM provided to us by our client, Todd & Weld LLP. The CD contained a hearing held on December 12, 2013 of the Sexual Misconduct Hearing Board at Amherst College, in the matter of John Doe

3/31/2015
Date

Patrick Emond, Operations Manager
Audio Transcription Center

John Doe   Hearing, 12/12/2013                          Page 1
Sexual Misconduct Hearing Board, Amherst College

1   F1:  OK.

2   JAMES LARIMORE:      Uh, OK.  Um, my name is Jim Larimore.  I'm

3       the dean of students here at Amherst College and I'll serve

4       as the chair for the -- uh, for this hearing.  The Sexual

5       Misconduct Hearing Board is assembled here today, Thursday,

6       December 12, 2013 to hear the case of John Doe  , who's

7       charged with violation of the honor code, specifically the

8       sexual misconduct policy, uh, and, uh -- and -- and more

9       specifically, uh, sexual assault.  I want to remind folks

10      who are participating in this process today that this

11      hearing is strictly confidential.  And I want to remind all

12      members of the board, the student who's a subject of the

13      complaint, the person filing the complaint, witnesses, and

14      any other person present at this point during this hearing,

15      that you're all reminded that this hearing is -- is

16      confidential.  No one should discuss anything that they see

17      or say or hear during the hearing with individuals that are

18      not directly, uh, connected to this hearing.  This process,

19      the hearing process, will also be private, uh, and when

20      directed by the chair, all witnesses and others without

21      responsibilities for the hearing will be requested to leave

22      the room.  Uh, both parties have met with the Dean of

23      Student Conduct and have been informed of the procedures

1 that the Sexual Misconduct Hearing Board will be following

2 through this hearing and have also been informed of the

3 following rights: the right to present information

4 regarding the alleged complaint, the right to a fair and

5 unbiased hearing, the right to present witnesses who have

6 relevance to the complaint, the right to select a trained

7 advisor from a list provided by the Dean of Student

8 Conduct, and to have the advisor present, uh, with them

9 during the hearing.  And just to remind the advisors that

10 the advisor may not participate directly in the

11 proceedings.  Um, no legal representation is allowed to be

12 present during the hearing, as well.  The right to be

13 present during the hearing and to conduct with an advisor

14 during testimony.  Uh, you have the right to question

15 witnesses and to respond to all written testimony.  The

16 right to prepare an impact statement to be considered by

17 the Sexual Misconduct Hearing Board, uh, while it's

18 determining sanctions if, and only if, the respondent is

19 found responsible.  The right to appeal the final decision

20 of the Sexual Misconduct Hearing Board, uh, in accordance

21 with the appeal procedures that are outlined in the student

22 handbook, as modified by the Amherst College 2012-13

23 student conduct process modifications that was previously

1       given, uh, to the parties.  Uh, now I'd like to take a few

2       moments for us to, um -- to go through some introductions.

3       And I'd like to begin by asking the members of the Sexual

4       Misconduct Hearing Board, uh, if you all would please

5       introduce yourselves.

6   TODD PORTER:   Hi, my name is Todd Porter.  I'm the Associate

7       Director of Residential Life at Mount Holyoke College.

8   IRANIA MUNIZ:  Irania Muniz (sp?).  I am a hall director for

9       Hampshire College.

10  ERIC HAMAKO:   Hi, my name is Eric Hamako.  I'm the program

11      coordinator for the Office of Institutional Diversity and

12      Equity at Smith College.

13  JAMES LARIMORE:   OK, great, thank you.  I'd now like to ask

14      the complainant if, uh, she would please introduce herself.

15  Sandra Jones :  I'm Sandra Jones (sp?).  Um, that's all.  Well --

16      well, I'm the -- well, I'm -- I'm the complainant.

17  JAMES LARIMORE:    Right.  And your class year?  Uh, your class

18      year or --

19  Sandra Jones :  Oh, I'm a senior.

20  JAMES LARIMORE:   OK.  Senior.  OK, great.  Thanks, S.J. .  OK.

21      And will the respondent please introduce himself.

22  John Doe :   I'm John Doe .  I'm a senior.

John Doe   Hearing, 12/12/2013                          Page 4
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK, great.  Uh, just want to note for, uh,

2        everyone, um, participating in the hearing that, um, Ms.

3        Jones requested, and I've approved, and Mr. Doe has agreed

4        to an accommodation that, uh, involves another person, uh,

5        to, uh, read aloud some of the comments and questions, um,

6        from Ms. Jones if that, um, is, um, is needed.  And I'd

7        like to ask if -- if you would introduce yourself.

8   E.B.        :    I'm E.B.          (sp?).  I'm also a

9        senior.

10  JAMES LARIMORE:    Great, thank you.  OK.  Now, I'd like -- now

11       to ask all of the witnesses, advisors, and other, uh,

12       people present to introduce themselves and the state -- uh,

13       for whom they've had -- agreed to appear or what their role

14       is in the process is.  And Professor Cobham-Sander, would

15       you --

16  RHONDA COBHAM-SANDER:    I'm Professor, uh, Rhonda Cobham-Sander

17       and I'm here as, um, S.J.'s , um, advisor.

18  JAMES LARIMORE:    OK, thank you.

19  L.R.        :    I'm L.R.          (sp?) and I'm here as S.J.'s

20       witness.

21  JAMES LARIMORE:    Mm-hmm.  OK, thanks.

John Doe   Hearing, 12/12/2013                    Page 5
Sexual Misconduct Hearing Board, Amherst College

1    SUSIE MINCHANNON:   I'm Susie Minchannon (sp?), the Dean of

2         Student Conduct and responsible for the tape recordings and

3         will be ushering people in and out as the board calls them.

4    LISA RUTHERFORD:   I'm Lisa Rutherford.   I'm the general

5         counsel for Amherst College and I'll be assisting Jim with

6         procedural issues.

7    ALISON KIRKER: I'm Alison Kirker (sp?).   I'm the investigator

8         who the college retained to, uh, interview witnesses and

9         draft a report.

10   JAMES LARIMORE:   OK.

11   LAURIE FRANKL: I'm Laurie Frankl.   I'm the Title IX coordinator

12        at Amherst College.

13   E.K.        : I'm E.K.        and I'll be serving as a

14        witness.

15   N.K.     :    N.K.        .   I'm a senior.   I'm just here as a

16        witness.

17   JAMES LARIMORE:   Mm-hmm.

18   R.M.     : R.M.        (sp?).   I'm a senior.   I'll be a

19        witness.

20   JAMES LARIMORE:   OK, thank you.

21   TORIN MOORE:   Uh, Torin Moore, from the Dean of Students

22        Office, Director of Residential Life and Housing, and

23        currently advisor to John Doe  .

1    JAMES LARIMORE:       OK, thank you all.  Um, now I'd like to ask

2        all of the witnesses -- um, actually let me check

3        (inaudible).  Um, OK.  Uh, now we want to share some

4        information with you all about the hearing process that --

5        that we're about to begin.  Um, the hearing will be guided

6        by the following procedures.  The complainant and

7        respondent, uh, will submit all of their questions that

8        they wish -- wish to ask, uh, directly of each other to me

9        as the chair and I'll, uh, determine if each question is

10       relevant and, uh -- and either ask the question on behalf

11       of the questioning party or -- or reject it.  Uh, other

12       questions you, uh, each are free to ask if you have

13       questions that you'd like to ask of the investigators or

14       other witnesses, you can ask those directly without, uh,

15       channeling those through me.  But I -- I will be making

16       judgments and rulings about the relevance of -- of the

17       questions that might come up.  Uh, the investigator will be

18       allowed, uh, 20 minutes to provide her report.  Uh, the

19       board will have the opportunity to question the

20       investigator.  The complainant and the respondent will have

21       the opportunity to ask questions of the investigator.  Uh,

22       the complainant will then be allowed 15 minutes or up to 15

23       minutes to present a statement.  The board will have the

1    opportunity to ask questions of the claimant and

2    respondent.  Uh, we'll also have the opportunity to ask

3    questions of the complainant.  The respondent will then be

4    allowed up to 15 minutes to present a statement and the

5    board will have the opportunity to ask questions of the

6    respondent and the complainant will also have the

7    opportunity to ask questions of the respondent.  The -- if

8    there's additional time that is needed, uh, then I'll make

9    a decision about the appropriateness of that and I'll try

10   and accommodate you both as -- as much as I possibly can.

11   The complainant's witnesses will appear individually and

12   the complainant, uh, will question each witness.  The board

13   will have the opportunity to ask questions of the witness

14   and then the respondent will also have the opportunity to

15   ask questions of the witness.  Whi-- so this applies to the

16   complainant's witnesses.  And the opportunity to ask any

17   additional questions will be allowed prior to the witness

18   being dismissed.  And that -- this procedure, uh, will be -

19   - um, will continue until each of the complainant's

20   witnesses has been -- has appeared.  Uh, the respondent's

21   witness will, um, uh, appear individually and we'll follow

22   the same process.  The respondent will, uh, have an

23   opportunity to ask questions of the witness.  The board

1    will have the opportunity to ask questions of the witness

2    and then the complainant will also have the opportunity to

3    ask questions of the witness.  We'll then provide an

4    opportunity for any additional questions to be asked

5    before, um, the witness is dismissed and the procedure will

6    continue along the same lines until each of the

7    respondent's witnesses have appeared.  If requested by

8    either party or the board, the investigator will be

9    available again, uh, later in the hearing process for any

10   additional questions.  And I'd just like all, uh, of you to

11   know that the board reserves the right to ask questions at

12   any time, uh, during this process.  Time limitations are

13   approximate.  I -- I think you all will know that and may

14   be extended at the discretion of the chair.  The board

15   insists on honest and forthright, um, responses to its

16   questions.  And we may -- uh, uh, you should know the board

17   may recommend penalties, including suspension or dismissal,

18   for any witness who's found responsible for not being

19   truthful or for being intentionally misleading, uh, to the

20   board.  Advisors are reminded that they do not possess the

21   right, uh, to address the board, the witnesses, or the

22   opposing person.  Advisors are present solely for the

23   purpose of advising the student and shall not otherwise

1        participate in the hearing.  All parties are reminded that

2        they cannot speak unless they've been recognized by the

3        chair and I'd ask that you please not interrupt each other

4        or speak over each other.  And, uh, as -- as you probably

5        noticed, there are tape recordings, uh, that are being

6        made.  So all -- a record of this hearing is going to be,

7        uh, made -- or will be made by the dean of student --

8        student conduct by tape recording and copies of these are

9        available, um, through the Dean of Student Conduct.  OK.

10       Before we begin, uh, the hearing process itself, I'm going

11       to make sure that, uh, all of the procedures that I've

12       outlined are understood and see if any of you have

13       questions at this point about the process.

14   John Doe   :   Uh, do I need to use the laptop?

15   JAMES LARIMORE:    Uh, so -- (inaudible).

16   SUSIE MINCHANNON:   So the -- the purpose of the laptop in front

17       of you, um, John   , is to allow you to communicate dir--

18       directly to Dean Moore when you're asking questions of

19       S.J. .

20   JAMES LARIMORE:    Larimore.

21   SUSIE MINCHANNON:   Dean Moore did I say?

22   JAMES LARIMORE:    Yeah.

John Doe   Hearing, 12/12/2013                    Page 10
Sexual Misconduct Hearing Board, Amherst College

1   SUSIE MINCHANNON:   I'm pointing at you, saying Dean Moore.   I'm

2        sorry.   So you are allowed to ask questions directly to the

3        investigator, directly to any of the witnesses.   But if you

4        have questions specifically for S.J. , you are not allowed

5        to address her directly so I've set up a Google Chat

6        between you and Dean Larimore.   Um, he can respond to you,

7        you can respond to him.   The -- and, um, no one else will

8        see that.

9   John Doe   :    Uh, should this be logged in?

10   __:   Yeah, he needs to get online.

11   SUSIE MINCHANNON:    OK, yeah.   We'll log in.

12   __:   OK.

13   JAMES LARIMORE:    OK, great.   Any other questions about the

14        procedures?   No, OK.   Uh, then at this point I'd like to

15        ask that all of the witnesses and those that are not

16        directly, uh, connected to the next phase of the hearing,

17        if you would, uh, please leave the room and, uh, if you

18        will stay where you've been -- um, been asked to wait, then

19        you'll be called when it's time for you to present your

20        statement.   Thank you.   Ok.   As -- as, um, we begin, I just

21        want to acknowledge that, uh, you know, that, um, I

22        understand that this has been a very difficult, um, process

23        for both the complainant, uh, and the respondent.   Uh,

1        today during the course of this hearing, uh, you may be

2        asked questions that will make you feel uncomfortable and I

3        apologize for that -- for that.  Uh, the importance of this

4        is that the -- uh, this is a fact-finding, uh, hearing, and

5        the committee -- the hearing panel really needs to be able

6        to ask questions that will help, uh, each of them, uh,

7        understand the situation as completely as they possibly can

8        but also add that, uh, there are times in other hearings

9        that I've participated in when hearing panel members may

10       ask, uh, a devil's advocate question without, uh, labeling

11       it as such and so I'd encourage you not to try and draw any

12       conclusions or inferences about, uh, what the hearing panel

13       members might be thinking, uh, based on the questions that

14       they ask.  The -- the purpose of this is really to try and

15       establish as firm an understanding of the facts as we

16       possibly can.  Uh, while the members of the hearing board

17       will try to be sensitive in their questioning, it's

18       important for them to receive the information that they

19       need so that they can make the judgment and determinations

20       that -- that the college has asked them to make.  Uh, so it

21       -- now I think at -- at this point in the process -- we'll

22       wait for Susie.

23   SUSIE MINCHANNON:   OK, thank you.

1   JAMES LARIMORE:    OK.  You -- either of you have any questions

2       then before we begin the hearing process?

3   John Doe :   No.

4   JAMES LARIMORE:    OK.  So, Susie, I think we're ready to begin

5       with, um, the investigator.

6   SUSIE MINCHANNON:  OK, great.  Um, so this -- I will have it --

7       oh, you have it.  No?  How did that happen?

8   John Doe :    Is this supposed to be a chat?

9   SUSIE MINCHANNON:  Yeah, there should be a chat.  Um...  I --

10      and I'm not a Mac person.  I have no idea how to pull up a

11      chat.  IT's on their way over.  OK.  So we'll have that

12      setup before you -- your -- you are asking questions of

13      her.  We don't need that right now.  OK?

14  John Doe :   Yeah.

15  SUSIE MINCHANNON:  All right, very good.

16  JAMES LARIMORE:    Thank you.  And just -- when the IT person

17      gets here we'll, uh, pause the proceeding so they can come

18      take care of business and then leave before we resume.  OK.

19  ___:  (inaudible).

20  JAMES LARIMORE:    I believe she's down here.  Yeah.  The

21      witness.

22  ___:  Oh.

23  JAMES LARIMORE:    Um, (inaudible).

John Doe   Hearing, 12/12/2013                    Page 13
Sexual Misconduct Hearing Board, Amherst College

 1   __:  Got it.

 2   JAMES LARIMORE:     Yeah.

 3   __:  (inaudible).   There you are.

 4   JAMES LARIMORE:     Ok.  Um, if you all are ready we'll begin

 5        the process.  All right?  OK.  And, uh, Alison, thank you

 6        for joining us.  I'd like to, um, ask if you would now

 7        present the complaint, response, and the summary of

 8        information, uh, contained in the report that you've

 9        provided.

10   ALISON KIRKER: Sure.  I'm happy to.  I'd like to start off by

11        saying that, um, each of the students and one former

12        student who I interviewed were, um, all, uh, very good

13        about participating in the interview.  So I met -- the --

14        the way I started off my investigation was to, um, read the

15        complaint files.  So I read, um, S.J.'s  complaint and then

16        John's   response to the complaint and, um, I understood

17        that they both had identified witnesses who they believe

18        had relevant information.  So I started off by meeting with

19        S.J.  and with, um, her advisor and she, um, took me through

20        what had happened that evening from her perspective and,

21        um, so would -- would you like me to summarize, um...

22   JAMES LARIMORE:     Mm-hmm.  Yes, yes.

23   ALISON KIRKER: OK.

1    JAMES LARIMORE:      Yes, I do.  Yeah.

2    ALISON KIRKER: So, um, from Ms. Jones's   perspective, the

3          evening, um -- the sexual encounter had started off

4          consensually.  She and Mr. Doe had run into each other at,

5          um -- in a common room, I believe in the Morris and Pratt

6          Dormitory and they left, um -- they left there together and

7          went to her dorm room.  She said that they, um, were

8          kissing and that at first she was OK with that.  Um, and --

9          and she told me that at a certain point she started to feel

10         uncomfortable.  Um, they were, um -- initially she

11         performed oral sex on him that was consensual.  She said

12         that it became non-consensual at a certain point when, um,

13         she felt that Mr. Doe was bragging that he had had, uh, a

14         sexual relationship with both the complainant, S.J. , as

15         well as with her roommate and that it -- it was that that

16         made her no longer feel as though she wanted to be, um, in

17         this -- in the, uh, sexual encounter with him any longer.

18         I asked her to describe for me what she had done to

19         demonstrate to him that it was no longer consensual.  Um,

20         and she said, um, that she pushed him back, that she had

21         used her, um, hands to try to push herself away from him.

22         Um, but that after a certain amount of -- after a while

23         she, um -- and these are her words, "Just wanted it to be

1        over and allowed him to finish."  Um, at the time, Mr. Doe

2        was sitting up on her bed and she was sort of lying down.

3        Um, when I asked her what she meant by, "Just let him

4        finish," and whether that meant that she, um, finished

5        giving him oral sex until he ejaculated and she said, yes,

6        that's what she had meant.  Um, she said that she had said

7        no to him on several occasions and that his response was,

8        "Come on, it's no big deal."  Um, that after, um, the

9        sexual encounter ended, Ms. -- um, Mr. Doe went to the

10       bathroom.  Um, she doesn't believe that he was wearing any

11       clothes at that time.  Um, when he was in the bathroom Ms.

12       Jones  took Mr. Doe's clothes, ID, and wallet and, um,

13       threw them outside of her dorm room and locked the door.  I

14       asked whether he had knocked on the door to come back in.

15       She said that he hadn't but that she heard him collecting

16       his belongings.  Um, the next day, um, Ms. Jones  reports

17       that Mr. Doe came to her room in search of his missing

18       phone, that they, um, had a brief discussion about the

19       phone but not about anything that had happened the previous

20       evening.  Um, the only other communication the two had with

21       each other were some -- uh, a few text message exchanges

22       that were about two issues, one being the missing phone and

23       two being Mr. Doe asking Ms. Jones  whether she was going

1       to tell her roommate about what had happened between the

2       two of them, because Mr. Doe was involved with Ms. Jones's

3       relation-- or, uh, sorry, was involved in a relationship

4       with Ms. Jones's  roommate.  Um, Ms. Jones did not tell

5       anyone immediately thereafter about what had happened with

6       Mr. Doe   Um, she didn't keep a journal or send emails

7       about it.  Um, about two months later she informed J.M.

        (sp?), who is an Amherst College class of 2012

9       graduate, and they were in the same choir group together.

10      So she told J.M.     about what had happened and was very

11      upset when she told N.M.     about this.  Um, she also told

12      P.T.      and L.W.     (sp?).  I'm not sure about their

13      class years.  Um, she reports that these two individuals,

14      P.T.      and L.W.   , were angry with her, with Ms.

15      Jones  because she had hooked up with Mr. Doe  who was, um,

16      involved with her roommate.  When Ms. Jones , um, the

17      following semester was studying in London she wrote an

18      article for the AC Voice about this experience.  Um, I read

19      the article.  And, um, my impression of the article was

20      that it focused on the reaction of, um -- or it was

21      primarily about the reaction of her friends when she told

22      them about the sexual assault more than it was about the

23      assault itself.  Um, Ms. Jones   also told me that she was

1    approached by L.R.        , L.R.          , who is a witness

2    for her today.  And that L.R.        told Ms. Jones   that

3    Mr. Doe had approached her, her being L.R.         , and had

4    in some way admitted that he had assaulted, um, Ms. Jones

5    and that she, L.R.        , would be willing to be a witness

6    for Ms. Jones  if Ms. Jones  decided to pursue, um, a

7    disciplinary hearing, uh, regarding this matter.  Um,

8    finally I asked Ms. Jones   what she would like to have, um

9    -- what results she would like to have from this hearing,

10   uh, or from the disciplinary process and she said that she

11   wanted Mr. Doe expelled from the college because she

12   believes that he will, uh, commit another act of sexual

13   misconduct.  I also interviewed Mr. Doe and, uh, he reports

14   being very intoxicated on the evening in question and

15   essentially has no memory of what happened.  Um, that is he

16   does not remember having any, um, sexual conduct with Ms.

17   Jones  and so he was unable to confirm or deny her specific

18   allegations.  The, um -- the focus of the interview with

19   Mr. Doe was that he wanted, um, to con-- to address, um,

20   how he felt when he found out about Ms. Jones's   complaint

21   about him and that she viewed their sexual encounter as

22   being nonconsensual and how distraught he was when he

23   learned that, um -- that he doesn't see him-- that he sees

1     himself as someone who is very empathetic.  These are his

2     words.  And that he doesn't see himself of being capable

3     of, um, doing something physically or emotionally to a

4     person such as what Ms. Jones l, uh, described.  Um, he

5     identified a number of witnesses who he spoke to in sort of

6     the days and weeks following, um, his discovery that Ms.

7     Jones  found -- um, or believed that their sexual encounter

8     was not consensual and, um, he learned about that from the

9     *AC Voice* article that a friend pointed out to him.  The --

10    the people he identified as having -- that he spoke to were

11    his roommate, N.K.     , um, E.K.          , who he was

12    involved with at the time.  Though I don't believe he spoke

13    to her right away.  I think they had email communications

14    or Facebook communications about it.  E.H.      (sp?) was

15    one of the first pers-- one of the first people that he

16    spoke to and, um, he wanted each of these people to speak

17    about his reaction in the days and weeks following his

18    discovery.  I asked Mr. Doe questions about his

19    conversation with L.R.      and he said that he reached,

20    um, out to her because she was a strong advocate against

21    sexual misconduct on campus and he was seeking her advice

22    about what he could do to, um, understand where Ms. Jones

23    was coming from and what he should do to make things right.

1      Um, Mr. Doe told me that no one has ever accused him of

2      anything like this in the past and that he has not had any

3      interactions with Ms. Jones  since they exchanged text

4      messages shortly after the evening in question.  Um, as I

5      said, I also interviewed a number of witnesses that both

6      the complainant and the respondent identified as having

7      relevant in-- um, information.  The first witness is E.H.

       and she is, um, a friend of Mr. Doe's .  She, um, is

9      not now and never was involved with him in a sexual or

10     romantic way.  She reports that after Mr. Doe learned of

11     the allegations about him, he was "shaken to his core" are

12     her words, and very caught off-guard.  She reports that his

13     reaction to the possibility of this accusation was horrible

14     for him and that he got very depressed.  Um, she describes

15     him as a very caring person who has supported her when she

16     struggled with, um, an emotional issue of her own.  Uh, she

17     does not know of any other allegations against him and

18     describes him as -- uh, or -- or knows of women who have

19     had sexual relationships with him who have described him as

20     sweet. E.K.         was the second witness who I

21     interviewed.  She was Ms. Jones's   roommate at the time and

22     was, um, in a very casual dating relationship with Mr. Doe

23     She was off-campus at the time of the alleged sexual

John Doe   Hearing, 12/12/2013                    Page 20
Sexual Misconduct Hearing Board, Amherst College

 1       assault at a squash meet.  When she came home that Sunday

 2       Ms. Jones told her that she and Mr. Doe had kissed and

 3       that she felt -- Ms. Jones felt bad about it.  When Ms.

 4       E.K. spoke to Mr. Doe about what had happened, he told

 5       her that he didn't remember anything and that he was very

 6       sorry about what had happened.  Uh, E.K. said that

 7       she did not learn about Ms. Jones's feeling that the

 8       sexual encounter was nonconsensual until someone forwarded

 9       -- forwarded the *AC Voice* article to her attention when she

10       was also studying abroad.  E.K. could not think of

11       any reason that Ms. Jones would have to fabricate an

12       allegation against Mr. Doe with the exception that

13       perhaps, um, she was upset because she'd lost her group of

14       friends, who mostly sided with E.K. because she had

15       been involved in a relationship with Mr. Doe I also spoke

16       with N.K., who was Mr. Doe's roommate at the time of

17       this incident.  He, uh -- he was... He and Mr. -- N.K.

18       and Mr. Doe were together in their room on the fourth floor

19       of the Morris and Pratt dormitory on the -- the night in

20       question and they heard people in the common room and so

21       left their room to see who was there.  And he remembers

22       that Ms. Jones was there, along with Ms. R.-- R.M. and,

23       um, so they were hanging out in -- in the common room.  Uh,

1        N.K.     witnesses Ms. Jones  and Mr. Doe hooking up and

2        then getting on the elevator together, he believed to go to

3        her room.  He did not hear Mr. Doe come back to the room

4        that evening.  The next morning Mr. Doe couldn't find his

5        phone and N.K.     suggested that Mr. Doe go look in Ms.

6        Jones's   room and it was then that N.K.     told Mr. Doe

7        that he had hooked up with Ms. Jones    the night before.  He

8        describes -- he, Mr. Doe describes Mr. Doe as being

9        baffled because he did not remember that he had hooked up

10       with Ms. Jones · N.K.      first learned of Ms. Jones's

11       allegations when a friend told him about the AC Voice

12       article and he described Mr. Doe as being very upset that

13       someone thought he had done something wrong by them.  Uh,

14       L.R.      was another witness who I interviewed and she

15       was identified by Ms. Jones  as someone who had relevant

16       information.  Uh, according to L.R.      ι, about two weeks

17       after the AC Voice article appeared, Mr. Doe contacted her,

18       first by email, to, um -- to get some advice from her.  And

19       L.R.       believed that he sought her out because she's a

20       sexual respect advocate on campus and has done a lot of

21       things that have been very public with respect to sexual

22       assault awareness and prevention.  Um, she reports that Mr.

23       Doe uh, told her that he thought he had assaulted a girl

1    and asked what he should do about it.  She asked him for

2    more detail about what he thought had happened and what her

3    response had been.  Um, he told L.R.        that he had

4    been very drunk and explained that he had been in the

5    common room with a girl, that he knows they had sex but

6    does not remember a lot of it.  Um, according to Ms.

7    L.R.    , Mr. Doe asked what he should do about the

8    situation and she told him that he should seek counseling

9    and should learn as much about sexual assault as he could

10    so that he did not repeat his action again.  Um, he asked

11    L.R.       if he should apologize to Ms. Jones   and she

12    advised him not to because to do so would be retriggering

13    and that Ms. Jones  probably did not want to engage with

14    him.  Um, L.R.       contacted Ms. Jones ⎮ the day after

15    her conversation with Mr. Doe  She said that she did not

16    tell Ms. Jones  specifically what Mr. Doe had said but that

17    if she wanted to go for-- if she, Ms. Jones , wanted to go

18    forward with the case, she should know that L.R.

19    could be a witness for her.  I was and still am confused

20    about parts of L.R.      's testimony, specifically her

21    position that Mr. Doe admitted that he had sexually

22    assaulted someone.  And I asked Ms. -- L.R.     ⎮ how she

23    drew that conclusion.  And I was confused as to whether Ms.

1    L.R.    was saying that Mr. Doe said, "I think I sexually

2    assaulted someone," or "I fear I sexually assaulted someone

3    because that's what she and others are telling -- or are --

4    are saying." And, um, L.R.    's response was that her

5    retelling of the situation was confusing because Mr. Doe's

6    telling -- um, telling of the story to her was confusing.

7    Um, she thinks that he actually went back and forth between

8    those two different statements, one being admission because

9    that's what he believed he did versus fear that he had done

10   this because this is what others were telling him had

11   happened.  Um, another question I had about L.R.    's

12   testimony was that she told -- was that she reported that

13   Mr. Doe told her that the event with Ms. Jones   was

14   something he didn't like to recall, even before he heard

15   rumors of anything else because it was an unpleasant

16   experience and an experience where he felt out of control.

17   Um, I had questions about that statement because according

18   to Mr. Doe and the witnesses who he identified as having

19   relevant information, he had no memory of anything that had

20   happened that night, prior -- or he still does not have any

21   memories of anything that happened that night and didn't

22   know that, um, anything potentially bad had happened until

23   he read the *AC Voice* article.  Um, I spoke to J.M.    ,

John Doe   Hearing, 12/12/2013                        Page 24
Sexual Misconduct Hearing Board, Amherst College

1     who confirmed that Ms. Jones had talked to her about the

2     alleged sexual assault about two months after it happened.

3     Um, she described Ms. Jones as being very upset when she

4     saw Mr. Doe at, uh, a party.  I believe at the time Mr. Doe

5     was part of the Glee Club and Ms. Jones was part of the

6     choir and the groups, um, either had a combined party or

7     members of the choir and the Glee Club were there together.

8     And J.M.       provided information about Ms. Jones's

9     reaction when she saw Mr. Doe and how upset she was.  Um,

10    she reported that Ms. Jones did not share any of the

11    specific details about the sexual assault.  She -- J.M.

12    and Ms. Jon-- Jones talked about Ms. Jones's reluctance

13    to do anything about the alleged sexual assault because Ms.

14    Jones had known people who had been raped and not

15    believed.  And J.M.      offered Ms. Jones whatever support

16    she could provide.  She said that they didn't discuss, um,

17    the situation very often but that, um, J.M.      tried to be

18    helpful and to be a good friend to Ms. Jones if there were

19    ever situations where Ms. Jones and Mr. Doe were at the

20    same social gathering.  I spoke to, um, R.M.  (sp?) and I'm

21    -- I'm sorry if I'm not pronouncing her last name right.

22    R.M. -- R.M.    maybe.  And she was identified by Mr. Doe

23    and he was the last person who I interviewed when I was on

1    campus conducting interviews.  So I int-- interviewed R.M.

2    by phone later, a couple of days later.  She just -- she

3    was in the common room that evening with Ms. Jones  and Mr.

4    Doe and describes Mr. Doe as barely able to stand, that he

5    threw himself at Ms. Jones  -- Jones  and that she

6    reciprocated. R.M.         was, uh -- was, um, wanting to

7    address two points.  One, Mr. Doe's reaction following his

8    discovery that Ms. Jones  believed that their interaction

9    had been nonconsensual and that, um, she described Mis--

10   Mr. Doe as being shocked.  She also wanted to clarify that,

11   um, she believes it was a misunderstanding with respect to

12   her position or -- or Ms. Jones's  belief that R.M.     --

13   R.M.  didn't believe her.  Um, he was making the

14   distinction between -- or she thought that Ms. Jones  was

15   saying that the sexual encounter was not consensual ever

16   and R.M.     was saying that, um, she -- she was saying

17   it was consensual at the beginning because that's what she

18   witnessed, was the two being consensual together in the

19   common room, but that she was not taking a position on

20   whether it was or was not consensual once they went to, um,

21   Ms. Jones's  room.  Um, so those -- that's a summary of --

22   of my report.  And I think I have gone over my -- my

23   impressions --

John Doe    Hearing, 12/12/2013                    Page 26
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:     Mm-hmm. Mm-hmm.

2   ALISON KIRKER: -- while I summarized the report so I'm happy to

3        answer any questions.

4   JAMES LARIMORE:     OK.  Well, thank you.  So let's, um, begin

5        by seeing if members of the hearing board have questions

6        for the investigator.  And I'll apologize.  The

7        configuration of the room (inaudible) to make it a little

8        tough in terms of peripheral vision so please, uh, speak

9        up.

10  __:  I have none.

11  IRANIA MUNIZ:  I have -- I have a question.  Um, you said that

12       you started your investigation by looking at the

13       complainant report and then the respondent's response.  Um,

14       and did you notice any inconsistencies between them?

15  ALISON KIRKER: I didn't.  I did not notice and I still don't

16       notice any inconsistencies between the complainant's

17       statement and the respondent's response because the

18       respondent does not have any memory of that evening.

19  IRANIA MUNIZ:  Mm-hmm.  So I guess I have a question that came

20       up in the investigator's report.

21  JAMES LARIMORE:     Mm-hmm.

22  IRANIA MUNIZ:  And I'm not sure if I -- that's -- feels a little

23       -- slightly inconsistent with the complainant's report.

1       And, um, I don't know if this is the time to -- to see

2       maybe if you noticed it.

3  ALISON KIRKER: Sure.

4  IRANIA MUNIZ:  Or if it was addressed.  So in your report you

5       state that -- it's (inaudible).  Um, did it start out, the

6       --

7  ALISON KIRKER: Can you tell me what pa-- page you're on?

8  IRANIA MUNIZ:  Sorry, page three.

9  ALISON KIRKER: OK.

10  IRANIA MUNIZ:  OK.  At the bottom of the page.

11  ALISON KIRKER: Mm-hmm.

12  IRANIA MUNIZ:  Uh, when you began talking about the oral sex and

13       it says, "If she was OK with, um, consensually giving, um,

14       Mr. Doe a blow job," and at that point it says, "Yeah, it

15       was a break."  Um, and then, "When did it become

16       nonconsensual?"  So I guess I'm -- I'm -- my question is

17       there's implied consent in your line of questioning and

18       then in her original report it states that at no point did

19       she consent to giving oral sex, that she didn't feel

20       comfortable with it at all.  So I don't know if you noticed

21       that or if that was addressed.

22  ALISON KIRKER: So that's what my impression was when I read the

23       complaint, was that it was never consensual.  And when I

1       was interviewing her it appeared to me that she was saying

2       that at a certain point it was consensual and that's why I

3       asked the question. I wanted to make sure that I was

4       understanding her properly, that it started off

5       consensually and then later became nonconsensual.

6    IRANIA MUNIZ:  OK.

7    ALISON KIRKER: Does that answer your question?

8    IRANIA MUNIZ:  A little bit, thank you.  The best I think...

9       OK.

10   JAMES LARIMORE:    OK.  So any -- any other questions from a

11       member?

12   ERIC HAMAKO:   (inaudible).  You had, uh -- in your report you

13       had spoken to some of the unclarity in -- in the L.R.

              statement.  I was wondering if you have any

15       further comment about that given that, uh, in reading it it

16       seemed to me as though -- there were certain things that I

17       was unclear on.  You had said in your report that you had

18       inquired about that and that L.R.        had said that it

19       was unclear in part because Mr. Doe's (inaudible) was

20       unclear.  Um, you have further comment about some of those

21       unclarities in the statement?

22   ALISON KIRKER: Sure.  And I guess I would add one further thing,

23       is that L.R.        also made the point that it, you know,

1       met -- her memory wasn't as clear now as it would have

2       been, I guess, you know, 18 or 20 months earlier.  Um, so

3       that would -- would have been another reason for her lack

4       of clarity.  But I -- I believe that I identified

5       specifically the issues that I had questions about and I'm

6       just going to flip to those.  So the -- the first question

7       I had was about L.R.        's statement that Mr. Doe had

8       said that he thought that he had assaulted a girl and, as I

9       said, that raised a question for me because she was the

10      only person I interviewed who believed or who said that he

11      had any recollection of that evening, that he would be able

12      to form a belief as to whether he forced someone or did not

13      force someone.  And there were several witnesses who

14      testified about Mr. Doe's shock at learning that Ms. Jones

15      had thought that he had assaulted her.  So that is the

16      primary question I had, was, um, about whether Mr. Doe

17      actually admitted that he feared he had, um -- he had, um,

18      forced Ms. Jones .  Um, another question I had was about

19      her statement that he knows -- he, Mr. Doe  knows they had

20      sex.  I don't -- when I interviewed Ms. Jones | and in her

21      statements she referred to blow jobs, she never referred to

22      sex.  And so I thought her terminology raised concerns for

23      me about whether it was consistent with the terminology

1    that Ms. Jones was using.  Um, another thing she said was

2    one of the reasons that Mr. Doe felt like he may have

3    assaulted Ms. Jones  was because he could not recall the

4    evening and that raised a question to me because it didn't

5    seem like a logical conclusion, having a blackout

6    necessarily follows that you then conclude that you may

7    have sexually assaulted someone.  Um, her statement that

8    Mr. Doe "sort of ran out of the room in a great hurry and

9    the only thing that he remembers was that he felt very out-

10   of-control because he was very drunk" also was inconsistent

11   with Mr. Doe's testimony, as well as the testimony of the

12   witnesses he identified as, um, his not having mem-- any

13   memories of that evening.  Uh, and then finally I think the

14   point I also already addressed was L.R.      's statement

15   that Mr. Doe described the night as something that he never

16   liked to recall, even before he heard rumors of anything

17   else because it had been an unpleasant experience, an

18   experience where he felt out-of-control.  And, again, that

19   to me raised a question because it was the first time, um,

20   I was hearing anyone describe Mr. Doe as having any

21   memories of that evening.  So those were the questions that

22   I had about her testimony.

1    TODD PORTER:   Throughout this incident, uh, both parties

2         admitted to using alcohol.

3    ALISON KIRKER: Mm-hmm.

4    TODD PORTER:   Um, at any point did you seek clarity or did the

5         parties provide information as to the level of

6         intoxication?

7    ALISON KIRKER: Um, I believe that in her account Ms. Jones

8         describes herself as being tipsy but that Mr. Doe describes

9         himself as drinking to the point of blacking out.

10   JAMES LARIMORE:    Other -- other questions from the hearing

11        board?  OK.  We'll have another opportunity la-- um, and I

12        want to -- at this point, uh, do you have any questions for

13        the investigator?

14   __:  Yeah, I do.  Um, the screen seems to be down.

15   __:  Is it on this computer?

16   __:  Yeah, it's on this computer (inaudible).

17   __:  OK.

18   __:  You're -- you're fine.  It's OK.

19   __:  OK.

20   JAMES LARIMORE:    Yeah.  It may have just gone to sleep.

21   __:  Is it plugged in because I think when (inaudible)

22        unplugged.

23   __:  Yeah, I saw it.  It went...

John Doe   Hearing, 12/12/2013                          Page 32
Sexual Misconduct Hearing Board, Amherst College

1    __:   Oh, did it unplug?

2    __:   It -- it seemed to because something --

3    __:   Something (inaudible).

4    __:   -- something was hit and that's when I saw it go -- go

5          down.

6    __:   Oh, OK.

7    __:   I didn't see anything that's wrong with this.

8    __:   No, it still seems to be plugged in.

9    __:   Is it tight?

10   __:   Yeah, but it still seems to be tight.  It seems as though

11         the projector is not turned off.

12   __:   (inaudible) screen.

13   __:   Oh.

14   __:   Yeah.

15   JAMES LARIMORE:     Yeah.  So there was a little countdown kind

16         of number --

17   __:   Yeah.

18   JAMES LARIMORE:     -- thing going for a while.  I'm not sure if

19         -- if...  It may have just --

20   __:   (inaudible) turning off.

21   JAMES LARIMORE:     -- gone to sleep or turning off.  Yeah.

22         Powering down.

John Doe   Hearing, 12/12/2013                    Page 33
Sexual Misconduct Hearing Board, Amherst College

1   __:  Ah.  That's not what I wanted.  Maybe we'll let the screen

2        go... Uh, there we go.  OK.  Have my laptop right here and

3        I have my power and I was told that those are the only two

4        buttons I would need.  Um...

5   __:  So, yeah, we'll try the power button.

6   __:  It's not a little knob, right?

7   SUSIE MINCHANNON:  So, um, what I'd ask the chair at this point

8        is if we can't get the display up and running right now for

9        people to see can we, uh, trust that E.B. would be reading

10       directly as S.J. is typing -- S.J. is typing?

11  JAMES LARIMORE:    Yeah, I think we can (inaudible).

12  SUSIE MINCHANNON:  OK.  In the meantime I'll try to get it.  I

13       will call IT.

14  JAMES LARIMORE:    OK.

15  SUSIE MINCHANNON:  Thank you.

16  Sandra Jones :  OK.  Oh, right.  I guess I don't have to type

17       here for you.  So, um, just... Just that.  OK.

18  E.B.         :   This is a question.  In the report there is

19       much discussion of John's  character by his witnesses.

20       Did you ask my witness, L.R.      , any of these character

21       questions?  If so, what was her response?

22  ALISON KIRKER: I asked every witness whether they had any, um,

23       reason to believe that, uh, Ms. Jones  would -- had any

John Doe    Hearing, 12/12/2013                        Page 34
Sexual Misconduct Hearing Board, Amherst College

1        reason to lie and each witness said that they could not

2        think of any reason to lie with the one -- or that she --

3        that Ms. Jones  would not be telling the truth, with the

4        exception of the -- the comment that E.K.      made about,

5        uh -- perhaps about losing friends.

6    E.B.        :    I was referring more to the descriptions of

7        Mr. Doe as a nice or sweet guy.  Did you ask any questions

8        to L.R.       of that nature?

9    ALISON KIRKER: I didn't ask any questions, um, about -- uh, I

10       didn't ask questions to Mr. Doe's witnesses or to Ms.

11       L.R.     about whether they thought the witness was a good

12       person or not a good person because I don't think it was

13       necessarily relevant.

14   E.B.        :    Is it possible that after hearing about the

15       event from others, Mr. Doe could have begun to remember

16       details by the time he spoke with L.R.     ?

17   ALISON KIRKER: I asked Mr. Doe and I can tell you what he said.

18       Um, I asked him that question.  On page eight I asked Mr.

19       Doe "In the time since that evening happened have memories

20       of that night come back to you, as far as pieces of it?"

21       His response was, "For me, the longer time passes, the

22       harder it is to remember what had happened.  It's hard.  It

23       was already hard to recollect anything but it's almost two

John Doe   Hearing, 12/12/2013                    Page 35
Sexual Misconduct Hearing Board, Amherst College

1        years and not exactly easy to recall things the longer it's

2        been.  Everything I told you is as much as I remember."

3   E.B.         :    OK, thanks.

4   JAMES LARIMORE:    Great.  S.J   -- S.J , do you have any

5        further questions?

6   Sandra Jones :   No, that's it.

7   JAMES LARIMORE:    Ok, great.  And, John    uh, do you have any

8        questions you'd like to ask the investigator?

9   John Doe :    Yeah.  Um, would I be able to ask for a break

10       first?

11  JAMES LARIMORE:    Oh, sure.  Why -- you know, why don't we

12       take about a five-minute break.  OK?  Sure.  And -- and,

13       actually (inaudible) do you need time to confer with your

14       advisor or just...  We're -- we're all eventually going to

15       need a little bio break and so if -- uh, five minutes if it

16       is just sort of a simple matter, 10 minutes if -- if the

17       two of you would like any time to confer.

18  John Doe :   Yeah.

19  JAMES LARIMORE:    Yeah.  OK.  So why don't we take five.

20       Great.  And I've been told that the men's room is on this

21       floor.

22  __:   (inaudible).

1    JAMES LARIMORE:    Unfortunately the women's room is down in

2        the basement level (inaudible) building.  So...

3    __:  (inaudible).

4    JAMES LARIMORE:    Taking a five-minute break.

5    SUSIE MINCHANNON:  OK.  We're still recording, just so the room

6        knows.

7    JAMES LARIMORE:    Oh, yeah.  I could -- I'm -- yeah, actually,

8        I will not touch --

9    SUSIE MINCHANNON:  OK.  All right.

10   JAMES LARIMORE:    I'll let you take -- take care of the tape

11       recorders.

12

13   [five-minute recess]

14

15   JAMES LARIMORE:    OK, good.  So we are officially back in

16       session.  Now -- and just prior to the break we turned to

17       John   to see if he had questions for the investigator.  So

18       why don't we pick up there.

19   John Doe :   I kind of just wanted to ask you to outline the

20       series of events, specifically starting with the

21       progression of the night, um, and then when the *AC* article

22       came out and then finally when I read the *AC* article.  Um,

1        so if you could kind of just...  Um, from what (inaudible)

2        outline that period.

3    ALISON KIRKER: Sure.  From whose perspective?  Because I -- my

4        understanding is that you have no memory of the night so do

5        you mean from Ms. Jones's  perspective?

6    John Doe :    Um, well, I guess if you -- from...  If you could

7        -- timeline the -- timeline the events from your

8        perspective.  Not, you know, the details but, um --

9    ALISON KIRKER: Sure.

10   John Doe :    -- just, uh, the progression.

11   ALISON KIRKER: OK.  And I will say that I am a bit unclear about

12       exactly when certain conversations occurred but I can give

13       you an overview and perhaps you can ask more specific

14       questions if I'm not -- if I go over things too abruptly.

15   John Doe :    OK.

16   ALISON KIRKER: So what I understand, um, is that Mr. Doe and Ms.

17       Jones  saw each other late on the night of February 4th,

18       which I believe was a Saturday night, of 2012 in the Morris

19       and Pratt dormitory.  Mr. Doe came into the common room

20       with his roommate, ¹N.K.   .  In the common room at the

21       time were Ms. Jones  and R.M.    , who lived on the

22       fourth floor of Morris and Pratt dormitory at that time.

23       There was some amount of time when everyone was hanging out

1    that Ms. Jones  and Mr. Doe um, started hooking up in

2    front of, uh, the other two people who were there.  There

3    may have been additional people.  I think -- um, yeah.  I -

4    - I'm not sure if there were more than those two people or

5    not.  Um, they witnessed, um, Mr. Doe and Ms. Jones

6    leaving together.  They, um, presumed to go to her room

7    because, um, N.K.    saw them getting in the elevator

8    together and I believe that Ms. Jones  lived on the third

9    floor of the do-- dormitory.  Um, the -- what I understand

10   from Ms. Jones's  perspective is that the evening -- or the

11   sexual encounter began consensually and at some point

12   became nonconsensual.  Um, that Mr. Doe and Ms. Jones  next

13   spoke to each other the following day when Mr. Doe went to

14   Ms. Jones's  room to look for his cellphone.  That, um, Mr.

15   Doe and Ms. Jones  exchanged text messages about the cell

16   phone and about, um, whether Ms. Jones  was going to tell

17   E.K.      about what had happened.  That Mr. Doe and Ms.

18   Jones  did not have any further interactions with each

19   other.  That Ms. Jones  told J.M.     as well as two

20   additional people, P.T.     and -- I've forgotten the

21   other person's name -- L.W.    about what had happened.

22   That, um, sometime in the fall of 2012, while Ms. Jones

23   was, uh, studying in London she wrote an article about what

John Doe   Hearing, 12/12/2013                          Page 39
Sexual Misconduct Hearing Board, Amherst College

1       happened with Mr. Doe as well as the response of her

2       friends and that -- or -- that was how Mr. Doe learned of,

3       uh, Ms. Jones's  feelings that the sexual encounter was

4       nonconsensual. That Mr. Doe um, according to L.R.          ,

5       about two weeks later approached him to talk about what had

6       happened and that Mr. Doe had thereafter spoken to a number

7       of individuals about, um... About, uh, his surprise that

8       this was how Ms. Jones had felt. Does that answer your

9       question?

10  John Doe :    Yeah. Um, so you said that, um -- was it

11      according to L.R. that I had sought her advice two weeks

12      after the article came out?

13  ALISON KIRKER: That's what, um -- that's what my transcript of

14      my interview with L.R.        says. So yes.

15  John Doe :    OK. Uh, based on your interview, uh, with S.J. ,

16      was it clear when the alleged events went from consensual

17      to nonconsensual? Was it clear for you, um, like after

18      listening to her? Like what point that was.

19  ALISON KIRKER: I don't -- I can't say that it was clear to me.

20      And -- and I can't say if that's because I didn't ask the

21      right questions or -- or because it just wasn't clear to

22      me. But no, I can't identify exactly when it became

23      nonconsensual except to say that I believe she felt it

John Doe   Hearing, 12/12/2013                    Page 40
Sexual Misconduct Hearing Board, Amherst College

1        became nonconsensual after, um, she felt like you were

2        bragging about having been with her roommate also.  That

3        that's the point at which she identifies that it went from

4        being consensual to nonconsensual.

5   John Doe  :    Um, and lastly, uh, did S.J. ever express to you

6        that she was fearful of me at any point?

7   ALISON KIRKER: Do you mind if I take a moment to review my notes

8        or the report because I can't recollect.

9   JAMES LARIMORE:    Go ahead.

10  ALISON KIRKER: I don't believe that she used the word fearful

11       but I didn't ask her -- I didn't use that word with her

12       either.

13  JAMES LARIMORE:    OK.  And any, uh, additional questions

14       (inaudible)?  OK.  We'd, uh, ask then, uh, for the hearing

15       board members, any additional questions that you have for

16       the investigator at this point?

17  IRANIA MUNIZ:  I don't.

18  JAMES LARIMORE:    No, OK.

19  ERIC HAMAKO:   Just as a -- a basic timeline question.  Reading

20       the report I had an initial, uh, question regarding the

21       date and time of the event.

22  ALISON KIRKER: Mm-hmm.

John Doe   Hearing, 12/12/2013                     Page 41
Sexual Misconduct Hearing Board, Amherst College

1   ERIC HAMAKO:   Um, and this report form indicates that the

2        alleged events occurred on Saturday, February 4th at 2:00

3        a.m., which most people refer to as Friday night because it

4        begins on Friday and ends on Saturday.  Uh, and then

5        another question suggests that the events happened on

6        Saturday night, from which I inferred that the events might

7        have happened Sunday, February 5th at 2:00 a.m.  So I -- I

8        was just a little bit unclear.  Can you confirm?

9   ALISON KIRKER: I'm sorry, I can't.  I -- I don't know if I knew

10        that.  And my guess is that the inconsistency is mine.

11        That for some reason I thought this happened on a Satur--

12        began on a Saturday night ending on a Sunday, but I may

13        have been wrong about that.  So any confusion is probably

14        my doing.

15   ERIC HAMAKO:   Thank you.

16   JAMES LARIMORE:     OK.  And, uh, S.J.   do you have any

17        additional questions at this point?

18   Sandra Jones  :   I do not.

19   JAMES LARIMORE:     OK.  Um, last opportunity at this phase then

20        for the hearing panel members.  No.  OK.  And John   , any

21        additional questions at this point for you?  OK, great.

22        Well, thank you very much for joining us.

23   ALISON KIRKER: Thank you.

John Doe   Hearing, 12/12/2013                           Page 42
Sexual Misconduct Hearing Board, Amherst College

1    JAMES LARIMORE:    OK.  OK.  So the next stage of the process

2         for us, S.J., is for you to make any opening statement that

3         you'd like to make.

4    Sandra Jones :   Yes.

5    E.B.         :    John   raped me the night of February 4,

6         2012.  Saturday.  In my initial report I did not explicitly

7         say that I had agreed to perform oral sex at the beginning.

8         I covered that under the phrase "started to hook-up".

9         Regardless, when I said no repeatedly and physically pushed

10        against him, John   did not listen or pay attention to my

11        clear refusal and held me down, forcing his penis into my

12        mouth until he ejaculated.  This assault was terrifying and

13        traumatic for me and took me a long time to name, let alone

14        tell anyone about it.  It has taken me longer still to feel

15        able to bring it forward.  I'd like to thank the board for

16        listening to something that has been nearly two years

17        coming.

18   JAMES LARIMORE:    OK, thank you.  And then we then turn to the

19        hearing panel members to see if they have questions that

20        they'd like to ask of S.J. .

21   IRANIA MUNIZ:  Are these of the opening statement or in general?

22   JAMES LARIMORE:    Uh, in general.

23   IRANIA MUNIZ:  OK.

John Doe   Hearing, 12/12/2013                    Page 43
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    Yeah.

2   TODD PORTER:   Throughout this, I'm curious to know...  Um,

3        during the alleged incident, was -- were you able to

4        recognize or understand his level of intoxication?

5   Sandra Jones :   Yes.  Um, so he did seem (inaudible) very, um,

6        drunk or intoxicated.

7   TODD PORTER:   Thank you.

8   JAMES LARIMORE:    OK.  (inaudible).

9   IRANIA MUNIZ:  I have a question.  Um, throughout the report

10       it's a little, um, I think unclear what -- how you define

11       hooking up and which parts were consensual and which part,

12       um, were unconsensual [sic].  Can you clarify that a little

13       bit?

14  Sandra Jones :   Sure.  I'm -- I'm going to type this one, um,

15       just to be clear.

16  IRANIA MUNIZ:  OK.

17  E.B.         :   We began kissing in the common room.  It was

18       consensual.  I agreed to go to my room with him and

19       continue kissing.  I continued to consent to performing

20       oral sex until he began saying things about myself and my

21       roommate.  At this point I said things like, "No," or "I

22       don't want to do this" and physically pushed him away.  It

23       was at this point it became nonconsensual.

1    IRANIA MUNIZ:  Thank you.

2    JAMES LARIMORE:    OK.  Um, other questions from the hearing

3         panel?

4    IRANIA MUNIZ:  I have -- have one more question.  Um, what was

5         your conversation with your roommate where you told her --

6    Sandra Jones :   Yeah.  Um, she had, um...  Well, she had like

7         just like come back from her squash, um, tournament.  Um,

8         but she like needed to like, well, change and to leave, um,

9         well, soon after that for -- I'm not sure, um, for

10        something.  Um, so I just said, um...  Trying to think of

11        my exact words.  Um, so I told her that, um -- so I told

12        her that I had like well hooked up with, um -- um, with --

13        um, John     Um, and then...  So I said that it had like

14        well gone past...  That it had gone past...  That it...

15        That it had like well gone past like well kissing, um, but

16        that -- but that we didn't have sex.  Um, yeah.  That's --

17        that's what I told her.

18   IRANIA MUNIZ:  Thank you.

19   ERIC HAMAKO:  After -- after John    left the room that night

20        can you walk us through the further events that happened,

21        um --

22   Sandra Jones :   Sure.

23   ERIC HAMAKO:   -- I guess until you go to sleep.

John Doe   Hearing, 12/12/2013                    Page 45
Sexual Misconduct Hearing Board, Amherst College

1   Sandra Jones :   Yeah.  Um, so after he, um -- so after he like

2        walked out, um, I didn't, um...  So I didn't...  So I

3        didn't...  So I didn't...  So I didn't...  So I didn't...

4        So I didn't...  So I didn't...  So I didn't, um...  I'm

5        sorry, I'm like very nervous.  I might type this one, too.

6        Um...

7   E.B.         :    After he left I did not want him to return

8        to my room to continue assaulting me.  To ensure that I

9        threw his clothes, wallet, keys and phone out into the

10       hallway and locked my door so he would have no reason to

11       return.

12  ERIC HAMAKO:   Thank you.  And to follow-up on that --

13  Sandra Jones :   Yeah.

14  ERIC HAMAKO:   -- in the report it had noted that this happened

15       around 2:00 a.m.  So can you walk us through, say, the

16       hours from when the event happened until, I don't know, say

17       6:00 a.m. or until you went to sleep?  So kind of the

18       events after -- after what you have noted here.

19  Sandra Jones :   OK.  Um, yeah.  Um...

20  E.B.         :    Um, after John   grabbed his clothes I felt

21       very alone and confused about what had happened.  I quickly

22       tried to convince myself that nothing out of the ordinary

23       happened but I realized that I did not want to be alone.  I

1        texted a friend to come over to talk to me and spend the

2        night.  I did not tell my friend anything about the assault

3        or that I had interacted with John Doe   at all.

4   ERIC HAMAKO:   Thank you.

5   JAMES LARIMORE:    Any other questions from the hearing panel

6        at this stage?

7   ERIC HAMAKO:  Um, how did your relationships with P.T.          ,

8        L.W.         (inaudible) and other people affected -- and

9        other people, how were your relationships affected once

10       they knew about your hookup with John   in the common room

11       or heard your allegations of forced oral sex?

12  Sandra Jones :   OK.  So should I do like...  So do you mean...

13       So do you mean...  Well, so do you mean, um, as a group or

14       each person?

15  ERIC HAMAKO:  How-- however you think would be most relevant.

16  Sandra Jones :  Um, OK.  Um...

17  E.B.          :    After they learned I hooked up with John

18       Doe they all felt they had to side with E.K.   and stop

19       speaking to me.  Some cases were more aggressive than

20       others. R.M.         in particular made it clear I was no

21       longer welcome in her presence by yelling at me in the

22       front room in (inaudible) about -- about what a whore and

23       slut I was. E.K.        and P.T.        Moore gradually

1       stopped interacting with me. L.W.        had a change of

2       heart when she needed my support in a complicated fight

3       with some of her friends.

4    ERIC HAMAKO:   Thank you.

5    JAMES LARIMORE:    Any, um, other questions from the hearing

6       panel?

7    IRANIA MUNIZ:  Any -- did you and E.K.   continue rooming

8       together for the remainder of the semester?

9    Sandra Jones :   Yes, we did.

10   IRANIA MUNIZ:  And did you have a friendship at that point?

11   Sandra Jones :   Um, um... So I think -- so I think that we

12       pretended to --

13   IRANIA MUNIZ:  Mm-hmm.

14   Sandra Jones :   -- but no.  Not really.

15   JAMES LARIMORE:    Any other questions at this stage?  OK.

16       And, uh, John   , do you have any questions that you'd like

17       me to consider directing to S.J. ?  OK.  OK.  So, um, I'd

18       like to ask if you remember the -- the people who were in

19       the common room with you and John   that evening and who

20       the people were.  If you recall, um, who chanted to you?

21   Sandra Jones :   Um, I believe that it was N.K.        , um, but I

22       couldn't be sure.

23   JAMES LARIMORE:    Mm-hmm.

1  Sandra Jones :   Wasn't really paying attention.

2  JAMES LARIMORE:     Yeah, OK.  Great.  And, uh, so would your

3       answer then -- is it N.K.  who you remember kind of

4       chanting or saying something and do you remember other

5       people who were in the room?

6  Sandra Jones :   Um, yes.  Um, I think -- it's hard because I

7       wasn't really paying attention to that.  Um, so I think --

8       so I think -- well, also like well J.H. -- um, so also like,

9       well, J.H.             (sp?) was there.  Um, um, he's also

10      a senior, um, from that floor.  Uh, I'm not sure who else.

11      Um, but there were, well, a few other people there.

12 JAMES LARIMORE:     OK.  Great, thank you.

13 __:  (inaudible).

14 Sandra Jones :   Oh.

15 JAMES LARIMORE:     OK.  So, um -- and I'd like to ask...  In

16      your statements, the documents that -- that people have

17      read, um, some -- in some you use the description of, um,

18      having been lightly drinking, in another it says a little

19      drunk, I think tipsy might have been a word that popped up

20      as well during your conversation with the interviewer.  The

21      word was tipsy was used.  Um, and I'm wondering if you

22      could clarify, um, the distinctions or differences that you

John Doe   Hearing, 12/12/2013                    Page 49
Sexual Misconduct Hearing Board, Amherst College

1        see between lightly drinking, a little drunk, and tipsy, if

2        there are any.

3    Sandra Jones :   Um, so I think I'm like well trying to say, um,

4        that I was not -- um, that I was not that -- so that I was

5        like well not that like well drunk.  I was like a bit like

6        well buzzed or tipsy or a bit drunk, um, but I didn't feel

7        intoxicated a lot -- a lot if that makes sense or if that

8        answers the question.

9    JAMES LARIMORE:     Mm-hmm.  OK, thanks.  Uh, and, uh, John   , I

10       should just let you know -- so since I have the written

11       questions that -- that you, um, submitted in advance, if

12       there are questions that you just want to let me know about

13       by number I can just, you know, read from this and save --

14       save you a few little keystrokes.  OK, thanks.  OK.  So the

15       question is in your testimony to the investigators you said

16       that you were OK with John   and you were -- and you going

17       to your room to hook-up.  Is that correct?

18   Sandra Jones :   Yes.  Um -- well -- although I would like to say

19       that I did feel some -- um, I did like well feel like well

20       some...  I did -- I did like well feel like well some

21       like...  Um, well, um, some like...  Um, like...  Some like

22       well pressure to do so.  But I -- but I did agree.

John Doe   Hearing, 12/12/2013                    Page 50
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK.  OK.  And, um, in your testimony to the

2       investigator you said that you started off being OK with,

3       um, performing oral sex or John .  Is that correct, as

4       well?

5   Sandra Jones :   Yes.

6   JAMES LARIMORE:    OK, thanks.  OK.  And then what specifically

7       did you say at the time that you felt that the encounter

8       became noncom-- nonconsensual to indicate to John   that

9       what you had been doing up to that point was no longer OK?

10  Sandra Jones :   So I said -- um, so I said like well no a bunch

11      of times.  I said, um, um, well -- um, well, so I told him

12      to leave, um, I think.  I think that's it.

13  JAMES LARIMORE:    Mm-hmm, OK.  Thank you.  OK.  And in your

14      testimony to the investigator, when asked if the oral sex

15      began consensually you said, "Yeah.  Well, it was a break

16      while we were like moving around."

17  Sandra Jones :   Mm-hmm.

18  JAMES LARIMORE:    Uh, could you explain that statement any

19      further?

20  Sandra Jones :   Yeah.  Um...  So -- I think it's just hard to

21      explain, which is like --

22  JAMES LARIMORE:    Yes, mm-hmm.

1   Sandra Jones :   -- how it became unclear.  Um, so I was -- so I

2        was both performing oral -- oral sex on him and then I

3        moved -- so we moved...  Um, so we -- so we changed...  Um,

4        so we changed -- um, so we changed, um, positions in

5        between and, um, it was, uh...  Yeah, if that clarifies it.

6   JAMES LARIMORE:     Mm-hmm.  OK.  OK.  So this may -- kind of

7        ask -- that more comment (inaudible) wants.

8   Sandra Jones :   Yeah.

9   JAMES LARIMORE:     So in your testimony to the investigator, in

10        describing the events of the night in question, the

11        investigator asked if at one point Joh-- John  was

12        standing and you said, "No, he was sitting up on my bed and

13        I was lying down kind of."  And in your statement about the

14        alleged events of that night, um, there's a -- a timeline.

15        You said -- say, "He was trying to get me to give him a

16        blow job.  He was standing over me naked while I sat on the

17        bed."  And you -- can you clarify, um, the -- those things

18        for us?

19   Sandra Jones :   Yeah.  Um, yeah.  Hold on.  I'm just going to use

20        the...

21   JAMES LARIMORE:     OK.

22   Sandra Jones :   So I think -- so I think that he began...  So I

23        think that...  So I -- so I think that -- and I began to

```
 1        say -- um, to say -- it was like...  Um, to say that it

 2        was...  Um, to say that it was -- well, a bad idea --

 3   JAMES LARIMORE:     Mm-hmm.

 4   Sandra Jones :   -- when he was, um, still, um, standing.

 5   JAMES LARIMORE:     Mm-hmm.

 6   Sandra Jones :  Um, so in the report -- so, um, um, someone

 7        marked that as a point.

 8   JAMES LARIMORE:     OK.

 9   Sandra Jones :  Um, yeah.

10   JAMES LARIMORE:     OK.  So these are, um, two different points

11        in time?

12   Sandra Jones  :  Yeah.

13   JAMES LARIMORE:     OK.  Thank you.

14   ERIC HAMAKO:  Um, (inaudible) I have another question --

15   JAMES LARIMORE:     Yeah, yeah.

16   ERIC HAMAKO:  -- so I don't if now is the time.

17   JAMES LARIMORE:     Well, I think we should probably allow

18        John   to finish his questioning first and then I'll come

19        back to you.  Um, so S.J. , I'd like --

20   Sandra Jones  :  Yeah.

21   JAMES LARIMORE:     -- if -- um, did you ever feel that your

22        safety was in jeopardy with John   that evening?
```

1   Sandra Jones :   I mean... So it depends, um -- so it depends on

2        -- so it depends on the word safety. Um, because at, um,

3        first, um -- so when I said things that were more like,

4        well, vague and like weren't as like, "No, please. Like

5        stop."

6   JAMES LARIMORE:     Mm-hmm.

7   Sandra Jones :   "No." Um, well, so I said, um, well, those --

8        um... Those -- um, well, those like were more vague, um,

9        well, things because I was like well scared, um, that he

10       did... Um, that if I did say, like, well, "No," um, that

11       he would, um, would not stop and I didn't want him to get

12       to that, like, well, point. Um, so -- so I would say,

13       um... So I would, well, say that, um -- well, I would,

14       well, say that, um... I would, well, say that, um -- I

15       would, well, say that, um, like, yes, that I did --

16   JAMES LARIMORE:     Mm-hmm. OK.

17   Sandra Jones :   -- feel that way.

18   JAMES LARIMORE:     OK.

19   Sandra Jones :   I didn't feel safe with him.

20   JAMES LARIMORE:     OK, great. Um, thank you. Uh, so I think

21       John   is, um, kind of reached the end of the questions

22       that he has. Please. So let me open this up to the

1       hearing panel to see if there are additional questions that

2       you all had.

3    __: I think we want to take a little break.

4    JAMES LARIMORE:    OK, sure.  So why don't we, um, take 10

5       minutes recess.  We'll come back (inaudible) so we'll come

6       back at 10 minutes after 3:00.

7    __: OK, thanks.

8

9    [10-minute recess]

10

11   JAMES LARIMORE:    OK.  So I will give you all about a --

12   __: (inaudible) I forgot (inaudible).

13   JAMES LARIMORE:    -- 30 -- 30 second warning that we're about

14      to get back underway and, uh, before she left the room

15      Susie Minchannon had kind of reactivated the tape recorder

16      so that we would, um, not have to rely on me doing that, I

17      guess.  Um, so, um, we are, um, at -- at kind of a stage in

18      the process where we -- I checked just before our break,

19      been asking the hearing, uh, board members if they had any,

20      uh, kind of remaining questions at this stage that they

21      wanted to direct, uh, to you, S.J.   And, um, first want to

22      check with the hearing panel members to see if there are

1        additional questions that they'd like to ask of you at this

2        point.  OK, yeah.

3    ERIC HAMAKO:   So in one of your verbal responses here you noted

4        that you felt pressured to go back to your room.  Um, could

5        you describe the pressure that you felt?

6    Sandra Jones :  Um, uh, um... Um, so as we were like making out,

7        um, in the common room, um... So, um, some -- some of the

8        students there, um, I -- um, um, so I think... Um, so I

9        think -- so I think, um, N.K.              , included, um,

10       were just like, well, chanting, like, well things about me.

11       Um, like -- like -- like a -- like, I mean, like... Um,

12       like, I mean, like... Um, I mean like this -- um, I mean,

13       like... Um, I mean like -- I mean, like slut and like that

14       kind of thing.  Um, and they also like, well, told us, um,

15       to get a room, so, yeah.  That's how, if that answers your

16       question.

17   ERIC HAMAKO:   Thank you.

18   JAMES LARIMORE:    And are there other -- other questions

19       (inaudible)?

20   __:  (inaudible).

21   IRANIA MUNIZ:  I had a question regarding, um, some of the --

22       the conditioning stated in the report and that you talked

23       about verbally as well as --

John Doe   Hearing, 12/12/2013                    Page 56
Sexual Misconduct Hearing Board, Amherst College

1   Sandra Jones :   Yeah, sure.

2   IRANIA MUNIZ:   -- in the investigator's report.  So, um, in

3       terms -- you talk about, um -- I think this is back a

4       little bit earlier.  But standing over, you were laying on

5       the bed.

6   Sandra Jones :   Right.

7   IRANIA MUNIZ:   Um, and then at some point there were comments

8       being made about you and your roommate and you decided that

9       you no longer wanted to engage.  That's when it became

10      unconsensual [sic].  Can you talk a little bit about where

11      you were positioned physically.

12  Sandra Jones :   At each point?

13  IRANIA MUNIZ:   Yeah.

14  Sandra Jones :   OK.  Yeah, I'll type you this one.

15  [sneezing]

16  __:  Gesun-- gesundheit.

17  E.B.          :     Initially when I was giving consensual oral

18      sex, John   was standing over me and I was standing on the

19      bed.  I began to feel uncomfortable with it simply because

20      we were in a room I shared with E.K.       .  So I said

21      things like, "We should stop," or "Maybe we should go."  He

22      didn't respond to those and then started to talk about he

23      and my roommate in a cocky way.  It was at that point I

1       began to use more forceful language like, "No, I don't want

2       to." He moved to the bed and pulled me closer to him and I

3       kept saying, "No," and "stop," and he forced me to give him

4       more oral sex.

5   IRANIA MUNIZ:  And were you laying on the bed and he was on top

6       of you?

7   Sandra Jones :  No, um, so he was, um... Um, so he was on his,

8       like, well back and I was on top of him. Um... Um, well,

9       no, because he was... Not exactly. Um, well, because

10      he... Well, um, because he was like well sitting, well, on

11      the bed. Um, yeah, like I was on -- on top of him if that

12      makes sense.

13  IRANIA MUNIZ:  And were you on the bed or standing next to it?

14  Sandra Jones :  I was on the bed.

15  IRANIA MUNIZ:  OK, thank you.

16  JAMES LARIMORE:    And are there additional questions at this

17      stage? OK. So then, John    , the question that you --

18      follow-up question that you had emailed us, is that a

19      question you'd like me to ask at this stage?  Yeah, OK.

20      So, um, uh,  S.J. , this is a -- this is a question that

21      John   has asked me to read, and I'll just read it off the

22      screen.

23  Sandra Jones :   Mm-hmm.

John Doe    Hearing, 12/12/2013                    Page 58
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:      Um, in your last response to the hearing

2        board about feeling safe, and this is the question before

3        the break --

4   Sandra Jones :   Yes.

5   JAMES LARIMORE:      -- you seemed to indicate that you were more

6        vague than direct in your communication with -- with me,

7        with John .   Is this correct?

8   Sandra Jones :   So I said -- so I said that I did that, um, um --

9        so I said that I did that, um...  So I said that I did that

10       first.

11  JAMES LARIMORE:      Mm-hmm.

12  Sandra Jones :   Um, but then I changed to, "No, stop," et cetera.

13  JAMES LARIMORE:      OK, OK.  And, um, the follow-up question is

14       what exactly did you feel would happen if you had been more

15       direct with him?

16  Sandra Jones :   Um, so I didn't...  Um, so I thought that he

17       would -- so I thought that he would -- so I thought that he

18       would -- so I thought that he would...  So I thought that

19       he would, um...  I'm just going to type.  Um...

20  E.B.          :   I thought that he would sexually assault me

21       or even get violent.  I did not want to be raped and I

22       thought that if I could convince him more gently to stop it

23       would not escalate to that point.

John Doe   Hearing, 12/12/2013                         Page 59
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK.  And, uh, John    are there additional

2       questions that you'd like me to consider at this point?

3       OK.  No more questions from John    at this stage.  Are

4       there any, uh, remaining questions from the hearing panel?

5       OK.  So we'll move on, um, in our process.  Now, we've

6       reached the point, um, in our, um, process where we'll ask,

7       uh, John    to present his, um, opening statement and then

8       the board will have an opportunity to ask questions of him.

9   John Doe   :   Um, I would like my written statement to be my

10       opening statement.

11  JAMES LARIMORE:    Mm-hmm.  OK, great.  And the board has

12       received and reviewed the written statement so you all have

13       that in your packets if you'd care to take a look at it.

14       OK.

15  IRANIA MUNIZ:  This one here?  Exhibit F?  Yeah.

16  JAMES LARIMORE:    Yeah. Mm-hmm.  Great.  At this point then

17       we'll, uh, hear questions from the -- from the hearing

18       panel.

19  IRANIA MUNIZ:  Just reading it over real quick.

20  JAMES LARIMORE:    Mm-hmm.

21  TODD PORTER:   I have a question.  Can you walk us through the

22       events of that evening prior to the, um -- the night in

1      question or the incident in question, um, up until the

2      point that you stopped remembering?

3  John Doe :   OK.  So I remember that night I had, uh, done out

4      to dinner in town with, uh, some of my friends at

5      (inaudible) East.  Um, and I think that was around the --

6      around 7:30 or 8:00, I'd say, um, and we started drinking

7      there.  Um, and I think I personally probably had like one

8      or two scorpion bowls, which is a type of drink they serve

9      there.  Um, and I was already -- by the time I left, I

10     don't remember the time I left, but, um, by the time I left

11     there I was already pretty drunk.  Um, and then we went up

12     to the hill, which is, um, some dorms half-- half-a-mile

13     that way, um, and we had a party there and I remember

14     drinking more there.  Um, then I know I had like a mixture

15     of beer and hard liquor, um, mixed drinks at that point.

16     Um, and I remember at some point, at one of the dorms

17     there, I knew I was like getting much more drunk than I

18     should have been and I stopped drinking, um, and I just

19     hung out for a little while with my friends.  Um, I don't

20     remember what time it was, um, but I remember deciding to

21     go to the (inaudible).  That's beyond the main campus,

22     pretty much on the other side.  Um, I decided I wanted to

23     go there because I -- I mean, I have some friends there.

1    To go see them.  Um, so at that point I remember -- so at

2    that point it was already getting hazy.  I don't really --

3    start-- I was already starting to forget things, um, there.

4    Um, and at that point I -- I knew I was kind of going

5    downhill pretty fast and I kind of -- I was making like a

6    conscious effort of making sure I could get to the socials

7    and trying to remember what I was doing and all that.  So I

8    remember specifically trying to tell myself, "All right,

9    I'm walking through town right now.  I'm walking, um, by

10   the police station.  Um, and then I kind of remember

11   wandering to a dorm called (inaudible) which is still over

12   there.  Um, and it was the first time I'd ever been inside

13   that dorm and I remember getting lost in there, um, and not

14   being able to find my way out.  Um, don't really recall

15   going into the dorm and don't really recall getting out of

16   the dorm.  Um, but I just remember that I was kind of

17   feeling pretty frantic because I was just walking around in

18   circles and, you know, seeing the same thing over and over

19   again.  Um, at some point, I don't remember how I got out,

20   at some point I was somewhere on the main campus, um, and I

21   ran into someone, um, who said, "Hey," like, "you're pretty

22   drunk."  Um, don't remember who this person was.  Um, but

23   at that point, you know, I knew I was drunk and I agreed

John Doe    Hearing, 12/12/2013                    Page 62
Sexual Misconduct Hearing Board, Amherst College

1        with them.  Um, and next thing I kind of remember -- I

2        don't really remember what happened after that.  I

3        remember, um, being with my roommate and we were walking

4        back towards our dorm.  Um, don't remember from where.  Um,

5        and then kind of the last glimpse I have is just kind of

6        being in my bed in my room and like laughing about

7        something with my roommate and that's kind of all I

8        remember of that night.  Um, and then, and this is kind of

9        onto the next morning, then I was looking for my phone.  So

10       do you want me to go on from there?

11  TODD PORTER:   If you remember anything else.

12  John Doe  :   The next --

13  TODD PORTER:   Uh, the next morning?  Yeah.

14  John Doe  :   Well --

15  TODD PORTER:   (inaudible).

16  John Doe  :   -- yeah.  So the next day I -- I woke up.  You

17       know, it was kind of rough -- rough waking up.  Um, but I

18       had a lot of work, I think.  So I just was -- was trying to

19       get out of bed and get the day started.  Um, so I was just

20       kind of like cleaning up my room, trying to get myself in

21       order.  I was going to go to the cafeteria to get food and

22       I couldn't find my phone, so I asked my roommate, "Do you

23       know where my phone might be?" um, and that's when he told

1    me that, um, you know, "You might have left it, um, in

2    S.J.'s  room." Um, which -- you know, I was like, "Why

3    would it be there?" He was like, "Oh, you guys like hooked

4    up last night." Um, so at that point I went downstairs to

5    try to get my phone. Um, but the first time I went I just

6    remember... You know, I heard that there was people in the

7    room so I thought I would just come back later. Um, so I

8    just -- I think I came back like an hour or so later to try

9    to find my phone. Um, she was there and I asked if she had

10   seen my phone. Um, we didn't really talk about the night

11   before. Um, and she said she didn't know where my phone

12   was and I kind of just like sear-- continued searching the

13   halls. Um, didn't find anything. I kind of just like went

14   about my day, um, without seeing the phone or having the

15   phone and then I remember finally, I think that evening, I

16   got an email from the dorm RC saying, "Oh, I found two

17   phones. One of them is an iPhone, the other is like a

18   Nokia," or something. I was like, "Oh, the iPhone's

19   probably mine." Um, I got it back the next day, which is

20   when I sent her the text message, saying like, "Hey, just

21   wanted to let you know I found my phone, um, and wanted to

22   know if you (inaudible) not." Um, and that was kind of it

23   in terms of, I guess, that interaction. Was -- was that --

John Doe   Hearing, 12/12/2013                     Page 64
Sexual Misconduct Hearing Board, Amherst College

1   TODD PORTER:   That's good, thank you.

2   IRANIA MUNIZ:  Um, when you said that your roommate said that

3         you were hooking up or that you had hooked up with S.J.,

4         can you -- did he say anything else about what that meant?

5   John Doe :   Um, he -- he just started laughing, I guess,

6         because he-- he's like, "Oh, you guys were just like making

7         -- making out in front of everyone.  It was kind of

8         ridiculous."  And I kind of -- I kind of -- you know, I'm

9         just like, "Oh, wow, like that -- like that's terrible.

10        Classy, or whatever."  Um, but that was kind of the extent

11        of it.  And he didn't really say much about it because, um,

12        he was only there for that part.  Um, I don't know if that

13        answers it, answers your question.

14  IRANIA MUNIZ:  Mm-hmm.

15  JAMES LARIMORE:    Yeah.

16  IRANIA MUNIZ:  Uh --

17  JAMES LARIMORE:    (inaudible) yeah.

18  TODD PORTER:  Uh, can you, uh, walk us through the conversation

19        that you had, um, with L.R. and -- and -- and as verbatim

20        as possible.

21  John Doe :    Yeah.  Um, so the one thing I will say is that I

22        didn't reach out to her two weeks after.  It was several

23        months after.  I'm trying to find -- I have it written

1       down, the date.  Um, so I didn't reach out to L.R. until...

2       Sorry.  So I didn't see -- so after that evening I didn't

3       see the article, um, until November 4th, so it was like nine

4       months after the incident.  Um, and then I didn't reach out

5       to L.R. until the April of next year.  So it was definitely

6       more than two weeks afterwards.  I have -- like I found the

7       emails (inaudible) it was definitely April.  So, um, so,

8       you know, I first sent her an email, you know, titled, you

9       know, "Looking for your help".  Um, and, you know, it just

10      said like, "I -- you know, I know you're very active on

11      campus in terms of, um, you know, sexual respect, um, type

12      of stuff and I kind of just wanted, um, to get your input

13      and, you know, would be forever thankful if you could just

14      give me your ear."  Uh, so we set up a time to meet, um, in

15      the middle of a weekday, I think at like ten o'clock on a

16      like a Wednesday or something.  Um, and at first we were

17      going to like meet in town but then she's like, "Oh, I'm

18      really busy.  Let's just meet somewhere on campus."  Um, so

19      we ended up meeting in the Rainbow Room, which she had

20      access to.  Um, she had like a key, uh, which is in the

21      basement of Morrow.  Um, so it was just the two of us in

22      there, um, and I kind of just, you know, told her, um,

23      "I've kind of been dealing with this issue.  I don't --

1        don't know how to handle it.  Um, I saw this article and,

2        you know, somebody told me that I'm the one that's being

3        referenced in this article, um, and I'm kind of just like

4        really confused about, you know, why this is being said.

5        I'm confused because I have no idea of what happened that

6        night, so I'm confused like what happened that night."  Um,

7        and I -- I just basically asked her what should I do?  You

8        know, obviously it's a pretty big accusation for someone to

9        say and I felt really uncomfortable just knowing that and

10       not doing anything about it, because I want to be -- kind

11       of be proactive about it.  Um, and asked her, you know,

12       what -- what should I do in this situation?  Um, and, you

13       know, after -- she asked me about the night and I kind of,

14       you know, pretty much said the same thing I told you guys

15       just now.  Um, I asked her, you know, "What should I do?

16       Like I -- I honestly just want to do something because I --

17       I feel bad not doing anything at all."  Um, and she said

18       that, you know, "You've forfeited the right to ever speak

19       to this person again.  Um, and that you should just go get

20       help.  You should go seek counseling."  Um, and that was

21       kind of the gist of my meeting with her.  I think it was

22       probably 20, 30 minutes because she had to run off to

23       class.  Um, but yeah, that was pretty much our interaction.

John Doe   Hearing, 12/12/2013                    Page 67
Sexual Misconduct Hearing Board, Amherst College

1   TODD PORTER:   Kind of to follow-up on that.  In the

2        investigator's report, um, she indicates that you discussed

3        being able to recall certain parts of the evening.  Um, did

4        that ever enter into that conversation?

5   John Doe :   Um, I don't -- I honestly don't know where she

6        got that from.  Everything I knew from that night was from

7        what my roommate had told me.  Um, and I don't -- I don't

8        really remember any details.  Because I know she said I --

9        I ran out of the room.  Um, I think that's what -- what she

10        said, that I ran -- ran out of the room and I don't even

11        remember running out of any room.  Um, so I'm -- I'm kind

12        of confused as to where she got that from.

13   JAMES LARIMORE:    Other questions at this point?

14   IRANIA MUNIZ:  Yeah.  Did you want to go first, Mis--

15   __:  (inaudible).

16   ERIC HAMAKO:   Go.

17   IRANIA MUNIZ:  Um, I have a couple of questions.  Did you -- how

18        -- how did you -- what made you think that the article was

19        written about you?

20   John Doe :   Well, it -- it was first, um...  I was -- uh,

21        sort of the -- that November, I guess, when -- was -- I was

22        out in town, again at (inaudible), um, and I think I left

23        the table, went to the bathroom, was coming back to the

1     table, um, and R.M. happened to be like a booth -- in a

2     booth with P.T.        I think at the time. Um, on the way

3     back to my table, which was in the back of the room, um,

4     she called me over and I just said, "Hi, like how you

5     doing?  You guys have a good night." Um, and she -- what

6     she said to me is, you know, "I just wanted to let you know

7     I don't think you are a rapist." Um, so at that point I

8     was like, "What are you talking about?" Um, I just -- I

9     don't know.  I thought maybe it was like a joke I wasn't

10    getting.  I -- I don't know.  It -- it threw me off and I

11    kind of was like, "Oh, thanks." Um, kind of just, you

12    know, went back to my table and about my night. Um, and

13    then later that night, um, I had gone back to my room and I

14    was just hanging out with some friends and I was like, oh,

15    telling, you know -- everyone was kind of going over what,

16    you know, their night was like, um, and I was telling them,

17    "Oh, yeah, I was like at dinner and I had this really weird

18    interaction." Um, and then that was when, uh, one of my

19    friends said -- was like, "Oh, well, maybe this article has

20    something to do with it." Um, and that was the first time

21    I saw the article.  Um, and then even after I saw the

22    article I wasn't quite sure, um, that this is what she was

1    talking about so then that's when I sent her a Facebook

2    message, um...

3  IRANIA MUNIZ:  You sent?  I'm sorry, you --

4  John Doe :    I sent R.M. a --

5  IRANIA MUNIZ:  OK.

6  John Doe :    -- a Facebook message.  So she was the one at the

7    restaurant so I sent her a link to the article, um, on

8    Facebook and said, "Was this what you were talking about?"

9    Um, then -- and then when she said yes -- um, she responded

10   to me, said, "Yes, this is what I was talking about."

11   That's kind of when I knew, um, for sure that that was what

12   she was talking about.

13 IRANIA MUNIZ:  Who was the person that originally showed you the

14   message or the article?

15 John Doe :    It was my friend G.T.    , um, and N.K. was also

16   in the room at that point, I believe.

17 IRANIA MUNIZ:  Did they indicate why they thought this might be

18   related to you?

19 John Doe :    Well, they know -- they knew that R.M. and, um,

20   S.J. and that group were kind of a friend group.  Um, so I

21   think that might have been, you know, how they kind of

22   started pulling that together.

23 IRANIA MUNIZ:  Thank you.

John Doe   Hearing, 12/12/2013                    Page 70
Sexual Misconduct Hearing Board, Amherst College

1   ERIC HAMAKO:   How did your relationships with P.T.        and

2        L.W.        , uh, R.M. , (inaudible), and, uh -- and other

3        people, how were those relationships effected in the time

4        after they learned about you hooking up, uh, with S.J.  in

5        the common room?

6   John Doe  :   Uh, well, to be honest, I-- I've never really had

7        a relationship with any of them.  Um, it's kind of been

8        more of an acquaintance, um, type of deal and, uh, we like

9        lived close together and we would say hi when we passed

10       each other in the halls.  I kind of mostly knew them, um,

11       through E.K.  , um, and that.  But we've -- we've -- I

12       would say we were never friends.  Is that we were -- yeah,

13       we were mostly acquaintances so I didn't really see any

14       change, um, in our relationships (inaudible).

15  ERIC HAMAKO:   OK.

16  IRANIA MUNIZ:  I have a -- I have a question.

17  JAMES LARIMORE:    Mm-hmm.

18  IRANIA MUNIZ:  Um, in your report you state that, um, you were

19       shocked and you don't believe that you could have done

20       this.

21  John Doe  :   Mm-hmm.

22  IRANIA MUNIZ:  Can you talk a little bit more about how you

23       believe you could have not -- how you believe that you were

John Doe   Hearing, 12/12/2013                    Page 71
Sexual Misconduct Hearing Board, Amherst College

1        -- could not have done this and at the same time had no
2        recollection of that night.

3    John Doe :    Um, I -- I guess --

4    IRANIA MUNIZ:  Is -- is that clear?

5    John Doe :    -- I can only say that just based off of knowing
6        me and kind of knowing my history and how I've been with,
7        you know, other people when they've said, you know, this is
8        as far as I want to go.  And I've never, never pushed the
9        boundaries.  Um, and even, you know, my witnesses have said
10       that they -- even if they had -- weren't people who were
11       romantic -- romantically involved with me ever, like
12       they've known people who have been --

13   IRANIA MUNIZ:  Mm-hmm.

14   John Doe :    -- um, and that was like never an issue.  Um, and
15       yes, I don't remember anything and I won't, you know,
16       comment on, you know, what might have happened that night.
17       Um, but just kind of based on that.  I kind of just find it
18       really hard to believe that, you know, for that one night
19       or that one instance I would do something like that.

20   IRANIA MUNIZ:  And in the reports it states that -- um, I think
21       it was E.K.        and maybe -- there was another person,
22       um, who said that they've had -- that you've had sex when
23       you or somebody else was under the influence of alcohol.

1    John Doe :    Mm-hmm.

2    IRANIA MUNIZ:  Can you comment about that?  Like how, um...

3    John Doe :    Um, could you be more specific in the question?

4    IRANIA MUNIZ:  Sure.  Um, I guess my -- my question is around

5         your -- your relationship to sex and alcohol.

6    John Doe :    Mm-hmm.

7    IRANIA MUNIZ:  How...  Let me -- yeah, I'm not being super

8         clear.  But how...  Can you talk a little bit -- like if it

9         was -- specifically E.K.       states that she has had sex

10        with you under the influence of alcohol.

11   John Doe :    Mm-hmm.

12   IRANIA MUNIZ:  Um, and then you stating now that you don't

13        believe you're that type of person and that all of your

14        relationships have been, um, consensual.

15   John Doe :    Mm-hmm.

16   JAMES LARIMORE:    Right.  And if I could maybe just stop in.

17        That, um, in our process, prior sexual histories are not

18        things that we explore but I think the question you're

19        trying to get at is around your belief, by your self--

20        self-perception, uh, and -- and where that comes from, like

21        how that -- how that (inaudible).

22   IRANIA MUNIZ:  Yeah.  Like...  I guess I'm -- I'm -- I'm trying

23        to understand, um...  I guess I'll just ask my question

1          directly and if it's not appropriate then you can just say

2          that.  Um, do you -- do you feel that it is OK to have sex

3          under the influence of alcohol?

4   John Doe :    Um, could you repeat it one more time, the

5          question?

6   IRANIA MUNIZ:  Do you feel that it is OK to have sex under the

7          influence of alcohol or engage in sexual relationships?

8   John Doe :    Um, well, I guess it's not necessary to have

9          alcohol.  Uh, uh, by no means is it necessary for alcohol

10         to be involved in like a sexual relationship.  Um, but I

11         think you'd be wrong in saying that, um...  Especially for,

12         you know, college students and, you know, our age group

13         that -- that they don't sometimes mix and that, you know,

14         sometimes the alcohol is involved with, um, a sexual

15         encounter or -- or a sexual relationship.  Um, I mean, I'm

16         not going to say it's ideal or anything.  Um, but I

17         wouldn't say it's unusual either.  I don't know if that

18         answers it.

19  IRANIA MUNIZ:  OK, thank you.

20  JAMES LARIMORE:    Are there, um, other questions from the

21         hearing panel at this point?  No?  OK.  Then, um, are there

22         any questions that you have that you'd like me to direct to

23         John  ?  OK.  So, John    , the question is, um, was blacking

1        out that night a singular instance for you or have you

2        blacked out before?

3    John Doe :    Could you repeat the question?  Sorry.

4    JAMES LARIMORE:    Sure, yeah.  Uh, was blacking out that night

5        -- and this is the night of February 4th -- a singular

6        incident for you or have you blacked out before?

7    John Doe :    Um, I have blacked out before.  Um, I wouldn't

8        say it's a common occurrence.  I'd say my first and second

9        weekends as a freshman in college I blacked out, um, mostly

10       because I, you know, didn't know what -- how -- how to

11       handle it, um, or what my limitations were.  Um, but I

12       would say it hasn't really happened -- it's been pretty

13       much isolated since -- since then.

14   JAMES LARIMORE:    OK.  OK.  Um, so John    , in your answer you

15       connected the idea of blacking out with not knowing your

16       limitations and I'm wondering if you can explain that a bit

17       further.

18   John Doe :    Um...

19   JAMES LARIMORE:    And you mentioned not knowing your

20       limitations with that freshman year experience.  So I think

21       the question may be much -- may be broader than that.

John Doe   Hearing, 12/12/2013                    Page 75
Sexual Misconduct Hearing Board, Amherst College

1   John Doe  :    Um, I guess not correctly calculating, um, the

2        effects of alcohol on me, um, on a particular night.  Uh,

3        I'm not sure if that really gets at the question though.

4   JAMES LARIMORE:     Mm-hmm.  OK.

5   John Doe  :    Sure, yeah.  And -- and I guess, well, this is --

6        would you, uh, care to try to clarify the question a bit

7        more?

8   Sandra Jones  :   Sure, yeah.

9   __:  May I -- may I also take a break at this point?

10  JAMES LARIMORE:     Um, sure.  Why -- why don't we take just a

11       short five-minute break.

12  __:  Yeah.

13  JAMES LARIMORE:     OK.  OK.  And just to remind folks, we'll

14       tape the tape recorder running during the break.  Susie?

15  SUSIE MINCHANNON:  OK.  Thank you.

16

17  [five-minute recess]

18

19  JAMES LARIMORE:     OK.  So we are all back in the room and

20       we'll continue, get things going again.  Uh, so John

21       this is a bit of a follow-up.

22  John Doe  :    Mm-hmm.

John Doe   Hearing, 12/12/2013                        Page 76
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    Um, so the first question, just to kind of

2        refresh your memory, um, asked you to connect the idea of

3        blacking out with "not knowing your limitations" and asked

4        if you could explain it or clarification here -- and I'll

5        read it verbatim.  I guess I'm asking what kind of

6        limitations do you mean and do you connect blacking out

7        with them?  The -- the limitations?  Does blacking out mean

8        that you're out of control and unaware of yourself?

9   John Doe :    Is -- so is she asking for my definition of

10       blacking out?

11  JAMES LARIMORE:    Well, I think this is -- um, well, I should

12       let you clarify it for him if you like.  The way that I

13       interpret it is about, you know, how you understand

14       blacking out, what that means for you.

15  John Doe :    Well, I guess, uh... So, uh, that's -- to me

16       that sounds like asking for the definition of blacking out.

17  JAMES LARIMORE:    OK, mm-hmm.

18  John Doe :    Uh, and I guess me blacking out just means that I

19       have, uh -- I'm just totally unaware.  Mentally just

20       totally unaware, um, of what's going on.  Um, you know, to

21       the point where I don't remember anything, um, if that

22       answers the question.

1   JAMES LARIMORE:    OK, sure.  So the follow-up then is when you

2       self-describe yourself as blacking out, do you feel that

3       you're out of control and unaware of yourself?

4   John Doe :   If I'm unaware of myself, that means that I don't

5       remember what I'm doing --

6   JAMES LARIMORE:    Mm-hmm.

7   John Doe :   -- then yes.

8   JAMES LARIMORE:    OK.  OK.

9   __:  (inaudible).

10  JAMES LARIMORE:    OK.  We're going to take a moment to --

11  __:  OK.

12  JAMES LARIMORE:    -- confer about the appropriateness of the

13      question.

14  __:  (inaudible) there's not (inaudible).  Yeah.

15  __:  (inaudible).

16  JAMES LARIMORE:    Yeah.

17  __:  I think we can (inaudible).

18  JAMES LARIMORE:    Yeah, yeah, yeah, sure, OK.  Great, thank

19      you.  Yeah.  So the -- nice to have someone to confer with

20      about kind of complex issues as they come on.  So the

21      question that has been asked is one that I'll, um -- I'll

22      allow on a very limited basis, uh, because it -- it's a --

23      the question has to do with prior sexual histories and, uh,

John Doe   Hearing, 12/12/2013                    Page 78
Sexual Misconduct Hearing Board, Amherst College

1        that -- uh, we have a very narrow, uh, path to trod in

2        terms of, um, any relevance on that topic.  So the question

3        is, uh, have you ever had another sexual encounter while

4        blacked out?

5    John Doe :   Is that allowed to be asked?

6    JAMES LARIMORE:    It is.  Yeah.  And as I mentioned, this is,

7        I think for, you know, a narrow question.  We're not going

8        to go very far, uh, with this.

9    John Doe :   (inaudible).

10   JAMES LARIMORE:    OK, thank you.  Thank you.  OK.  So this is

11       a question regarding Exhibit D, which (inaudible) give

12       everyone a moment to find their...

13   TODD PORTER:  D.

14   JAMES LARIMORE:    And this is a -- a text message exchanged

15       between John  and S.J. .  Looks like folks have that.  And,

16       John  , the question is in your text message (inaudible)

17       you the next day after your alleged blackout you say that

18       you hope you weren't "being too weird".  What did you mean

19       by that?

20   John Doe :   Um, well, I was... You know, it's pretty

21       standard for me to text a girl afterwards, after we've done

22       anything to kind of, you know, check up on, want to make

23       sure they're OK.  Um, and I -- that part, I guess, was

John Doe   Hearing, 12/12/2013                    Page 79
Sexual Misconduct Hearing Board, Amherst College

1       specifically referring to the fact that, you know, if we --

2       if I was drunk to the point where, um, we were making out

3       in front of people in public, um, in the common room, then,

4       you know, that -- that's pretty weird in my book.  Um, so I

5       guess I was just kind of addressing that.

6    JAMES LARIMORE:      Mm-hmm.

7    John Doe :   Um, just because I knew, you know, we had done

8       that.  Um, you know, I was assuming that it would be a

9       pretty awkward situation (inaudible) in front of, you know,

10      others.

11   JAMES LARIMORE:      So, um, new question.  When you speak to

12      L.R. she says that you asked her if you should "apologize"

13      to me.  What would you have apologized for?

14   John Doe :   Um, well, I'm not sure if I used that word.  But

15      I guess I would have wanted to address, you know, how she

16      was feeling.  Um, like I said, I'm a pretty empathetic guy

17      and just -- um, it's just a horrible, horrible feeling to

18      think that -- you know, to think that of someone.  Um, I

19      kind of just wanted there to be a way to kind of figure out

20      what had happened, um, see if there was like any way we

21      could address it.  Um, and I guess kind of address the

22      feelings that she had.

John Doe   Hearing, 12/12/2013                    Page 80
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:     OK.  OK.  And, uh, S.J.  , do you have any

2       remaining questions that you'd like to ask at this point?

3   Sandra Jones :   I do not.

4   JAMES LARIMORE:     OK, great.  Let me, uh, return to the

5       hearing panel, let me see if there are additional questions

6       that you'd like to ask.

7   IRANIA MUNIZ:  I have a question.  Um, did you have a

8       conversation with E.K.   after you contacted S.J.  to see if

9       she had told E.K.   about your hooking up with...?

10  John Doe :    We had spoken through a third person.  Um, it

11      wasn't a very long interaction because obviously it was

12      kind of awkward.  Um, but actually that -- um, we did kind

13      of sit down over coffee and have a talk about, you know,

14      what that meant.  Um, you know, we did that a couple of

15      times, just to kind of...  Yeah, between the two of us,

16      figure out what that meant.  Um, so that -- that was that

17      conversation, over those two coffees mostly.

18  IRANIA MUNIZ:  What did you tell her happened that night?

19  John Doe :    I mean, I basically told her I got too drunk, um,

20      and that I had hooked up with S.J.  and that, you know, I

21      was really apologetic and that it was definitely something

22      I wouldn't have wanted to do if I was sober, um, because,

23      you know, I wouldn't want to hurt anyone.  You know,

1        wouldn't want to hurt E.K. , um, doing so.  Um, and, you

2        know, at that point, kind of just agreeing, well, we'll --

3        we'll just kind of be friends but we'll keep our distance.

4    ERIC HAMAKO:   So what do you think might explain S.J. alleging

5        that you forced her to perform oral sex on you?

6    John Doe :    I don't really want to put words in her mouth or

7        I don't want to pretend like I know what's going on in her

8        head.  So I don't know if I feel comfortable.  I mean, I --

9        I have no idea.  So I -- I don't know.  I'll just kind of

10       make something up.

11   ERIC HAMAKO:   Thank you.

12   IRANIA MUNIZ:  I -- I just want to clarify.  Did you state -- do

13       you remember kissing S.J. at all in the common space?

14   John Doe :   Um, I -- I -- I thought I'd just gone to bed.  I

15       remember laughing about something with my roommate.  I -- I

16       don't know what we were laughing about.  That was kind of

17       the...

18   IRANIA MUNIZ: OK.  Thank you.

19   JAMES LARIMORE:    Ok.  Are there, um, um, other questions from

20       the hearing panelists?  No.  OK.  And, um, S.J. ¹, do you

21       have any further questions that you'd like to ask?

22   Sandra Jones :   No, I do not.

1   JAMES LARIMORE:     OK, thank you.  Well, then, we are, um,

2        about to make another, uh, transition with the hearing

3        process and, uh, we'll call in our first witness for the

4        afternoon.  S.J.  , we'll begin with your witness, L.R.

         .  So, Susie, if you would ask L.R. to join us.

6   SUSIE MINCHANNON:    OK.  (inaudible).

7   JAMES LARIMORE:     OK.  And just -- first we'll offer L.R. an

8        opportunity to make any kind of opening remarks.  We'll --

9        I'll -- I'll let her know that we've all read the material

10       that's in the investigative report and then, uh, S.J. will

11       have the first opportunity to ask questions of her.

12  SUSIE MINCHANNON:    (inaudible) stay here.

13  JAMES LARIMORE:     All right.  Um, L.R.  . thanks for joining us.

14       Um, just as we get underway here, I want to, um, remind

15       you, um, the hearing panel members and all of the

16       participants have reviewed the packet that we received from

17       the investigator, um, the material already here, so there's

18       no need to, um, kind of go back, um, over that material.

19       But, um, uh, as we get started here I'd like to provide an

20       opportunity for any, uh, kind of opening remarks that you'd

21       like to make and then we'll, uh, (inaudible) questions that

22       she may have for you.

1  L.R.          :  Um, yeah, actually I have some prepared if that's

2       OK.  Um, I wanted to add a couple of things because I felt

3       like --

4  JAMES LARIMORE:    Mm.

5  L.R.          :  -- the investigator's report didn't fully capture

6       what I was trying to say and I had additional things that I

7       wanted to sort of clarify, um, and I think I'm better in

8       writing than in speaking anyway.

9  JAMES LARIMORE:    Mm-hmm.

10 L.R.          :  So I just had a couple of things here if that's

11      OK.  Um, so S.J.   has been a writer on *AC Voice*, um, which

12      is an online publication of which I'm the editor-in-chief

13      for over a year and a half.  I met her through her freshman

14      roommate,  E.K.   , who has been a friend of mine since

15      preschool.  Um, on October 22, 2012 S.J.   sent me an *AC*

16      *Voice* post originally titled Distance which was later

17      retitled, um, which she had already sent to her peer

18      editor.  She wanted me to give it a once over as the

19      editor-in-chief, mostly to look for an image that could

20      accompany it, some technical things, um, and because I was

21      a -- considered sort of a sexual respect, um, expert on

22      campus because of some advocacy work I had done over the

23      past two years both on and offline.  Um, I sent her back

1    edits and recommendations and she published on October 25,

2    2012.  Um, at the time that S.J.'s  article was published,

3    which I'm assuming you've all read, it's appendix E, um, I

4    reached out to her to offer support and referred her to the

5    campus survivor's group.  I didn't know exactly who the

6    people, um, were that she was talking about, um, although I

7    knew that she and her roommate had had a bad fight the

8    previous year after S.J. hooked up with a boy E.K.   liked,

9    but I wasn't sure who the boy was.  Um, John   contacted

10   on April 15, 2012, asking me if I could lend him an ear.

11   Um, those were his words.  I knew John   vaguely from when

12   he had been dating E.K.  .  I wasn't sure what he was

13   contacting me about but as someone who is an outspoken

14   sexual assault advocate and, um, I was the head of

15   (inaudible) that year, I assumed it was about one of those

16   two, um, things and I'm not sort of unused to people coming

17   up to me and asking me very, very personal questions or for

18   advice.  Um, thinking that it might be an emergency I

19   offered him my phone number and told him he could call me

20   right away and we could speak.  He said instead that he

21   would prefer to meet in person so we met the next day,

22   April 16th, in the Queer Resource Center.  Um, when we met

23   John   seemed very nervous and told me that while drunk he

1     thought he might have assaulted a girl on campus.  He asked

2     me what he should do about it, that her behavior had been

3     strange since then and that he wasn't sure if he should try

4     and contact her to apologize.  I was quite taken aback by

5     that information, um, but I told him not to contact her

6     right away because the -- the girl might find contact from

7     her assailant triggering and upsetting.  I then asked

8     John   to explain to me what had happened so I could him

9     figure out next steps.  John   told me that he had -- that

10    he had been very drunk and had started making out with a

11    girl in a common room in front of some of his friends.  He

12    had then gone up to the girl's room and had been sort of

13    blacking out and doesn't remember the details.  He told me

14    repeatedly that he didn't remember much of the night but

15    that they did engage in sexual activity.  His words were

16    hook-up.  He felt really uncomfortable with it both at the

17    time and in the morning.  He left the girl's room quickly

18    and with some confusion and felt very out-of-control.  I'm

19    sorry for the length.  I just want to be thorough.  Since

20    that night, John   had been approached with rumors that he

21    had assaulted the girl.  He was very concerned both with

22    his -- both with his behavior that night and with the

23    rumors.  I referred him to the counseling center and told

1    him to learn more about sexual assault so that he could

2    understood more about what happened that night.  John

3    thanked me and left.  I did not follow-up with him to see

4    if he had moved forward on any of those suggestions.

5    Because I had read S.J.'s  post and knew a little bit about

6    her social life through E.K.  , I was able to put together

7    that the incident that John   approached me about involved

8    S.J. .  I then was torn between reporting through

9    administrative channels or not.  I see myself as a

10   mandatory reporter of sorts because of, um, my position of

11   leadership.  Um, but I also felt an unethical level, that

12   since administrative channels were not fully up and running

13   last April, it might not be adequate or appropriate to go

14   through them as a means of following-up on the issue.  I

15   consulted with Danielle Hussey (sp?), then area coordinator

16   and director of the Women's and Gender Center, without

17   giving her any names or identifying information about

18   either of the people.  I decided to approach S.J.  directly

19   and let her know that John   had approached me about the

20   issue.  On April 22, 2013 I contacted S.J.  and said I

21   wanted to talk to her.  We met on April 24th and I told S.J.

22   that John   had spoken to me about the night that he had

23   assaulted her, which I wanted her to know.  Instead of

1      reporting an incident of sexual assault, I wanted S.J. to

2      have the option to report and also to know what her

3      resources were.  I did not tell S.J. any of the details of

4      my conversation with John   and she did not ask for any.

5      I referred her to the counseling center, the survivor's

6      group, and the peer advocates for sexual respect.  S.J.

7      followed up with me on April 29th, thanking me and telling

8      me that she had followed up with a peer advocate.  I

9      responded that I was happy to talk through -- through the

10     process but I reminded her that I was not a peer advocate.

11     S.J. and I met again on May 1st.  S.J. had -- had some more

12     questions for me about the disciplinary hearing processes,

13     which I told her to speak to a PA or a dean about because

14     my knowledge of those processes was somewhat limited since

15     the college's handling of sexual misconduct was in flux.

16     The next I heard from S.J. was October 31st.  Um, basically,

17     in conclusion, um, the investigator questioned my

18     recollection of events, in particular my definition of sex.

19     I use sex in a broad based way, um, as it is often used in

20     the sexual respect advocacy world and in queer communities,

21     in which I speak frequently.  Um, and is which -- which are

22     the forums in which I'm used to speaking about sexual acts.

23     I reported to the investigator everything I could recall

1   from what John   told me.  Immediately after John   and I

2   spoke I wrote up a document of our conversation and that

3   day my computer was stolen from Frost Library and I didn't

4   have a backup.  So I had a whole document of everything

5   that was said and then it was lost and it was finals period

6   and, um, so it goes.  Unfortunately I don't have it.  I

7   didn't have it to present to the investigator.  I have no

8   clearer testimony than my impressions based on a

9   conversation several months ago of his recollections of

10  that night which were both muddled in retelling and his

11  capacity for remembering what happened.  Um, I realize also

12  that I should have reported, um, what John   told me to the

13  dean and not to ⁱS.J. .  At the time of the conversation with

14  John   I had already spoken several times to the head of

15  the Women and Gender Center about the fact that I needed

16  more guidance in how to deal with sort of an onslaught of

17  people coming to me, so this was a moment of like real

18  administrative flux and also real flux of like my position

19  and how, um, reporting should work.  And so instead I

20  decided to, um, give S.J. the agency to figure out whether

21  or not to report on her own.  So that's how that went down.

22  I don't know...

John Doe   Hearing, 12/12/2013                    Page 89
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK, great.  Thanks.  (inaudible) do you have

2       questions that you'd like to ask of L.R. ?

3   Sandra Jones :   Yes.  Um...

4   JAMES LARIMORE:    Oh, and L -- no, um, need to actually --

5       (inaudible) to serve as a reader.

6   L.R.        :  Oh.

7   JAMES LARIMORE:    (inaudible).

8   E.B.        :    So from your understanding John   was

9       unhappy and uncomfortable with that night before he read my

10      blog article?  If so, did he say why?

11  L.R.        :  Um, yes.  So he told me that he was -- when he

12      came to me it was after he had been directed to the blog

13      article but he told me that he was both uncomfortable with

14      what actually happened that night and uncomfortable with

15      the rumors about what would have happened that night,

16      meaning the blog article separately.  Both of those things.

17      Um, if so, did he say why?  Um, he recalled being out of

18      control and not really remembering a lot and being worried

19      about what happened in that interaction.

20  Sandra Jones :   Yeah, that's it.

21  JAMES LARIMORE:    OK.  And no further questions?

22  Sandra Jones :   No further questions.

John Doe   Hearing, 12/12/2013                           Page 90
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK.  Why -- I'll turn first to the hearing

2       panel to see what questions you all might have for L.R. .

3   IRANIA MUNIZ:  So in the investigator's report it -- um, you

4       said that he continue -- you said that he thought he

5       assaulted a girl.

6   L.R.       :  Yeah.

7   IRANIA MUNIZ:  Did he explain more or did you ask him to explain

8       more what that meant?

9   L.R.       :  Yeah.  So I did ask him to explain more what that

10      meant.  Um, I -- he then explained to me that he -- as I

11      said I think in here, um, that he had gone up to the girls

12      room and that they hooked up and that he was blacking out

13      and felt out-of-control and uncomfortable and he left the

14      room very quickly and it was very unclear to him what had

15      happened.

16  TODD PORTER:  So in your conversation with Mr. Doe um, did --

17      was there any sort of indication or, um, conclusion that he

18      did remember stuff about the actual event?

19  L.R.       :  Um, I'm sorry, can you like --

20  TODD PORTER:  Yeah.  Did he indicate that he had -- possessed

21      memories of the actual event?

22  L.R.       :  Yes.

23  TODD PORTER:  And what were those memories?

1   L.R.        :  Um, I mean, I -- he didn't get particularly -- he

2        didn't get very graphic with me.  He said hooking up in --

3        in her room, um, and that he remembered, I think, like

4        moments of that.  Um, I -- I didn't ask for anything more

5        graphic than that.  Um...  Does that fully answer your

6        question or...?

7   TODD PORTER:   Yeah, thank you.

8   L.R.        :  OK.  And -- and he expressed impressions that

9        weren't specific, like acts or images but, um, feelings.

10  TODD PORTER:   OK.  Thank you.

11  JAMES LARIMORE:    OK.  And are there other questions from the

12       board members at this point?  Yeah?

13  ERIC HAMAKO:   So in...  In your statement it also --

14       (inaudible) in the statement you just delivered you had

15       noted that John   had said a particular -- um, either that,

16       "I ran out of the room," or, as you had said, he said he

17       left the room quickly.  Some of the other testimony that

18       we've heard John  , he said that he doesn't remember

19       anything about the night.  How do you -- how do you

20       reconcile those two?  The current testimony and, um, and

21       his statement to you that, "I ran out of the room" or "I

22       left the room quickly."

John Doe   Hearing, 12/12/2013                    Page 92
Sexual Misconduct Hearing Board, Amherst College

1   L.R.          : Um, how do I reconcile the disparity between

2          those? I mean, I don't know.  I only heard John   talk

3          about it one time and I reported to the committee what I

4          heard him say, which was that he left the room quickly.  So

5          I -- I don't know why those two things are different.

6   ERIC HAMAKO:   OK.

7   JAMES LARIMORE:    OK.  Are there other questions then at this

8          point?  OK.  So, uh, John   , are there, um, questions that

9          you have, uh, for -- for this witness?

10  John Doe : Yeah.  Uh, well, the first question is at what

11         point of the discussion did I say that I thought I had

12         assaulted a girl?

13  L.R.          : Um, at the very beginning of the conversation

14         when you were sort of opening.  You said that you thought

15         you might have assaulted a girl and you were trying to

16         figure out if you should apologize to her, um, as I said

17         both in my opening statement and (inaudible).

18  John Doe :  Uh, were those the exact words that -- that you

19         recall me saying and, uh, give specifics.

20  L.R.          : Um, you gave the specifics that I've expressed

21         here.  Um, as I -- I didn't ask you anything more graphic

22         and you didn't say anything more graphic than everything

23         that I have here.  But, um, you said, you know, all the

John Doe   Hearing, 12/12/2013                    Page 93
Sexual Misconduct Hearing Board, Amherst College

1        things I said about you feeling uncomfortable and out of

2        control, um, and that you were hooking up and blacking out,

3        that you left the room quickly or ran out of the room.  Um,

4        your exact language -- I mean, no, I don't have your exact

5        language.  I have my impressions of -- of what you told me.

6        Um, I can't -- I -- I wasn't recording you and I don't have

7        my immediate -- my -- the document I wrote immediately

8        afterwards.

9    John Doe  :   Well, is it -- is it not true that all I said was

10       that we hooked up and nothing more specific?

11   L.R.        :  I mean, I recall you saying something different,

12       which was closer to you think you might have assaulted a

13       girl.

14   John Doe  :   Um, but with no specifics on how, right?

15   L.R.        :  No, no specifics on how.  You said hooked up.

16   John Doe  :   Uh, that's all.

17   JAMES LARIMORE:    That's all.  Thank you.  Thanks.  And, um,

18       back to the hearing panel then.  Any additional questions

19       that you have at this stage?

20   IRANIA MUNIZ:  I have -- I have one question.  You said that in

21       the report here, um -- actually, no I don't.  No, I do.

22       Sorry.  You say, "He says that he knows they had sex but

1       doesn't really remember a lot of it but that he felt

2       shitty."

3  L.R.        :  Yeah.

4  IRANIA MUNIZ:  Um, can you talk more about that?  That he knows

5       that they had sex?

6  L.R.        :  Um, can you clarify your question?

7  IRANIA MUNIZ:  Sure.  Because, um, I'm hearing that it was

8       confirmed that he stated about hooking up.

9  L.R.        :  Mm-hmm.

10 IRANIA MUNIZ:  And then reading this it says sex.

11 L.R.        :  Yeah.  So I'm -- that was -- I understand sex

12      broadly and I also understand hooking up broadly, um, and

13      in the context that I -- I normally speak in those things

14      are understood to be analogous and also not specific to a

15      kind of penetration.  Um, so that's how I used it.

16 IRANIA MUNIZ:  But you would use -- but penetration would be

17      included in your definition of sex, not just kissing?

18 L.R.        :  Um, can you -- I'm sorry, can you clarify?

19 IRANIA MUNIZ:  So when you said that you know that he -- that

20      they had sex, what -- what -- what were you saying in your

21      definition?

22 L.R.        :  I -- I was sort of using the term broadly as in

23      they engaged in acts of sexual intimacy.

1   IRANIA MUNIZ:  OK.

2   L.R.          :  Yeah.

3   IRANIA MUNIZ:  Thank you.

4   JAMES LARIMORE:    Yeah.  Any, um, additional questions then

5       for the hearing panel?

6   ERIC HAMAKO:  As related to that, um...  Sorry.  Um, can you --

7       can you tell us about or how would you describe how John

8       kn-- knew that they had had some sort of sexual

9       (inaudible)?

10  L.R.          :  Um, how he knew that?  Um, well, he told me that

11      they had hooked up so...  I don't -- I don't want to make

12      conjecture but, um, I think he remembered that they had

13      hooked up.  I mean, he -- that's what he told me so I'm

14      assuming that was -- he told me he went up to a girl's room

15      and that they hooked up so...  I don't know if there's

16      more.

17  ERIC HAMAKO:  Mm-hmm, mm-hmm.

18  L.R.          :  If there's more specifically directly that I can

19      answer there.

20  ERIC HAMAKO:  Just a -- I -- I think that answers the question.

21  L.R.          :  OK.

John Doe   Hearing, 12/12/2013                           Page 96
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:      OK.  And other questions from the hearing

2       panel?  Ok.  And then, uh, John    , you had an additional

3       questions?

4   John Doe :   Um, do you recall saying to me that even though

5       you weren't a PA and that they're not legally sworn to

6       confidentially, that you would keep our discussion

7       confidential?

8   L.R.        :  Um, I -- I don't recall saying that.  But also,

9       like, yeah.  No, I -- I don't recall saying that and, I

10      mean, I was conflicted on like what channel to go through

11      in -- in dealing with that.  Um, yeah.  But I'm -- I'm not

12      a confidential source.  I have no -- not a counselor.  I'm

13      not a PA, um, and I'm not, um, bound by confidentiality

14      other than like my own ethical choices.

15  JAMES LARIMORE:      OK.  Other additional questions?  OK.  And

16      other questions from the hearing panel?  No.  OK.  And,

17      S.J. , any further questions you'd like to ask?

18  Sandra Jones :   No further questions.

19  JAMES LARIMORE:      OK, great.  Well, thank you.  I should ask

20      whether, at this point, um, there's a sense -- we'll check

21      back in about this later, about whether people may have

22      follow-up questions to ask, uh, of L.R. but we'll come back

1       around to that maybe -- during a break a little further

2       out.  But thank you for spending time with us today.

3   L.R.        :  OK.  Thank you.

4   JAMES LARIMORE:    Thanks.

5   ERIC HAMAKO:   Thank you.

6   IRANIA MUNIZ:  What is a peer advocate?

7   JAMES LARIMORE:    Oh, um...  Yeah, yeah, thanks.

8   IRANIA MUNIZ:  (inaudible).

9   JAMES LARIMORE:    Yeah.

10  __:  (inaudible).

11  JAMES LARIMORE:    Yeah.  PAs have been -- peer advocates.

12      It's a role that has changed.  Um, primarily now they're

13      focused on support, educational work, kind of peer-to-peer

14      support and educational work.  There had been a different

15      component to that job at an earlier point in its -- in its

16      life.

17  IRANIA MUNIZ:  Confidential counseling or resources, stuff like

18      that?

19  JAMES LARIMORE:    Um, never -- never intended to be that way

20      but I think that there was a period of time where the PAs

21      kind of operated that way, so that was one of the things

22      that was addressed during that sexual misconduct kind of

John Doe   Hearing, 12/12/2013                    Page 98
Sexual Misconduct Hearing Board, Amherst College

1        review and -- and, um, adjustments that were made over the

2        past -- the past couple of years.

3   IRANIA MUNIZ:  OK, thank you.

4   JAMES LARIMORE:     OK.  And I realize that some of the

5        conversation -- I'll just, you know, say this on the record

6        and with all of you here.  Uh, for people who are serving

7        on the -- on the hearing panel from other institutions,

8        sometimes when we speak in acronyms and building locations

9        and things that are very familiar to us but may not

10       necessarily translate or transfer over all that easily so,

11       you know, thank you for asking the question, feel free to

12       ask for any clarification that you all might need and I

13       think each of us, you know, from here should take on a

14       special obligation of trying to explain ourselves.  And

15       even having been here for five months there are still

16       acronyms and places that I'm learning.  So... OK.  Good.

17       So we are... Again, I think, S.J.    I just want to confirm

18       that L.R. was the sole witness that you wanted to bring?

19   Sandra Jones :   Yes.

20   JAMES LARIMORE:     OK.

21   __:  Um, so if we could have a break.

22   JAMES LARIMORE:     OK.  Yeah.

23   __:  (inaudible).

John Doe   Hearing, 12/12/2013                    Page 99
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:     Yeah, absolutely.  Uh, so, yeah.  Why don't

2       we take about a 10-minute break.  We'll give -- recognizing

3       -- and, actually, let me ask this question.  It was brought

4       up during -- in the earlier period.  So the women's room is

5       all the way down in the basement.  The men's room is right

6       next door.  If any of you are having preference, we'll

7       gladly guard the door if you prefer to have a shorter walk

8       or if you're OK downstairs then...

9   __:  I'll take a walk.

10  JAMES LARIMORE:     OK.  Can't blame you.  So we'll be back in

11      10-- 10-minutes then.

12

13  [10-minute recess]

14

15  JAMES LARIMORE:     OK, great.  OK.  So we're back in session

16      again ad, you know, we got clarification from, uh, Susie.

17      We're at that point where we're now going to switch over

18      and, uh, we'll have an opportunity, uh, to spend some time

19      with, um, with John's   witnesses.  And so is there a

20      particular order of some that you'd like to ask (inaudible)

21      first.

22  John Doe  :    Could I have N.K. , please?

John Doe   Hearing, 12/12/2013                    Page 100
Sexual Misconduct Hearing Board, Amherst College

1    JAMES LARIMORE:     OK, great.  OK.  And on this portion of the

2         evening -- and then you'll have the first opportunity --

3         we'll provide people with a chance to make any brief

4         opening remarks that they would like and then you'll have

5         an opportunity to ask the first questions.

6    John Doe :   Mm-hmm.

7    IRANIA MUNIZ:  Who's coming now?

8    John Doe :    Oh, uh, so John   first, then the board, and then

9         S.J. ·

10   __:  Oh, OK.

11   IRANIA MUNIZ:  And, uh, who was the witness?  The person?

12   JAMES LARIMORE:     Oh, uh, N.K. ·

13   John Doe :   N.K.            ·

14   IRANIA MUNIZ:  N.K.           ·

15   John Doe :   OK.

16   JAMES LARIMORE:     Yeah.  Great.  Uh, thanks -- uh, thanks for

17        joining us, N.K. ·  Um, so we're back in session during the

18        hearing and the way that the -- this portion of our time

19        goes now is that, um, John   will have an opportunity to

20        ask you some questions, followed by the hearing board and

21        then, uh, S.J. if she has questions that she'd like to

22        direct to you, as well.  As we, um, uh, enter into this,

23        you know, period of time together, we'll want to provide an

1        opportunity for any kind of opening remarks that -- that

2        you would care to share before we'll, um, start with the

3        questions.

4    N.K.      :      I'm assuming you guys know.  So at the time I was

5        John Doe's    roommate.

6    JAMES LARIMORE:      Mm-hmm.

7    N.K.      :      That's all I really have to say, I guess.

8        (inaudible).

9    JAMES LARIMORE:      Mm-hmm.  OK.  Great.  Thanks.  And, uh,

10       John  , do you have questions you'd like to ask of N.K. ?

11   John Doe  :      Yeah.  Um, could you clarify who was in the

12       common room that night and their affiliation to S.J. and

13       me?

14   N.K.      :      Yeah, sure.  So from my memory, I remember me,

15       John  , R.M. , and S.J. .  That's all I can really remember

16       of people that were present.

17   John Doe  :      Uh, do you recall any chance or any other kind of

18       conversation going on during this period in the common

19       room, um, and if so, who was speaking to whom?

20   N.K.      :      I don't recall any chance or anything.  I just

21       remember us four talking in the common room.  Yeah.

22   John Doe  :      Uh, how would you characterize my state of mind

23       in the common room that evening?

John Doe   Hearing, 12/12/2013                    Page 102
Sexual Misconduct Hearing Board, Amherst College

1   N.K.        :    Um, you were intoxicated but just -- everyone was

2        having -- having a pretty civil conversation.  Everything

3        seemed totally normal.

4   John Doe :    And how would you characterize S.J.'s  state of

5        mind in the common room that evening?

6   N.K.        :    Again, just like very normal, being social with

7        everyone in the common room, as well, is what I remember.

8   John Doe :   Um...

9   JAMES LARIMORE:    OK, bear -- bear with us for just a moment.

10  John Doe :   That'll be all.

11  JAMES LARIMORE:    Oh, OK, great.  And, um, members of the

12       hearing panel, are there questions you'd like to direct to

13       N.K. ?

14  TODD PORTER:   So can you indicate for us the level of alcohol

15       that was consumed both by yourself and Mr. Doe that

16       evening?

17  N.K.        :    Well, I wasn't with John   that night so I have

18       no idea.

19  TODD PORTER:   OK.

20  N.K.        :    But myself...  I would imagine like just at

21       typical weekend.  Maybe a couple of drinks.  Nothing crazy.

John Doe   Hearing, 12/12/2013                    Page 103
Sexual Misconduct Hearing Board, Amherst College

1   TODD PORTER:   OK.  And to kind of follow-up on that.  Have you,

2        um, ever witnessed Mr. Doe black out as a result of alcohol

3        usage?

4   N.K.      :    Um, I have -- he was -- he's my roommate so I've

5        seen him (inaudible) before.

6   TODD PORTER:   OK.  And what does that look like in terms of how

7        does he behave, how does he respond, are you aware that

8        he's blacked out at that point?

9   N.K.      :    He's just very social and talkative.

10  TODD PORTER:   Thank you.

11  JAMES LARIMORE:    All right, OK.

12  ERIC HAMAKO:   In your time as John's    roommate how -- I guess

13       I should first ask how long were you John's    roommate?

14  N.K.      :    So for the -- all of sophomore year and then last

15       year we were neighbors in Coolidge and we're now currently

16       suitemates.

17  ERIC HAMAKO:   Great.  And kind of following on my colleague's

18       question.  Um, in that time, how many times have you known

19       John   to be so drunk that he was blacked out or didn't

20       remember things?

21  N.K.      :    Not often at all.

22  ERIC HAMAKO:   Can you -- can you give a number?  A number of

23       times?

John Doe   Hearing, 12/12/2013                    Page 104
Sexual Misconduct Hearing Board, Amherst College

1   N.K.      :    I couldn't really give you (inaudible).  Very --

2        very few.  He's a pretty responsible drinker so...

3   ERIC HAMAKO:   Thank you.

4   IRANIA MUNIZ:  Just a follow-up.  Um, you said on that evening

5        you felt like he was intoxicated to a normal amount

6        compared to when you've seen him black out?

7   N.K.      :    Um, well, on the weekends I didn't -- I'm --

8        don't know.  We (inaudible) different circles.  I'm on the

9        crew team, lacrosse, so...  On the weekends I normally

10       don't run into him unless it's like one of us is going to

11       sleep or anything.  So...  But I would say he was drunk.

12   TODD PORTER:   To kind of follow-up on that, my questioning, are

13       you able to tell when John   has blacked out?

14   N.K.      :    Um, I would say yes.

15   TODD PORTER:   And did he appear to have been blacked out that

16       evening, the night in question?

17   N.K.      :    No, because he seemed -- his function normally

18       seemed fine -- I had conversations with him.  Can't...

19   ERIC HAMAKO:   So in some of the -- in some of the statements

20       that have been made that, um, seems to be agreed on by most

21       -- most of the folks we've heard from, that John    and S.J.

22       were making out in the common room.  Would you describe

23       what you saw?

John Doe   Hearing, 12/12/2013                    Page 105
Sexual Misconduct Hearing Board, Amherst College

1   N.K.       :     Yeah, sure.  So I remember being in the common

2        room of Morris Pratt.  Me and R.M. were sitting together

3        on the couch on one side of the common room.  On the other

4        side there's S.J. and John   and they were just kind of the

5        usual, talking.  Like, "Oh, how was your night?" after

6        everyone -- all coming back.  And all of a sudden I see

7        them making out at -- very consensual on both ends in my

8        eyes.  Um...

9   ERIC HAMAKO:   What indicated to you consent?

10  N.K.       :     Well, there was no like opposition on either

11       side.  And they were talking also like while making out.

12       So I didn't -- there was no indication to me that -- that

13       it -- I didn't see, um, anyone trying to stop or say, "No,

14       please stop."

15  TODD PORTER:   How closely were you aware of their conversation,

16       what was actually being said?

17  N.K.       :     Um, I wasn't in like their conversation.  I was

18       like sitting across from them.  I really don't know what

19       was said.

20  IRANIA MUNIZ:  Do you know when, um, John   returned to your

21       room that evening?

22  N.K.       :     I don't recall.  I -- I don't remember.

John Doe   Hearing, 12/12/2013                          Page 106
Sexual Misconduct Hearing Board, Amherst College

1   IRANIA MUNIZ:  What was your conversation like with John   the

2       following morning?

3   N.K.        :   We were looking for his phone.

4   IRANIA MUNIZ:  Mm-hmm.

5   N.K.        :   That was the -- confused me.  He had no idea

6       where it was and just went around, "Oh, crap," looking for

7       his phone and then eventually (inaudible) RC and at some

8       point of the day had his phone I think.  And then yeah.

9       The conversation there was like, "Where's my phone?"

10  IRANIA MUNIZ:  Mm-hmm.

11  TODD PORTER:   And in that conversation were you -- did you ever

12      address the fact that he had hooked up with S.J.  --

13  N.K.        :   Um...

14  TODD PORTER:   -- the prior...

15  N.K.        :   I don't remember but it probably came up.  I

16      would assume so.

17  IRANIA MUNIZ:  Do you remember him talking -- or you talking to

18      him about him hooking up with S.J. at all?

19  N.K.        :   I don't really --

20  IRANIA MUNIZ:  Post --

21  N.K.        :   I don't really remember.

22  ERIC HAMAKO:   So how would you explain S.J.'s  allegations that

23      John   forced her to perform oral sex?

1   N.K.       :     What do you -- what do you (inaudible) mean by

2         that question, I guess?  I'm confused.

3   ERIC HAMAKO:   So, uh, S.J.'s   naking these allegations.  Um,

4         what do you -- what do you think's motivating those

5         allegations?

6   N.K.       :     I knew at the time John   was hooking up with her

7         roommate at the time.  But, like, I really don't know what

8         caused her to make these kinds of allegations.

9   ERIC HAMAKO:    Thank you.

10  JAMES LARIMORE:     Are there other questions from the hearing

11        panel?

12  IRANIA MUNIZ:  (inaudible).  Did you and John   talk about that

13        evening at all?  Did he say that maybe he didn't remember

14        anything?

15  N.K.       :     I'm sure we did but I don't remember that

16        conversation.

17  ERIC HAMAKO:   Just in terms of the timeframe of things, um, do

18        you have a sense of kind of roughly when you arrived in the

19        common room, how long you were in the common room before

20        John   and S.J.  left?

21  N.K.       :     The act-- I have no idea what the time was when

22        we were in the common room.  But I'd say our conflict, the

John Doe   Hearing, 12/12/2013                     Page 108
Sexual Misconduct Hearing Board, Amherst College

1          interaction between us four was maybe 20, 30 minutes,

2          maybe.

3     IRANIA MUNIZ:   Hmm.

4     N.K.       :    If I had to guess.  It didn't seem like very

5          long.

6     ERIC HAMAKO:   Thank you.

7     JAMES LARIMORE:     All right.  Are there other questions then

8          from the hearing panel?  No.  OK.  And, S.J.  , do you have

9          any questions?

10    Sandra Jones  :   No, I don't.

11    JAMES LARIMORE:     OK.  And, um, John     are there other

12         questions that you have?

13    John Doe  :    No.

14    JAMES LARIMORE:     OK.  Final opportunity for the hearing panel

15         then.  OK.  No -- then, uh, N.K.  , thanks for joining us.

16    IRANIA MUNIZ:  Thank you.

17    JAMES LARIMORE:     OK.  Appreciate your waiting, for your time

18         here with us.

19    N.K.       :    No problem.

20    JAMES LARIMORE:     And now -- and you're excused.  Thanks.

21    N.K.       :    Thank you.

22    IRANIA MUNIZ:  Thank you.

John Doe   Hearing, 12/12/2013                    Page 109
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:    OK. John    , which person would you like to

2       call in next?

3   John Doe :    Uh, R.M. , please.

4   JAMES LARIMORE:    R.M. , OK, great.  And, uh, just to keep all

5       of this as (inaudible) as possible, I would ask a question

6       about, uh, kind of seating arrangements and one of the, you

7       know, up-- upcoming witnesses and so I was trying to do a

8       little logistical work with Susie in passing her a note and

9       typing a message, so...

10  SUSIE MINCHANNON:    (inaudible).

11  JAMES LARIMORE:    OK.  So thanks for joining us and just, uh,

12      because I want to make sure we have the pronunciation of

13      your first name right.  Is it R.M. ?

14  R.M.        : Yeah.

15  JAMES LARIMORE:    OK, great.  So thanks.  Thanks for, um,

16      spending time with us this afternoon.  Um, we're, uh, going

17      to go through a process, as I mentioned kind of earlier,

18      uh, where John    will have the first opportunity to ask you

19      questions, followed by the hearing panel members, uh, and

20      then, uh, S.J. will have the opportunity to ask any

21      questions that she would, uh, like to, as well.  Before we

22      begin that process I would like to, you know, provide any

1      opportunity that you'd like to make any opening statement

2      or remarks.

3  R.M.           Um, so thank you.

4  JAMES LARIMORE:    OK, great.  And then, John  , your

5      questions.

6  John Doe :  Can you clarify who was in the common room that

7      night and their affiliation to S.J. and me?

8  R.M.         :  Um, so apart from S.J. and you there was me.  Um,

9      I was friends with S.J. N.K. , who was your roommate at

10     the time, I think, and J.H.     , who lived on that floor.

11 John Doe :  OK.  Um, and do you recall any chants or other

12     kinds of conversation going on during that period in the

13     common room?

14 R.M.         .:  Any chants?

15 John Doe :  Chants.

16 R.M.         :  What do you mean?  What does that mean?

17 John Doe :  Uh...

18 R.M.         :  I mean --

19 John Doe :  I can --

20     __:  C-H-A-N-T-S.

21 R.M.         :  Chants?

22 John Doe :  Chants.  C-H-A-N-T.

23 R.M.         :  You just want to know what we talked about?

John Doe   Hearing, 12/12/2013                    Page 111
Sexual Misconduct Hearing Board, Amherst College

1   __:   Chanting.

2   R.M.        :   Is that --

3   John Doe  :    Was there any chanting going on?

4   R.M.        :   Not that I recall.  From the people in the room?

5   John Doe  :    Yeah.

6   R.M.            Um, no.  I don't remember that --

7   John Doe  :    OK.

8   R.M.        :   -- happening.

9   John Doe  :    OK.  Um, how would you characterize my state of

10       mind in the common room that evening?

11   R.M.        :   You were very drunk.  You, um, could barely stand

12       on your own.  Um, N.K. : put you to bed and then you like

13       sort of crawled back into the common room.  You were very

14       drunk.

15   John Doe  :    OK.  Um, and how would you characterize S.J.'s

16       state of mind in the common room that evening?

17   R.M.        :   She was a lot soberer than you were.  She might

18       still -- this was the end of the night so she might still

19       have been tipsy but, I mean, we had just had food.  She

20       seemed normal.  She seemed fine.

21   John Doe  :    Uh, could you describe my interactions with S.J.

22       in the common room?

1    R.M.       :  Um, she was sitting on the couch when you sort of

2        just like flung yourself at her.  Um, but she was

3        responding so I guess everybody else who was around didn't

4        intervene.  Um, you weren't doing much talking.

5    John Doe :  OK.  Did it seem friendly and consensual from

6        your perspective?

7    R.M.       :  Yeah.  She was smiling and giggling and you were

8        just (inaudible) -- really, I don't know.  Yeah.

9        (inaudible).

10   John Doe :  Um, are there any other observations from -- or

11       are there any other observations in general you'd like to

12       share?

13   R.M.     :  No.  I think you've asked me pretty much

14       everything I remember.

15   John Doe :  OK.

16   JAMES LARIMORE:   OK.  And, John  , any further questions at

17       this point?

18   John Doe :  (inaudible).

19   JAMES LARIMORE:   OK.  And then for the hearing panel.  What

20       questions would you like to ask?

21   TODD PORTER:  When you state that he threw himself or flung

22       himself at her, what does that mean?  Can you clarify what

23       actually was (inaudible) that?

1  R.M.        :  He stumbled into the room and just sort of like

2         fell on her and the couch.  Um, yeah.  It -- I mean I was

3         ready to pull him off her but she was clearly responding.

4         But otherwise it would have been a very -- pretty

5         aggressive sort of gesture but, um, he was completely -- I

6         think he lost his balance more than anything.  Um, but

7         yeah.  Just sort of like fell on her.

8  TODD PORTER:  And can you give specifics of how she responded?

9  R.M.        :  Um, he fell on her and he started kissing her and

10        she kissed him back.  Um, once in a while -- I remember

11        saying -- talking to her and she would pause once in a

12        while and turn to me and just like look at me and giggle

13        and then go back to making out with him.  Um, I don't know,

14        like heavy petting.

15 ERIC HAMAKO:  So you had said that John    appeared to you to be

16        very drunk at that time.

17 R.M.        :  Yes.

18 ERIC HAMAKO:  Can you describe what you're basing your

19        testimony?

20 R.M.        :  He couldn't stand by himself.  Um, he first

21        walked in sort of -- he was being supported and like led to

22        his room by N.K.   And, um, when he came back...  I mean,

23        like the falling over the couch, that looked like he didn't

John Doe   Hearing, 12/12/2013                    Page 114
Sexual Misconduct Hearing Board, Amherst College

1        have any balance.  Um, he didn't seem to be aware who he

2        was talking to, he was with.  I mean, I'm not even 100%

3        sure he knew he was making out with S.J.  Um, we were -- I

4        mean, he didn't respond to anything anyone said to him.

5        And, um, when they left together he couldn't make it down

6        the stairs by -- by himself.  She had to support him and

7        help him down.

8    __:  (inaudible).

9  IRANIA MUNIZ:  Yeah, I have a question.  Um, when did you find

10        out about the article that was written?

11  R.M.          :  Um, sometime in -- I think it was junior year

12        fall semester.  Um, E.B. actually texted me.  Um, she

13        assumed I had already seen it but -- so I didn't

14        understand.  She said something like, "Oh, I read S.J.'s

15        article.  I'm here if you want to talk about it."  So I

16        didn't know what it was about so, um, I want to say halfway

17        through the fall semester of junior year.

18  IRANIA MUNIZ:  OK.  I'm sorry.  You said who texted you?

19  R.M.          :  Sorry?

20  IRANIA MUNIZ:  OK.

21  R.M.          :  E.B.

22  IRANIA MUNIZ:  Um, and did you notify John   of the article?

John Doe   Hearing, 12/12/2013                    Page 115
Sexual Misconduct Hearing Board, Amherst College

1    R.M.        :  I pretty much did the same thing as E.B.    .  I

2         assumed he'd already seen it.

3    IRANIA MUNIZ:  Mm-hmm.

4    R.M.        :  Um, we saw each other at a restaurant I think.

5         He came to say hi.  And I said something like, "By the way,

6         I don't think it's exactly what she's saying.  I don't

7         think you're a rapist."  And he was completely -- I mean,

8         the expression on his face when I told him that, I realized

9         he didn't know.  Um, and, um, we didn't talk about it

10        anymore and then I think maybe like a couple of days later

11        he sent me a message with a link to the article asking me

12        if this was what I was referring to and I said, "Yes," and

13        I, you know, apologized for sort of telling him about it

14        that way.  Um, yeah.

15   IRANIA MUNIZ:  OK.

16   ERIC HAMAKO:  So in your -- in your November 4th Facebook

17        message to John   , which is in Exhibit G, you said, uh --

18        you quote is, "You are the asshole who hurt my friend but

19        not a rapist."  Uh, in that statement who were you

20        referring to that John   hurt and how were you referring to

21        them hurting?

22   R.M.        :  I was referring to E.K.   .  Um, E.K.    , S.J.  , and

23        I were very close and, um, her and John   sort of had this

1       casual relationship.  Um, and she really liked him and I

2       think he was aware of that.  So when he hooked up with S.J.

3       it was a big deal in the sense that it completely, um,

4       destroyed her.  I mean, she cried for like a whole month.

5       So when I said that he hurt my friend I meant E.K.   .  Um,

6       yeah.

7   ERIC HAMAKO:   OK.

8   IRANIA MUNIZ:  So in the same email thread you, um -- or

9       Facebook thread you mention that you were the person that

10      S.J. had referred to as the friend in the article?

11  R.M.        :  Yeah.  I mean, she didn't say any names but I

12      recognized sort of -- she didn't get the exchange

13      completely right but I'm pretty sure I'm who she was

14      talking about.

15  IRANIA MUNIZ:  Can you say what exchange made you think that?

16  R.M.        :  Um, so the article said something like she tried

17      to speak out about what happened but one of her friends

18      said, "Oh, so he raped you?  That's completely -- like

19      that's a lie."  And, um, I assumed she was talking about me

20      because of a conversation we had I think in the weeks after

21      the -- after that night.  Um, so she was trying to make

22      amends to E.K.  , um, because E.K.  was very upset.  And

23      so E.K.   came to me and said something along the lines of,

1      "Oh, she suggested that he like forced himself on her when

2      he initiated the hookup," which I knew not to be true

3      because I saw it happen.  So, um, I got pretty angry and I

4      confronted her and I said, "Oh, so he raped you now?

5      That's completely bullshit."  And she immediately went back

6      and recanted and saying stuff like, "That's not what I

7      meant.  That's not what I said."  But I just like walked

8      away and didn't really give her a chance to keep talking.

9   IRANIA MUNIZ:  Mm-hmm.

10  R.M.        :  Um, but yeah.  That's what I was talking about.

11      That's -- so it's not quite as she portrayed it in the

12      article but I'm pretty sure she's talking about me.

13  IRANIA MUNIZ:  And in the investigator's report you say that,

14      um, she referred to -- that you did not believe her story

15      but then you describe it as a misunderstanding, that you

16      only meant they voluntarily left the common area and not --

17      whether or not -- what happened next.

18  R.M.        :  I meant what I saw happening in the common room.

19      Um, I can't speak as to what happened later when they were

20      alone.

21  IRANIA MUNIZ:  Mm-hmm.

22  R.M.        :  But, uh, the understanding was that she was

23      trying to justify the hookup to E.K.   but saying that he

1        sort of, you know, forced himself on her and didn't give

2        her a chance to refuse.  But that's not what I saw happen.

3        Um, yeah.  I'm definitely not talking about what happened

4        when they left together.  I have no idea what happened in

5        that room.

6   TODD PORTER:   In the common room that evening, are you aware of

7        any, um, names or anything that was said specifically to,

8        uh, S.J. from other members of the group?

9   R.M.       :  Um, no.  The other people in the group didn't

10       talk to her.  Um, once John    and S.J. left together there

11       was some talk of, um -- this is kind of horrible.  But J.H.

12            said something along the line of -- along the lines

13       of, "Oh, that girl is a slut."  And I said, "She's my

14       friend."  And he said, "No, but I know this other guy who

15       had sex with her and she's a slut."  And I said, "That

16       makes your friend a slut, not her."  And -- but none of

17       this was said in her presence.  But that's the only -- like

18       as far as names go that's the only thing I remember.

19  ERIC HAMAKO:   And in Exhibit G, in a Facebook message on -- on

20       November 4th you had said, "I know she hooked up with

21       another guy, uh, after you left that same night."  How did

22       you -- how did you know that?

John Doe   Hearing, 12/12/2013                     Page 119
Sexual Misconduct Hearing Board, Amherst College

1   R.M.        :  I heard it from, um, other friends.  I can't tell

2       if it was C.      or E.K.  but one of our other friends

3       that she had talked to the next morning told me.  Um, but

4       yeah.  But I didn't hear it directly from her so I guess

5       it's all hearsay.

6   TODD PORTER:  Thank you.

7   JAMES LARIMORE:    OK.  Are there additional questions from the

8       hearing panel?

9   TODD PORTER:  None at this point.

10  ERIC HAMAKO:  Uh, another question I have is, uh, how would you

11      explain S.J.'s  allegations that John   performed her to --

12      uh, forced her to perform oral sex?

13  R.M.        :  How would I explain it?  Like how it happened

14      (inaudible)?  Like how I think it happened or...?

15  ERIC HAMAKO:  What do you think would be -- uh, what do you

16      think S.J.'s  motive is for making these allegations?

17  R.M.        I mean, if you had asked me two years ago I would

18      have said she's pissed off.  Half of her friends aren't

19      talking to her anymore.  But I don't -- I have a hard time

20      thinking it's still relevant at this point and frankly I

21      can't think of any reason why so-- why she would put

22      herself through this whole ordeal if it was all fake.  So I

23      don't -- I mean, I have a hard time making sense of it in

John Doe   Hearing, 12/12/2013                          Page 120
Sexual Misconduct Hearing Board, Amherst College

1       that way.  But then again, I also don't think that John

2       intentionally hurt her or assaulted her, so it's kind of

3       hard for me to make sense of any of this.  I don't -- I

4       don't understand why someone would lie about this two years

5       later, if that's what you mean.

6   ERIC HAMAKO:    Thank you.

7   JAMES LARIMORE:    OK.  Are there additional questions, then,

8       for R.M. ?

9   IRANIA MUNIZ:  No.

10  JAMES LARIMORE:    OK, good.  And, S.J. , do you have any

11      questions you'd (inaudible)?

12  Sandra Jones :   No, I do not.

13  JAMES LARIMORE:    OK.  And, John  , do you have any further

14      questions?

15  John Doe :   No.

16  JAMES LARIMORE:    OK.  Then, uh, one final opportunity then

17      for the hearing panel.  OK.  OK.  So, R.M. , thank you very

18      much for waiting and for joining us this afternoon.  So

19      you're excused from the hearing for (inaudible).  OK, and,

20      uh -- so our next --

21  Sandra Jones :   Can I take a break?

22  __:  Can we -- can we do a little break?

23  __:  A break?

John Doe   Hearing, 12/12/2013                          Page 121
Sexual Misconduct Hearing Board, Amherst College

1   JAMES LARIMORE:     Sure.  OK.  Yeah, why don't we take, um,

2        five minutes, 10 minutes?  How --

3   __:  Ten minutes?

4   Sandra Jones  :   Five's fine.  I just need to get out of the room.

5   JAMES LARIMORE:    OK.  So we'll take a five-minute break then.

6   __:  If you -- do you need a private room?

7   Sandra Jones  :   Yeah.

8   __:  OK.  Can you go to 204?

9   __:  I thought (inaudible) was on 204?

10  __:  (inaudible).

11

12  [five-minute recess]

13

14  JAMES LARIMORE:     Uh.  Oh.  So I think our next step is to

15       have E.K.   join us as a witness and I think E.K.    is

16       going to be seated down at this end just to give people a

17       sense of, um, why stuff has been moved or cleared --

18  __:  OK.

19  JAMES LARIMORE:     -- from the table.  Um...

20  __:  (inaudible).

21  JAMES LARIMORE:     The cookies have disappeared from view but

22       they're right back here if anyone is --

23  __:  (inaudible).

1   JAMES LARIMORE:     -- need --

2   __: (inaudible) chocolate cookie.  (inaudible) I have no...

3   JAMES LARIMORE:     OK.  Oh, and, uh, for S.J. and John , I

4       want you -- after we've had a chance to spend time with

5       E.K. , we're going to ask you whether there -- your

6       thoughts about -- if you have questions that you'd like to

7       direct to other -- to any of the witnesses we spent --

8       spent time with.

9   __: Oh, (inaudible).

10  JAMES LARIMORE:     So we'll be doing a check in with you on

11      that in a few minutes.  OK.  Great.  So we are -- the

12      recorders are both back on.

13  SUSIE MINCHANNON:   Yes.

14  JAMES LARIMORE:     OK.  We are back, um, in session again for

15      this afternoon's hearing.  And, uh, so, E.K. , thank you

16      for waiting, uh, and for joining us now.  The process that

17      we'll go through in just a moment will, uh, provide John

18      an opportunity to ask questions that he might have of you,

19      followed by the hearing board members asking questions of

20      you and then finally, uh, S.J. having an opportunity to ask

21      questions of you and then others may have follow-up, uh,

22      questions.  But I also wanted to, um, offer you an

John Doe   Hearing, 12/12/2013                    Page 123
Sexual Misconduct Hearing Board, Amherst College

1        opportunity to make any opening remarks or statements that

2        you might be able to share with us.

3   E.K.          : No (inaudible).

4   JAMES LARIMORE:     OK.  Great.  In that case, John  , your

5        questions.

6   John Doe  :   Um, can you describe how you learned about S.J.

7        and me?

8   E.K.          .: Um, so I got back, um, from a weekend away and

9   S.J. told me that John    had been very drunk and that he'd

10       come on to her and kissed her and then she felt bad and

11       told him to leave.

12  John Doe  :   Um, was there any sign from S.J.  to you that she

13       had an issue with what occurred between us?

14  E.K.          .: Um, just like in the sense that she felt bad

15       because of me.

16  John Doe  :   Uh, what was your relationship like with S.J.

17       after you learned about what had occurred between us?

18  E.K.          : Um, for about a week or two I, like, took some

19       space and we didn't really talk and then we just sort of

20       went back to being friends and didn't ever talk about what

21       happened.

John Doe   Hearing, 12/12/2013                    Page 124
Sexual Misconduct Hearing Board, Amherst College

1   John Doe  :    Um, is there anything more about the

2         conversation, um, with S.J. about that night you'd like to

3         share?

4   E.K.           .: Um, that was all the conversation that happened

5         between us and then I talked to R.M. and she told me that

6         you guys had gone down to our room, which I hadn't

7         initially understood.  Um, so then at some point, I think a

8         couple days later, I said like to S.J. that I hadn't

9         originally understood that that had happened and, um, like

10        that, you know -- that the reason I was upset was because I

11        had to find that out from R.M.  Um, and she was just like

12        basically like, "OK, I understand that," and we didn't

13        really talk about it anymore.

14  John Doe  :    I think that's all.

15  JAMES LARIMORE:    O-- OK.  And then for the hearing board

16        members.  Any questions?

17  TODD PORTER:   At any point in your conversations with S.J. did

18        she indicate that the contact between her and John  was

19        not consensual?

20  E.K.          : No.

21  IRANIA MUNIZ:  Did she indicate -- did she explain what hook-up

22        meant and to what extent?

John Doe   Hearing, 12/12/2013                     Page 125
Sexual Misconduct Hearing Board, Amherst College

1   E.K.            .: Um, like what -- when she originally talked to me

2        she just said that they kissed and she like didn't go into

3        any more detail at that point.

4   IRANIA MUNIZ:  Did she later go into any more detail?

5   E.K.           : No.  other than the conversation I said where I

6        understood in fact that they had gone down to the room and

7        that more than just like making out had happened.  So I

8        said that and she just like agreed.

9   TODD PORTER:   In the -- the Facebook posting from 11/6 in

10        Exhibit G, um, you indicate that you think that this was,

11        um, meant -- the article was meant as an attack on R.M.

12        Can you elaborate a little bit more about what you mean by

13        that?

14   E.K.           .: Um, well, my -- first -- my initial reaction was

15        shock and then, um, from reading the article I -- I don't

16        know.  Definitely it did seem like it was -- it was talking

17        about R.M.  -- R.M. .  Like, you know, calling her a slut-

18        shamer and, um, and I guess I was -- I was just kind of

19        like in shock about the whole thing because I hadn't seen

20        it coming.

21   ERIC HAMAKO:   In Exhibit G, in one of the Facebook posts, you

22        stated that it was your sense that S.J. "has lots of

John Doe   Hearing, 12/12/2013                    Page 126
Sexual Misconduct Hearing Board, Amherst College

1        emotional issues".  What do you see those emotional issues

2        as being and what evidence did you base your statement on?

3 E.K.          : Um, it was essentially from the fact that this

4        happened.  Like I thought like -- I never thought this

5        happened and then I knew that it must have been very

6        difficult for her because our friendship -- and like our

7        friend group was very torn apart and, um, I don't -- I

8        figured that it was just like very -- like psychologically

9        difficult experiencing the whole semester.  Um, I don't

10       know.  Could have, you know, prompted her like being upset

11       in the article.

12   ERIC HAMAKO:   Thank you.

13   IRANIA MUNIZ:  What -- what -- did you have a conversation with,

14       um, John    after talking to S.J. ?

15 E.K.          : The first time?

16   IRANIA MUNIZ:  Mm-hmm.

17 E.K.          : Yeah.  Um, I talked to him and he told me that he

18       didn't remember anything that had happened and, um, yeah, I

19       guess that's fair.  He just said that he didn't remember

20       anything that happened and he apologized.

21   IRANIA MUNIZ:  Did you follow-up once you realized that more had

22       happened?

23 E.K.          : I didn't.

John Doe  Hearing, 12/12/2013                    Page 127
Sexual Misconduct Hearing Board, Amherst College

1   TODD PORTER:   In that same Facebook, um, message you indicated

2        that you, uh, witnessed and hooked up with John  , um, when

3        he has been really drunk.  Can you describe what his

4        affects and behaviors are when he is really drunk and how

5        do you -- how do you know that?

6   E.K.          .: Um, just in -- in the way that you would know

7        that someone was drunk ever.  I don't know.  Like goofing

8        around.  Um, loss of balance.

9   TODD PORTER:   Has -- and to follow-up on that, has there ever

10       been any indication, um, from his intoxication that he has

11       ever blacked out as a result of being drunk?

12  E.K.          : Um, like with me?

13  TODD PORTER:   Mm-hmm.

14  E.K.          .: Um, it's kind of hard to remember because it's

15       been two years.  I think maybe like browning out and

16       forgetting certain things.  I can't really think of any

17       specific times or anything.

18  IRANIA MUNIZ: So I have a question.  In the Facebook exchange,

19       um, when John   originally contacted you regarding the

20       article he stated that, um, "I beg that you don't share my

21       reaction with anyone else."  What do you think he meant by

22       that?  Or why do you think he requested that?

John Doe   Hearing, 12/12/2013                    Page 128
Sexual Misconduct Hearing Board, Amherst College

1  E.K.           .: I think that he just like didn't want to -- like

2        he just wanted to keep the whole thing on the down low

3        and...  I mean, I wasn't really sure but...  I guess -- or

4        maybe like didn't want to make it seem like he was like

5        asking for (inaudible).

6   ERIC HAMAKO:   So in one of your Facebook posts you had said --

7        the quote is "From the way I heard her tell the story to

8        other -- uh, to other people, her close friends, it wasn't

9        like this."  Uh, to which close friends did you hear and

10       tell the story, how did you hear it and what did you hear

11       her say to them?

12  E.K.           .: Um, well, I heard her say that -- so our friend

13       D.R.   was our RC and he told me that she texted right after

14       having been done and like said that she had like done

15       something bad.  Um, and -- sorry.  I -- it's just -- it's

16       really hard to remember.  Like I know at some point someone

17       told me that her (inaudible) but that's...  I don't know

18       who but basically there was...  Like I just had never heard

19       any, um, thing about like sexual harassment from, uh --

20       from those (inaudible).

21  ERIC HAMAKO:   And so can you clarify again who -- who you were

22       hearing the stories from?

John Doe   Hearing, 12/12/2013                     Page 129
Sexual Misconduct Hearing Board, Amherst College

1   E.K.          : OK.  So from the RC D.R.          (sp?), from,

2       uh, C.        and N.     , who are our friends who lived

3       next door.

4   ERIC HAMAKO:  And so you had heard S.J. telling them something.

5   E.K.          : I -- I didn't hear her telling them --

6   ERIC HAMAKO:  OK.

7   E.K.          : -- but it's just what -- what I was told by them.

8   ERIC HAMAKO:  OK.  And so can you -- can you describe what they

9       told you that S.J. had said to them?

10  E.K.          : Um, like that they had like a -- they hadn't had

11      sex but that other things had happened.  Um, and like that

12      her belly button ring had fallen out and then that she had

13      helped him throw up.

14  ERIC HAMAKO:  OK, thanks.

15  IRANIA MUNIZ:  Can you repeat the last part?  That she had

16      helped him --

17  E.K.          : Helped him throw up.

18  IRANIA MUNIZ:  Throw up.

19  E.K.          : But I don't remember like where I heard that from

20      at this point.

21  TODD PORTER:  Earlier on in this testimony, um, you indicated

22      that S.J. had never indicated to you that there was any

23      sort of nonconsensual or, um, forcible, um, action.  Um, in

John Doe   Hearing, 12/12/2013                    Page 130
Sexual Misconduct Hearing Board, Amherst College

1        the Facebook post, um, from R.M. to John   , um, it did say

2        that, uh, that there was, um, a -- an attempt to, uh,

3        force, um -- that he had forced himself on her and that she

4        had indicated that to you and you didn't believe her.  Can

5        you clarify whether or not that was the case?

6    E.K.        : I was just -- I was really confused from when I

7        first talked to her, like the -- the sense that I got was

8        that he'd been really drunk and that he'd like fallen on --

9        on her, like come on to her and that they started making

10       out and then that she had like felt bad and asked him to

11       stop or asked him to leave.

12   TODD PORTER:   OK.

13   ERIC HAMAKO:   So on -- on page 10, uh, you had referred to S.J.

14       "losing her group of friends and people being angry at

15       S.J.  "  Would you please describe what the social

16       (inaudible) looked like?

17   E.K.         .: Um, so our friends R.M.  and C.        were very

18       angry, um, and it did -- definitely like our friend group

19       changed.  Um, R.M. ๅ and C.       ι stopped talking to her

20       completely.  Um, I know at one point like R.M. . yelled at

21       her.  So...  Is there anything else you want me to say with

22       that?

23   ERIC HAMAKO:   So is there any other observations that you have?

John Doe   Hearing, 12/12/2013                     Page 131
Sexual Misconduct Hearing Board, Amherst College

1  E.K.            : Not really, no (inaudible).

2  ERIC HAMAKO:   Thank you.

3  JAMES LARIMORE:    Are there other questions from the hearing

4       panel?  OK.

5  ERIC HAMAKO:   I have one other question.

6  JAMES LARIMORE:    OK.

7  ERIC HAMAKO:   Um, so S.J. has made these allegations.  Um, what

8       do you think motivated her to make these allegations?

9  E.K.            : I honestly don't know.  Like hon-- like I said, I

10      think it was definitely a very difficult like semester in

11      that it tore our friend group apart but I don't know.

12  ERIC HAMAKO:   OK, thank you.

13  JAMES LARIMORE:    OK.  Are there, um, other questions from the

14      hearing panel then?  OK.  And, S.J. , are there questions

15      that you'd like to ask of E.K. ?

16  Sandra Jones  :   No.

17  JAMES LARIMORE:    No.  Ok.  And, John  , any additional

18      questions that you'd like to ask?

19  John Doe  :   No.

20  JAMES LARIMORE:    OK.  Then, uh, final opportunity then for

21      the hearing panel members.  OK.  Then thank you for joining

22      us.  Uh, you're excused (inaudible) follow-up with you

23      outside.  Thanks.  So with the --

1   __: (inaudible).

2   JAMES LARIMORE:    Yeah.  OK.  OK.  So, um, we are kind of at -

3       - at the point now where we have had a chance to speak with

4       the investigator, we've had a chance to speak with the

5       witnesses that each of you, uh, have called to participate

6       in the hearing.  What I'd like to do is take a five-minute

7       break or kind of a brief break to give you an opportunity

8       to confer, uh, with your, um...  Actually, we'll hold this

9       point.  So I will give you a -- uh, like kind of a prior

10      notice.  I think what I'd like to do is invite the

11      investigator back for any kind of remaining questions you

12      all might have.  After that I'd like to, um, you know, ask

13      you to give some thought now to whether you would like to

14      recall any of the witnesses that we've seen today, uh, so

15      that you will have an opportunity to ask any remaining, uh,

16      questions.  And, uh, and then we'll return to which, uh,

17      witnesses we need to ask --

18  __: Does somebody want to call the investigator?

19  JAMES LARIMORE:    Um, well, I think if, if I'm understanding

20      correctly from Susie, that, um, that she's here.  But yeah.

21      Actually probably good to check that.

22  __: Well, yeah, I mean....

1   JAMES LARIMORE:     So let me then kind of circle back around on

2        this.  Um, so -- oh, perfect timing.  So we have the

3        investigator and the witnesses all remaining here.

4   SUSIE MINCHANNON:   Yes, yes.

5   JAMES LARIMORE:     And so the question I think is -- but I will

6        give you all a chance to confer with your advisors.  We'll

7        take a very brief break for this and then as you come back

8        I'd like to get your thoughts about whether you'd like to

9        speak with the investigator again, whether there are

10       witnesses that you'd like to confer with again, and I'll be

11       asking, uh, the panel members to consider this (inaudible).

12       So if we could take a -- just a brief break so you can have

13       an opportunity to confer.  OK.  So we'll (inaudible).

14   __:  Are you guys going to step out?

15   __:  I don't think so.

16   __:  No.

17   __:  Oh, OK.

18   __:  (inaudible) confer.

19   __:  Unless you need us to step out.

20   JAMES LARIMORE:     Yeah.

21   __:  Yeah.

22   John Doe  :   We don't need to bring anyone back for us.

23   JAMES LARIMORE:     Mm-hmm.  OK, great.  And (inaudible)?

1  Sandra Jones  :   No.

2  JAMES LARIMORE:     No?  OK.

3  Sandra Jones  :   (inaudible) other...

4  JAMES LARIMORE:     OK.  Would you -- do you have any additional

5       questions to ask of the investigator or any of the other

6       witnesses?

7  ERIC HAMAKO:   Uh, I don't believe so.

8  JAMES LARIMORE:     No, OK.  Then, um, last call on this

9       question then before we let everyone -- um, the witnesses,

10      investigator, go.  OK.  Then we'll -- consensus then that

11      we'll --

12  SUSIE MINCHANNON:   OK.

13  JAMES LARIMORE:     Thank people for spending the afternoon --

14  IRANIA MUNIZ:  Can you, yeah, thank them first?

15  SUSIE MINCHANNON:   Yes, I absolutely will.

16  IRANIA MUNIZ:  Thank you.

17  JAMES LARIMORE:     OK.  Thanks, Susan.

18  SUSIE MINCHANNON:   OK.

19  JAMES LARIMORE:     Thank you. OK.  So we're at the point --

20      I've appreciated everyone's patience as we work our way

21      through the afternoon.  I -- I think we're at that stage

22      now where one of the most important things is for the, um,

23      hearing panel, uh, to, uh, you know, consider any final

John Doe   Hearing, 12/12/2013                     Page 135
Sexual Misconduct Hearing Board, Amherst College

1       questions or remaining questions that you all might have.

2       We'll also have an opportunity, uh, for you all to raise

3       any, uh, final questions that you might have remaining, as

4       well.  Why don't we start with the hearing board members.

5   ERIC HAMAKO:   And, I'm sorry, these are questions directed

6       towards --

7   JAMES LARIMORE:    Oh, uh, towards either John   or S.J. ·

8   IRANIA MUNIZ:  One at a time or it doesn't matter at this point?

9   JAMES LARIMORE:    Uh, well, I think we should follow the

10      things that you feel like you need to know more about.

11  IRANIA MUNIZ:  OK.

12  JAMES LARIMORE:    Yeah.  Right.

13  TODD PORTER:   I have a question for S.J. ·  Um, in that we heard

14      in testimony that there was a text message sent to D.R.

        , the RC, after the incident.  Do you recall what

16      the -- the content of that message was?

17  Sandra Jones  :   Um, so -- so I think I -- um, so -- um, so I

18      think I did say like, well, something about...  Something

19      about -- something about like well doing...  Well, about...

20      Well, about like well doing a bad thing.  But, I mean...

21      So actually like well texted him, um, so almost -- so

22      almost like right after, um, John    had, um, left.  Um, I -

1       - when I didn't -- so I didn't... So I didn't... So I

2       didn't... So I didn't... I'll have to type. Um...

3  E.B.           :    I didn't want to address what had happened

4       to me and I was in no position yet to accept that it had

5       been rape. So in my text messaging to D.R.         I only

6       said things about the hook-up as if it had been consensual.

7  JAMES LARIMORE:    OK. Are there, um, any additional

8       questions?

9  ERIC HAMAKO:   So you had said previously that immediately after

10      John   had left you had texted someone, um -- and someone

11      came over. Was D.R.          the person who came over?

12 Sandra Jones :   No.

13 ERIC HAMAKO:   And... Thank you. And I believe it was R.M.

14      had -- uh, had referenced that she had heard that you and

15      E.K.   had had -- or she referred to it as a bad fight, um,

16      sometime after. Can you -- can you characterize some of

17      your interactions with R.M.   (inaudible)?

18 Sandra Jones :   So I think that that was actually, um, my -- um,

19      so I think that that was actually with L.R.  and not R.M. .

20 ERIC HAMAKO:   OK.

21 Sandra Jones :   Um, so, um, she -- so, um, like... We aren't,

22      um, close. Um, but it is a small school so, um, she...

23      Um, so she -- um, so she did like well know, um, that --

1      um, that that spring, um, the whole...  Well, she knew that

2      the whole like well group, um, had been like, um, dissolved

3      or like...  Yeah.  Like...  Yeah.

4   ERIC HAMAKO:   OK.  And in terms of interactions that you had

5      had with E.K.   that someone might have characterized as a

6      bad fight or -- I guess how would you characterize your

7      interactions with E.K.   after...?

8   Sandra Jones  :   Right.

9   ERIC HAMAKO:   After that night?

10  Sandra Jones :  Um, so they were, um...  So...  Um, so they were

11     like, well, more like, well, calm than, well, upset.  Um,

12     she was just, um -- and, well, she was...  And, well, she

13     was like more sad than mad.  So yeah.

14  ERIC HAMAKO:   Thank you.

15  JAMES LARIMORE:   OK.  Are there, um, additional questions?

16  ERIC HAMAKO:   I'd like to confer with you about...

17     (inaudible).

18  JAMES LARIMORE:   Mm.  Yeah, I -- yeah, I think this is a --

19     so focus -- question is kind of outside of the focus of the

20     events of what happened, you know, that particular night,

21     that weekend.  So, you know, we shouldn't include that.

22  ERIC HAMAKO:   Thank you.

23  JAMES LARIMORE:   OK, thanks.

John Doe   Hearing, 12/12/2013                         Page 138
Sexual Misconduct Hearing Board, Amherst College

1    IRANIA MUNIZ:  Um, did -- did you tell anyone else what had

2         happened --

3    Sandra Jones :  Um...

4    IRANIA MUNIZ:  -- after?

5    Sandra Jones :  So I -- I mean, so I told some people that I had

6         like well hooked up with him.  Um, I think I told...  Um, I

7         think I -- um, I think I told like well P.T.  like P.T.  ,

8         um, that I had just hooked up with him.  I didn't say that

9         I had been assaulted.  Um, so I said the same to J.M.  .

10        Um, then, um, like a fe-- like a few other people.

11   IRANIA MUNIZ:  OK, thanks.

12   JAMES LARIMORE:    OK.  Um, any additional questions then?

13   ERIC HAMAKO:  Um...

14   JAMES LARIMORE:    No?  OK.  OK.  And, uh, John   , are there

15        any, um, remaining questions that you feel the committee --

16        that the panel should consider?

17   John Doe  :    Um, no, but I was just going to request like a

18        15-minute break (inaudible).

19   JAMES LARIMORE:    Oh, sure.  Yeah.  And we'll offer each of

20        you an opportunity to have a -- a break and a chance to

21        consult with the advisors before closing statements.  And -

22        - and, actually, this is probably a good opportunity for me

23        to remind you that, um, during closing statements there are

John Doe   Hearing, 12/12/2013                        Page 139
Sexual Misconduct Hearing Board, Amherst College

1      no questions that are allowed and so you won't be, um, you

2      know, interrupted, peppered with questions, or anything of

3      that sort.

4   IRANIA MUNIZ:  Can I ask one question?

5   JAMES LARIMORE:    Mm-hmm.  Sure.

6   IRANIA MUNIZ:  Sorry.  So in your statement you indicated that,

7      um -- I just want to make sure I get it right.  That you

8      had hoped that, um, John   was expelled because you were

9      worried he would do this again.  Can you talk a little bit

10      more about that?

11   Sandra Jones :   Um, sure.  Um, (inaudible).

12   E.B.       :    Regardless of how much John   remembers of

13      that night he is still responsible for the rape he

14      committed.  Expulsion is a fair sentence for ignoring my

15      will and violating my body.

16   JAMES LARIMORE:    OK.  Are there, um, additional questions?

17      OK.  And, um, S.J. , do you have any additional questions

18      you'd like us to consider?

19   Sandra Jones :   No, I do not.

20   JAMES LARIMORE:    OK.  And, John    , uh, other questions?

21   John Doe :   No.

22   JAMES LARIMORE:    OK.  Hearing panel?  OK.  In that case

23      we'll, um -- we're going to take a 15-minute, um, minute

John Doe   Hearing, 12/12/2013                    Page 140
Sexual Misconduct Hearing Board, Amherst College

1        recess and, um -- and provide an opportunity for you all

2        to, uh, consult with your advisors before we'll accept, um,

3        any closing statements that you care to make.

4    IRANIA MUNIZ:  I'm sorry.  If we had questions for John    we

5        should ask it now?

6    JAMES LARIMORE:     Yes.

7    IRANIA MUNIZ: OK.

8    JAMES LARIMORE:     OK.  Well, so let me ask if -- are there

9        questions -- so when -- when I mentioned that, you know --

10   IRANIA MUNIZ:  Yeah.

11   JAMES LARIMORE:     -- you should direct questions to whomever

12       you might need to speak to gather the information that you

13       need to make this decision.

14   IRANIA MUNIZ:  (inaudible).

15   JAMES LARIMORE:     So, yeah, this is --

16   IRANIA MUNIZ:  so may I ask a question?  I apologize.  Um, I

17       have a question, um, that I asked E.K.    earlier regarding

18       your Facebook exchange.

19   John Doe  :    Mm-hmm.

20   IRANIA MUNIZ:  About not wanting for anyone to know your

21       reactions.  Can you talk a little bit more about what you

22       meant by that?  It's -- if you need to look back on that,

23       it would be Exhibit G.

1    John Doe :    I -- I think I remember (inaudible).  What

2         exhibit -- exhibit number?

3    IRANIA MUNIZ:  It's G.

4    __ :  G.

5    IRANIA MUNIZ:  G and...  Yeah, it's the first exchange.  So

6         right after the first page on the top.  The first one

7         there.

8    John Doe :    Um, well, I guess it's -- it was a pretty basic

9         response for me I guess in -- in terms that, you know, one

10        I didn't really want, um, this allegation to spread.  Um,

11        two, I didn't really -- I guess I'm a really private person

12        a lot of the time.  I didn't really want people to kind of

13        know that I was, um, you know, feeling bad or anything.  I

14        kind of -- for the most part I just kind of wanted to keep

15        it to myself and, um...  You know, I'm -- uh, does that

16        answer your question?  I just didn't really want to kind of

17        share with too many people, you know, because just like a

18        pretty private guy.

19   IRANIA MUNIZ:  Sure.

20   JAMES LARIMORE:    Thank you. Any other questions?  OK.  OK.

21        Then any final questions then?  OK.  Then we'll take a 15-

22        minute break.  Why don't we, uh, just for the sake of

23        convenience, we'll be back in session, um, at six o'clock.

1       Uh, so 15 minutes from now and we'll move into the closing

2       comments -- closing statements.

3   IRANIA MUNIZ:  Uh, what do you guys think?

4   ERIC HAMAKO:   I think I'm going to go to the bathroom.

5   __:  (inaudible).

6   SUSIE MINCHANNON:   We're still recording (inaudible).

7   IRANIA MUNIZ:  Oh, wow.

8

9   [15-minute recess]

10

11  JAMES LARIMORE:    OK.  So for the final time today someone

12      else will push the on-button.

13  SUSIE MINCHANNON:   We will let you do that, Jim.

14  JAMES LARIMORE:    No, I'm not going to go near it because

15      things have worked with the technology so far so don't let

16      me near it.  Um, OK.  Well, I apprec-- I'm glad that you

17      all had an opportunity to confer with your advisors and --

18      and have, uh, at least a brief break from the hearing this

19      afternoon.  We're now on the sort of final, uh, steps of

20      our process and, uh, and this next, um, you know, phase

21      involves hearing any closing statements or closing remarks

22      that you'd like to share with us.  And, um, S.J. , I would

John Doe   Hearing, 12/12/2013                          Page 143
Sexual Misconduct Hearing Board, Amherst College

1          like to begin by offering you a chance to make any closing

2          comments you'd like.

3    Sandra Jones :   Thank you.

4    E.B.          :   John's   witnesses throughout the report say

5          he's a nice guy.  Before he raped me I would have said the

6          same.  I had no idea he was capable of what he did to me.

7          From the little I knew of him he seemed like just an

8          average guy.  I learned that night how wrong that

9          impression was.  As I read the report and listened to

10         John's   testimony in this hearing I think it is clear

11         there's not a lot of discrepancy between what we have to

12         say about that night.  The one difference is the area

13         during which he blacked out and I was forced to remember

14         forever.  Regardless of whether he remembers the night or

15         not, he is still forever responsible for the harm he

16         caused.  Maybe he is telling the truth when he says he

17         doesn't remember raping me but I do viscerally remember

18         being raped and that's something that has caused me pain

19         and I've had to live with it since then.  I'd like to thank

20         the board for hearing my case today.  This has been a very

21         difficult process for me and I appreciate your

22         understanding.

John Doe   Hearing, 12/12/2013                    Page 144
Sexual Misconduct Hearing Board, Amherst College

 1   JAMES LARIMORE:    OK, thank you.  Thanks.  And, uh, John   ,

 2        now is the time for your closing statement.

 3   John Doe  :    I apologize to everyone in the room for having to

 4        be here today.  I feel remorse for S.J. ., the witnesses, and

 5        everyone else involved in this process because it will

 6        never be pretty.  I don't doubt or dismiss S.J.'s  feelings.

 7        I wish I could have given more to this case today.

 8        However, I have given and presented everything I have,

 9        which are only the things that were given to me by others.

10        Since I've read the article that S.J. wrote, I have been

11        sincerely confused and depressed.  I also found the

12        information presented today to be confusing.  Given that --

13        given that, I am certain that it is out of my character to

14        conduct myself in the ways that were alleged today.

15        Therefore I should not be found responsible for these

16        allegations.

17   JAMES LARIMORE:    OK, thank you.  So, um, we're now kind of in

18        the -- in the final, uh, few minutes of our time together

19        this afternoon.  I just want to let, uh, you all know that

20        after the board, uh, deliberates and makes its decisions

21        tonight, the board's -- the final decisions will be

22        provided, uh, to each of you in writing, uh, generally

23        within 48-hours and I think Susie has probably been in

John Doe   Hearing, 12/12/2013                          Page 145
Sexual Misconduct Hearing Board, Amherst College

1        touch with you all about the arrangements certainly we've

2        tried to put in place about notification.  Um, both parties

3        are -- our practice is that we notify both parties

4        concurrently in writing and then we'll also, uh, have some,

5        uh, follow-up contact with you, as well.  So, uh, I'd like

6        to ask at this point, uh...  S.J.   I understand that you

7        have already provided Susie a copy of an impact statement.

8   Sandra Jones :   Yes, I have.

9   JAMES LARIMORE:    OK.  And, uh, John   do you have an impact

10       statement that you'd like to submit, as well?  OK.  And do

11       either of you have any questions about the process at -- at

12       this point?  OK.  Then, um -- then this hearing is

13       concluded and I want to thank you all for participating

14       with us today and also remind you about the confidentiality

15       of this hearing, which is a very important aspect of -- of,

16       um, this process.  So thank you and, um, wish you all the

17       best (inaudible).

18   Sandra Jones :   Yes.  Thank you.

19   SUSIE MINCHANNON:   Um, can you hit the stop button on that

20       recorder for me?

21   JAMES LARIMORE:    No.

22   IRANIA MUNIZ:  The stop, not the pause, right?

23                              END OF AUDIO FILE