UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,
     Plaintiff,

     v.

AMHERST COLLEGE, CAROLYN MARTIN,
JAMES LARIMORE, TORIN MOORE,  SUSIE
MITTON SHANNON, and LAURIE FRANKL,
     Defendants.

C.A. No. 3:15-cv-30097-MAP

**LEAVE TO FILE BRIEF IN EXCESS
OF TWENTY (20) PAGES GRANTED
ON OCTOBER 2, 2015**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Scott A. Roberts (BBO No. 550732)
     sroberts@hrwlawyers.com
Tobias W. Crawford (BBO No. 678621)
     tcrawford@hrwlawyers.com
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
Tel. (617) 348-4300 / Fax (617) 348-4343

Counsel for Defendants Amherst College, Carolyn
Martin, James Larimore, Torin Moore, Susie Mitton
Shannon, and Laurie Frankl

Dated: October 5, 2015

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

    A.    The Sexual Encounter Between Jones and Doe................................................ 3

    B.    Jones's Article about the Incident.......................................................... 4

    C.    Jones Files a Disciplinary Complaint against Doe Regarding their Sexual Encounter .......................................................................................... 5

    D.    Doe is Notified of the Assault Complaint and Offered an Advisor .................... 5

    E.    Attorney Kurker's Investigation of the Incident.................................... 6

    F.    Attorney Kurker's Report ..................................................................... 8

    G.    The Hearing .......................................................................................... 8

    H.    The Hearing Board's Decision............................................................. 15

    I.    Doe's Appeal ....................................................................................... 16

    J.    Doe's Submission of Additional Information to the College ............................. 16

ARGUMENT.................................................................................................................... 18

    A.    Standard of Review............................................................................... 18

    B.    Doe's Breach of Contract Claim Fails Because Amherst Met His Reasonable Expectations under the College's Sexual Misconduct Procedure (Count I)......... 18

        1.    The Hearing Board Found Doe Responsible for Violating the College's Sexual Misconduct Policy by a Preponderance of the Evidence and Properly Applied the College's Policy. ................................................... 20

        2.    The Investigation and Hearing Met the Reasonable Expectations under the Policy............................................................................................. 24

        3.    The College Responded to Jones's Assault Complaint against Doe in Accordance with Its Misconduct Procedure, and the College Did Not Treat Doe in a Discriminatory Manner.................................................... 29

        4.    Amherst's Misconduct Procedure Did Not Create Any Reasonable Expectation that the College would "Reopen" Disciplinary Proceedings for Any Reason after the Expiration of the Final Appeal. ............................. 31

        5.    The College's Disciplinary Process Comported with Basic Fairness. .......... 32

    C.    Doe's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails Because Amherst Complied with its Misconduct Procedure (Count II)...... 33

    D.    Doe's Claim for Tortious Interference with Contract Against the Individual Defendants Fails Because Doe Merely Recites The Elements of the Claim, without Any Plausible, Factual Support (Count III)............................................. 34

    E.    Doe Cannot Sustain His Title IX Claim Because He Fails to Allege Sex-Based Discrimination, An Essential Component of Any Title IX Claim (Count IV) ..... 36

1.   Doe Has No Private Right of Action to Enforce the Regulations and Guidance of the Department of Education, with Which the College Complied in Any Event................................................................................................................ 38

2.   Doe Fails to State a Claim for Selective Enforcement................................... 39

F.   Doe Alleges Neither Racial Discrimination Nor an Impaired Contract, Rendering His Section 1981 Claim Meritless (Count V) ......................................................... 43

G.   Doe's Conclusory Allegation that Defendants "Capitulated" to Pressure from Student Activists Fails to State a Cognizable Claim under the MCRA (Count VI) ....................................................................................................................................... 46

H.   Doe's Defamation Claim Fails Because the College's Notification Regarding His Expulsion was True, and Because Doe Does Not and Cannot Allege that the Notification was Motivated by Ill Will or Malevolent Intent (Count VII) ........... 48

I.   Doe's Intentional Infliction of Emotional Distress Claim is Meritless Because He Alleges Neither Extreme and Outrageous Conduct Nor Severe Emotional Distress (Count VIII) ..................................................................................................... 51

J.   Doe's Negligent Infliction of Emotional Distress Claim Fails Because He Alleges Neither Negligence Nor Physical Harm Manifested by Objective Symptomatology (Count IX) ............................................................................................. 53

K.   Because All His Claims Lack Merit, Doe Cannot Seek Injunctive Relief (Count X) ............................................................................................................................... 54

CONCLUSION.......................................................................................................................... 55

## <u>INTRODUCTION</u>

In October 2013, Sandra Jones, then a student at Amherst College, filed an internal disciplinary complaint against another student, Plaintiff John Doe, alleging that he had sexually assaulted her by forcing her to perform oral sex after she had withdrawn her consent.  Faced with this complaint, Amherst responded promptly and in compliance with its written procedures.  The College notified Doe of the accusation, offered him an advisor to guide him through the College's disciplinary process, engaged an outside attorney to conduct an investigation, advised him of his right to seek the advice of counsel, provided him multiple opportunities to present evidence on his behalf, and afforded him a hearing before a board composed of three panelists from outside of the College, at which Doe questioned witnesses and challenged the evidence against him.  Ultimately, Doe was found responsible for sexual misconduct and expelled from the College, after which he exercised his right to file a written appeal to the College's provost.  His appeal was considered and ultimately denied on December 27, 2013, at which point the disciplinary action against Doe was final under the College's procedures.

A year and a half later, Doe filed this lawsuit.  Even though the courts have long afforded private colleges great deference in making internal disciplinary decisions, Doe seeks to embroil this Court in a disciplinary decision that it reached in compliance with its policies and procedures.  Throughout his complaint, Doe assails not just Amherst College for expelling him and the college administrators who did nothing more than perform their jobs[1] (and whom Doe baselessly accuses of racism and sexism).  He also attacks Ms. Jones, who brought sexual assault charges against him, and another female student, LR, who testified at Doe's disciplinary hearing.

[1]    In addition to the College, Doe has sued Carolyn Martin, the President of the College; Laurie Frankl, the College's Title IX Coordinator; James Larimore, former Dean of Students; Susie Mitton Shannon, former Interim Dean of Student Conduct and Deputy Title IX Coordinator; and Torin Moore, former Assistant Dean of Students and the Director of Residential Life (collectively, the "Individual Defendants").

Employing a tactic sometimes used by those charged with sexual misconduct, Doe goes on the offensive against Jones, accusing her of promiscuity and deceit.  He launches a similar barrage against LR, insinuating that she orchestrated the charge against him and testified falsely so that he would be driven from campus.  Finally, Doe argues that the College should have reinstated him as a student or reopened its disciplinary proceeding when he later came forward with additional information months after his expulsion had become final, even though his request and desired response had no basis in the College's policies or procedures.

Behind the fury of Doe's complaint, his objective is both simple and impermissible: he wants to retry his disciplinary action in this Court and to repeat arguments that he made – and that failed – during the internal proceeding.  In his attempt to gain traction towards that goal, he punctuates his complaint with conclusory allegations of discrimination, even though he was afforded the same mandatory process that is provided to all students, regardless of gender or race.

To be sure, Doe's complaint is replete with derisive accusations against the Defendants, Jones, and LR.  What the complaint lacks, however, is plausible and sufficient factual and legal support for any of the ten claims it asserts.  When this Court disregards Doe's many paragraphs of rhetoric and argument, the deficiencies of Doe's claims are manifest, and the well-plead factual allegations that remain establish that his claims fail as a matter of law.  Under well-established law, courts have fittingly dismissed similar complaints upon the filing of a Rule 12 motion.  Doe presents nothing that warrants different treatment for his complaint.  For the reasons set forth below, the Defendants request that the Court enter judgment on the pleadings in their favor and dismiss Doe's complaint in its entirety.

## STATEMENT OF FACTS[2]

### A.      The Sexual Encounter Between Jones and Doe

On the night of February 4, 2012, John Doe, then a sophomore at Amherst College, was drinking heavily.  Cp., Ex. 2, p. 29.  He got very drunk, to the point where he was, in his words, "out of control."  *Id.*; Cp., Ex. 3, pp. 77-78, 90.  Hours later, Doe returned to his dormitory, where he had a sexual encounter with Sandra Jones ("Jones"), another student and the roommate of EK, the woman Doe was then dating (the "Incident").  Cp., ¶27.  For his part, Doe contends that he and Jones "engaged in consensual sex" in her room and that she performed oral sex on him.  *Id.*; Cp., ¶1.  Jones describes the Incident very differently, stating that while the encounter began consensually, she withdrew her consent after Doe's behavior and comments made her uncomfortable.  Cp., Ex., 2, pp. 3-5, 18, 20.  Jones states that, despite her withdrawal of consent, Doe forced her to continue performing oral sex by forcing his penis into her mouth, holding her head, and causing her to choke, stopping only after he had ejaculated.  *Id.*   When Doe left the room to go the bathroom, Jones threw his clothes into the hallway and locked the door.  *Id.*

The next day, Doe went back to Jones's room in search of his phone.  Cp., Ex. 2, p. 6.  According to Doe, "[Jones] didn't say anything about what had happened last night, and I didn't say anything either.  It was awkward … especially because I had hooked up with her roommate before."  *Id.*  Later that day, Doe sent an email to Jones stating:

---

[2]      The allegations are based upon facts (not arguments) in Doe's Complaint and the documents appended to or referenced in his Complaint.  The Court may properly rely on the documents attached or referenced in the Complaint in deciding a Rule 12(c) motion.  *See Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 51 (1st Cir. 2014) (court may "supplement" the facts alleged in complaint "with implications from documents incorporated by reference into the complaint"); *Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 377 (D. Mass. 2012) (court may consider "documents referred to in the complaint but not annexed to it" in deciding motion to dismiss).  Citations to allegations in Doe's Complaint will be in the form "Cp., ¶__."  Citations to documents attached to the Complaint will be in the form "Cp., Ex. _."  Documents referenced but not attached to the Complaint are submitted in the accompanying Affidavit of Scott A. Roberts ("Roberts Aff."), and citations to those documents will be in the form "Roberts Aff., Ex. __."

> Hey, good news!  Found my phone.  Now I just wanted to be honest and say that I really don't have recollection of Saturday.  NK [Doe's roommate] had to tell me.  I hope I wasn't being too weird.  But anyhow, I was (sic) if you were going to tell EK [Jones's roommate].  She's a really nice girl and I don't want to upset her.  Cp., Ex. 2, p. 23.

Jones responded, "Yeah I told her yesterday.  I figured she deserved to hear it from me."  *Id.*

Thereafter, Doe "never interacted" again with Jones, and he concluded that she was "plainly avoiding" him.  Cp., Ex. 2, pp. 6, 34.

### B.      Jones's Article about the Incident

Several months later, while Jones was studying abroad in London in the fall of 2012, she wrote an article about the Incident (the "Article").  Cp., ¶38; Ex. 2, Ex. E.  In the Article, Jones stated that the encounter "*began consensually, but evolved into something that was decidedly not.*"  Cp., Ex. 2, p. 26 (emphasis added).[3]  Jones stated that she had been in a period of "self-denial" for months, and she expressed confusion about what had occurred during Incident, rhetorically asking:

> Was it rape if at first I said yes?  Was it rape if he was 'too drunk' to stop himself?  By the time I could answer those questions with a definite yes or even think about going to the dean and face what seemed an endless process of proving myself, the semester was over.  *Id.*

After returning to campus in the spring of 2013, Jones met with Susie Mitton Shannon, the College's Deputy Title IX Coordinator and Interim Dean of Student Conduct ("Dean Mitton Shannon"), and explored her options for bringing a disciplinary action against Doe.  Cp., Ex. 2, p. 21.  Because the College was nearing the end of the term, Jones decided to wait until the fall to pursue disciplinary action.  *Id.*

---

[3]      In his Complaint, Doe argues that Jones "fundamentally changed" her description of the Incident, from one that was "non-consensual throughout" to one that "*became* nonconsensual."  Cp., ¶32 (emphasis in original).  He made this same argument in the internal disciplinary proceeding.  *See, e.g.,* Roberts Aff., Ex. A at 4.  In fact, from the time of Jones's account of the Incident in her Article through the disciplinary proceeding, she stated that the Incident "began consensually" but became nonconsensual.

**C.** **Jones Files a Disciplinary Complaint against Doe Regarding their Sexual Encounter**

On October 28, 2013, Jones filed a written misconduct complaint against Doe seeking a disciplinary referral and alleging that he had sexually assaulted her (the "Assault Complaint") in violation of the College's Sexual Misconduct Policy ("the Policy"). Cp., ¶27; Ex. 1, pp. 2-18; Ex. 2, p. 18. In her complaint, Jones stated that she "started to hook up" with Doe, but that she then became "uncomfortable" when Doe started saying "weird things" and told him that he should leave. *Id.* She reported:

> Throughout this whole time I kept saying that maybe he should leave. Then he tried to get me to give him a blowjob again. This time I said, "No. I don't want to. You should leave. I don't want to do this anymore." He ignored what I said and pushed his penis into my mouth anyway. He kept my head pushed down so I couldn't move, even though I was choking with how hard he was holding me down. I pushed against his hand with my head and tried to support myself with my arms but eventually I just waited for it to be over. Finally, he got up because he was feeling nauseous since he'd been drinking that night. When he left to go the bathroom, I threw all his clothes out into the hallway along with his phone and ID and locked my door so he wouldn't come back in. Cp., Ex. 2, p. 18.

**D.** **Doe is Notified of the Assault Complaint and Offered an Advisor**

On November 1, 2013, in accordance with the College's Sexual Misconduct Procedure (the "Misconduct Procedure"), Dean Mitton Shannon notified Doe about the Assault Complaint. Cp., ¶29. Doe was offered and provided an advisor to guide him through the disciplinary process from a list of trained advisors maintained by the Dean of Students Office. Doe selected Torin Moore, the Assistant Dean of Students and Director of Residential Life ("Dean Moore"). Cp., ¶¶12, 29, 42.[4]

---

[4]      The Misconduct Procedure states, "[T]he Respondent will be offered an Advisor at the time he or she is notified of the complaint. The Complainant and Respondent may select from the list maintained by the Dean of Students of trained Advisors or decline the assistance of any Advisor. An Advisor serves to guide the student through the pre-hearing and hearing process and may accompany the student to any meeting with a college employee and to the hearing." Cp., Ex. 1, p. 19.

Doe submitted a written response to the Assault Complaint (the "Response").  Cp., Ex. 2, p. 29.  With respect to the night of the Incident, Doe stated that he "realized" that he had "gotten much drunker than intended," that he "decided" to "stop drinking for the night," and that he "decided" to walk back towards campus.  *Id.*  While Doe reported myriad recollections of the night's activities,[5] he claimed that he "[did] not have any recollection" of any sexual interaction with Jones.  *Id.*  Doe stated, however, that he had reviewed Jones's Assault Complaint and that he "[did] not believe those are actions [he] would do."  *Id.*

### E.   Attorney Kurker's Investigation of the Incident

The College engaged Attorney Allyson Kurker ("Attorney Kurker") to investigate the Incident.  Cp., ¶30.  The College's Misconduct Procedure provides that the investigator "will interview the Complainant and the Respondent separately," and that "[t]he Complainant and Respondent may be accompanied by their respective Advisors."  Cp., Ex. 1, p. 22.  The Misconduct Procedure further states that the investigator "will make a good-faith effort to contact and interview any witnesses identified by the parties or in the documentation," and that the investigator "may also interview any other individual he or she finds to be potentially relevant to the allegations of the complaint."  *Id.*  With respect to documentary evidence, the Misconduct Procedure likewise affords discretion to the investigator, stating: "In addition to reviewing any documents submitted by the Complainant and the Respondent, the Investigator will try to obtain any such other physical or medical evidence relevant to the investigation as the Investigator determines, in his or her judgment, to be necessary."  Cp., Ex. 1, pp. 21-22.

---

[5]     For example, Doe reported that he "remember[ed]" walking through town, past the police station, and past a particular dormitory.  *Id.*  Doe also reported that he encountered someone who told him he was "too drunk," an assessment with which Doe "agreed."  *Id.*  Doe reported that he "remember[ed]" walking back to his dormitory with his roommate, returning to their room, and getting into bed, and laughing.  *Id.*; Cp., Ex. 3, pp. 60-63.

On November 11, 2013, Attorney Kurker separately interviewed Jones and Doe in the presence of their respective advisors. Cp., ¶31; Ex. 2, p. 2.[6]  During her interview, Jones described her encounter with Doe as she had previously, stating that "it start[ed] off that [she] was okay" performing oral sex but that she "felt uncomfortable" after Doe began "grabbing [her] head" and started "bragging" that he had "hooked up" with both Jones and her roommate, EK. Cp., Ex. 2, pp. 3-4.  Jones reported that she "stopped" Doe and said, "No, … I don't want to keep going," and that the encounter then became "not consensual."  *Id.*  Jones reported that Doe then "took [her] head" and "pushed" it near his penis, "holding [it] down" until he ejaculated.  *Id.* During Doe's interview with Attorney Kurker, he again stated that he was "very intoxicated" and "[did] not remember hooking up with [Jones] at all."  Cp., Ex. 2, pp. 6, 8.

During Attorney Kurker's investigation, Doe identified four (4) witnesses whom he believed had relevant information (EH, EK, NK, and RM), and Jones identified two (2) witnesses (JM and LR).  Cp., ¶31.  Attorney Kurker interviewed all six (6) witnesses identified by Doe and Jones.  Cp., ¶¶31, 35, 36; Ex. 2, pp. 2, 9-13.  Attorney Kurker also received and reviewed documents provided by Doe and Jones, including: (1) text messages between Doe and Jones the day after the Incident (in which Doe expressed his concerns about having acted "weird" the night before and about Jones telling EK about the encounter), (2) the Article that Jones had written about the Incident, and (3) Facebook messages that Doe exchanged with two of his witnesses (RM and EK) soon after the Article was published.  Cp., ¶38; Ex. 2, pp. 5-7, 22-27, 30-34.

---

[6]     Jones's advisor was Professor C. Rhonda Cobham-Sander.  Cp., Ex. 2, p. 2.

###### F.  **Attorney Kurker's Report**

The Misconduct Procedure provides that the Investigator "will prepare an Investigative Report summarizing and analyzing the relevant facts determined through the Investigation, referencing any supporting documentation or statements." Cp., Ex. 1, p. 22. The Report may include summaries of interviews with the Complainant, Respondent, and third-party witnesses, as well a summary of the investigator's impressions, including context for the evidence. *Id.* The Misconduct Procedure bars the investigator from making a finding on the issue of responsibility, stating that the "determination as to whether a violation occurred" will be "reserv[ed] … for the Hearing Board." *Id.*

On November 20, 2014, Attorney Kurker submitted her investigative report (the "Report") to Dean Mitton Shannon, and copies of the Report were simultaneously provided to Doe and Jones. Cp., ¶39; Ex. 2. In her Report, Attorney Kurker summarized her interviews with Jones, Doe, and the six witnesses, and she also appended the documentary evidence that she had reviewed. Cp., Ex. 2, pp. 2-34.

###### G.  **The Hearing**[7]

On December 12, 2013, a hearing on Jones's Assault Complaint was held before a Sexual Misconduct Hearing Board (the "Hearing Board"). Cp., ¶47. The Hearing Board was composed of three persons who were employed by Mount Holyoke College, Hampshire College, and Smith College. Cp., Ex. 3, p. 4.[8] During the hearing, a physical barrier was placed between Doe and

---

[7]  A transcript of the hearing is attached as <u>Exhibit 3</u> to the Complaint. There is a difference between the page references for the Exhibit and the page references for the transcript: for example, "Page 2" of the Exhibit is "Page 1" of the transcript. To avoid confusion, and to be consistent with prior citations, Defendants' citations refer to the Exhibit page number.

[8]  The Misconduct Procedure states: "The Hearing Board for a particular hearing comprises three persons that are drawn from a pool of individuals from the community, including the Five College Consortium." Cp., Ex. 1, p. 23.

Jones.  Cp., ¶49.  Doe and Jones were accompanied by their respective advisors, Dean Moore

and Professor Cobham-Sander.  Cp., ¶48.

Dean Larimore chaired the disciplinary hearing.  Cp., ¶48.  The Misconduct Procedure

provides that the Chair "will explain the hearing process and provide an opportunity for all

parties to ask procedural questions prior to initial statements and the presentation of

information."  Cp., Ex. 1, p. 26.  In accordance with this provision, Dean Larimore called the

hearing to order and then reviewed and described the rights set forth in the Misconduct

Procedure, stating:

> [B]oth parties have met with the Dean of Student Conduct[,] have been informed
> of the procedures that the Sexual Misconduct Board will be following through this
> hearing and have also been informed of the following rights:
>
> - the right to present information regarding the alleged complaint
> - the right to a fair and unbiased hearing
> - the right to present witnesses who have relevance to the complaint
> - the right to select a trained advisor from a list provided by the Dean of
>   Student Conduct, and to have the advisor present with them during the
>   hearing.  And just to remind the advisors that the advisor may not
>   participate directly in the proceedings[;]… no legal representation is
>   allowed during the hearing as well[9]
> - the right to be present during the hearing and to [confer] with an advisor
>   during testimony
> - the right to question witnesses and to respond to all written testimony.

Cp., Ex. 3, pp. 2-3 (bullet points added).  Dean Larimore then explained the hearing process,

stating as follows:

- The investigator would present her report to the Hearing Board, and the Board,
  Jones, and Doe would have an opportunity to question the investigator;
- Jones would make her statement, and the Hearing Board and Doe would have an
  opportunity to question her;

---

[9]     The Misconduct Procedure states the Complainant and Respondent have the right to consult private
attorneys, but further provides, "Attorneys cannot participate in the Hearing Board Process.  Attorneys may be
present on campus during a hearing; however, they are required to remain outside of any hearing room."  Cp., Ex. 1,
p. 19.

- Doe would make his statement, and the Hearing Board and Jones would have an opportunity to question him;
- With respect to the questions that Doe and Jones wished to ask of each other, each would submit the questions to the Chair, who would determine whether the question was relevant, and, if so, pose the question on behalf of the questioning party; and
- Doe and Jones would each have the opportunity to present witnesses, who could be questioned by the Hearing Board and each party.

Cp., Ex. 3, pp. 7-9.[10]   After reviewing these procedures, Dean Larimore asked Doe and Jones whether they had any questions about the procedures, and they did not.  Cp., Ex. 3, p. 11.

Attorney Kurker testified first and summarized Jones's Assault Complaint, Doe's Response, her investigation (including her interviews of the witnesses identified by Jones and by Doe), and her Report.  Cp., ¶52, Ex. 3, pp. 14-26.  Attorney Kurker was then questioned by the Hearing Board (Cp., Ex. 3, pp. 27-32),[11] Jones (Cp., Ex. 3, pp. 34-36), and Doe (Cp., Ex. 3, pp. 36-40).[12]

Jones testified next.  Cp., ¶53, Ex. 3, p. 43.  In describing the Incident, Jones again stated that she "agreed to perform oral sex at the beginning" of the encounter with Doe, but then withdrew her consent through her words and actions, which Doe disregarded.  *Id.*  She testified, "[W]hen I said no repeatedly and physically pushed against him, [Doe] did not listen or pay attention to my clear refusal and held me down, forcing his penis into my mouth until he ejaculated."  *Id.*  Echoing the confusion that she had previously expressed about the Incident in the Article, Jones then stated:

---

[10]      Dean Larimore fairly described the process afforded under the Misconduct Procedure.  *Compare* Cp., Ex. 3, pp. 7-11 *with* Cp., Ex. 1, pp. 23-26.

[11]      The Hearing Board members sought clarification regarding: (1) whether the Incident was "never consensual" or whether the Incident "started off consensually and then later became nonconsensual"; (2) the testimony provided by a witness, LR; and (3) the parties' respective descriptions of their level of intoxication.  *Id.*

[12]      Doe questioned Attorney Kurker about: (1) the timeline of events on the night of the Incident; (2) the timing of communications between Doe and LR, another witness; (3) when, based on Attorney Kurker's interview with Jones, the Incident "went from consensual to nonconsensual"; and (4) whether Jones told Attorney Kurker that she was "fearful" of Doe at any point.  *Id.*

This assault was terrifying and traumatic for me and took a long time to name, let alone tell anyone about it.  It has taken me longer still to feel able to bring it forward.  *Id.*

The Hearing Board then questioned Jones, who again described her confusion in the immediate aftermath of the Incident, as well as her effort to persuade herself that nothing wrong had happened, stating:

> I felt very alone and confused about what had happened.  I quickly tried to convince myself that nothing out of the ordinary had happened but I realized that I did not want to be alone.  I texted a friend to come over to talk to me and spend the night.  I did not tell my friend anything about the assault or that I had interacted with [John Doe] at all.  Cp., Ex. 3, pp. 46-47.[13]

Doe then questioned Jones.  Cp., Ex. 3, pp. 47- 53.  During Doe's examination, Jones again stated that she had "started off being OK" with performing oral sex on Doe, but that the encounter became nonconsensual and that she "said … no a bunch of times."  Cp., Ex. 3, p. 51.

Doe testified next.  Regarding the night of the Incident, Doe testified that he was able to "remember" multiple events and interactions on the night of the Incident, including:

- Where he went over a period of time and who he was with (*e.g.*, having dinner in town with friends, walking half a mile to a party, hanging out with friends at a dorm for some period of time, walking through town and then entering another dorm that he had never been in before, walking through the main campus, encountering someone who told Doe that he was "pretty drunk," walking back to his room with his roommate, laughing in his room with his roommate);
- How much he drank;
- His level of intoxication;
- Making a decision to stop drinking ("I remember at some point … I knew I was like getting much more drunk than I should have been and I stopped drinking"); and
- Making a "conscious effort" to go to the Socials (a group of dorms on campus).

Cp., Ex. 3, pp. 60-62.  During questioning by the Hearing Board, Doe declined to "comment on" his interaction with Jones, stating, "I don't remember anything and I won't, you know, comment

---

[13]     Among other things, the Hearing Board questioned Jones about: (1) her understanding of Doe's level of intoxication ("very drunk"); (2) the portions of the "hook-up" with Doe that were consensual and nonconsensual; (3) her communications with her roommate EK about the Incident; and (4) the events that transpired after Doe left her room.  Cp., Ex. 3, pp. 43-47.

on, you know, what might have happened that night." Cp., Ex. 3, p. 72.  Jones then questioned

Doe, who stated that when he is in a state of "blacking out," he feels that he is "*out of control*

*and unaware of [himself].*"  Cp., Ex. 3, pp. 77-78 (emphasis added).[14]

LR, another student, then testified about a conversation that she had with Doe about the

Incident.  LR stated that Doe told her that "he recalled being *out of control* and not really

remembering a lot and being worried about what happened in [the] interaction" with Jones.  Cp.,

Ex. 3, p. 90 (emphasis added).  LR said that, during their conversation, Doe "seemed nervous"

and "told [her] that while drunk he *thought he might have assaulted a girl on campus.*"  Cp., Ex.

3, pp. 85-86 (emphasis added).  LR further stated that Doe "repeatedly told [her] that he didn't

remember much of the night but that they [Doe and Jones] did engage in sexual activity," which

left him feeling "really unconformable with it both at the time and in the morning."  Cp., Ex. 3,

p. 86.  During cross-examination, Doe questioned LR about their earlier conversation, and LR

reiterated her earlier testimony, stating, "You said that you thought you might have assaulted a

girl and you were trying to figure out if you should apologize to her."  Cp., Ex. 3, p. 93.  Doe

then confronted LR about revealing the content of their conversation about the Incident, with the

following exchange occurring at the end of her examination:

> Doe:  *[D]o you recall saying to me that* even though you weren't a [peer advocate] and
> that they're not legally sworn to confidentiality, *you would keep our discussion*
> *confidential*?
>
> LR:  *I – I don't recall saying that…. I'm not a confidential source* … I'm not a [peer
> advocate], and I'm not bound by confidentiality other than like my own ethical
> choices.  Cp., Ex. 3, p. 97 (emphasis added).

---

[14]    Doe also testified that he spoke to EK, his former girlfriend and Jones's roommate, about what
happened on the night of the Incident.  Doe stated that he told EK that he "got too drunk and that [he] had hooked up
with [Jones]," adding, "I was really apologetic and it was definitely something I wouldn't have wanted to do if I was
sober, um, because you know, I wouldn't want to hurt anyone."  Cp., Ex. 3, pp. 81-82.  He then added, "You know,
wouldn't want to hurt EK."  *Id.*

12

Doe then called his witnesses, RM and NK, who presented conflicting testimony regarding Doe's behavior and level of intoxication.  RM, a friend of EK (Doe's former girlfriend and Jones's roommate at the time of the Incident), described Doe as "very drunk" and "barely [able to] stand on [his] own."  Cp., Ex. 3, p. 112.  NK (Doe's roommate) painted a different picture, testifying that while Doe was "intoxicated" he "seemed totally normal" and capable of "pretty civil conversation."  Cp., Ex. 3, pp. 102-103.  NK also rejected any suggestion that Doe had "blacked out," stating that he had seen Doe "blacked out" on prior occasions but that Doe did not appear "blacked out" on the night of the Incident.  Specifically, NK testified as follows:

> Board Member:  [A]re you able to tell when [Doe] has blacked out?
>
> NK:  Um, I would say yes.
>
> Board Member:  *And did he appear to have been blacked out that evening, the night in question?*
>
> NK:  *No, because he seemed – his function normally seemed fine – I had conversations with him*.  Cp., Ex. 3, p. 105 (emphasis added).

NK and RM also depicted Doe's interactions with Jones in the dormitory common room very differently.  NK stated that the interaction between Jones and Doe in the common room was unremarkable – "just kind of the usual" – and that they began "making out" in a manner that appeared "very consensual on both ends."  Cp., Ex. 3, pp. 105-106.   By contrast, RM stated that Doe "flung [himself]" at Jones as she was sitting on the couch (which RM described as "a very – pretty aggressive sort of gesture"), and that Doe started kissing Jones.  Cp., Ex. 3, pp. 111-114.  RM added, "I was ready to pull [Doe] off her but she was clearly responding" by kissing him back.  Cp., Ex. 3, p. 114.  Perhaps concerned that RM had supplemented the depiction of Doe as

"out of control," Doe then asked RM whether his interaction with Jones in the common room "seem[ed] friendly and consensual," and RM said it did.  Cp., Ex. 3, p. 113.[15]

Doe then presented the testimony of EK, his ex-girlfriend and Jones's former roommate, who described various communications with Jones, Doe and others about the Incident.  EK stated that Jones initially told her that "[Doe] had been very drunk and that he'd come on to her and kissed her and then she felt bad and told him to leave," but that Jones later confirmed that "more than just like making out had happened."  Cp., Ex. 3, pp. 124, 126.  EK also stated that she had heard from their friend (DR) that Jones "texted right after having been done and like said that she had like done something bad," but EK then apologized to the Hearing Board and said that it was "really hard to remember" and that "someone" told her that but she "[didn't] know who."  Cp., Ex. 3, p. 129.  A Board Member then followed up with Jones and asked her about the referenced text message to DR and its content, and Jones (who stutters) responded as follows, first orally and then in a typewritten response:

> Um, so – so I think I – um, so, – um, so I think I did say like well, something about … Something about – something about like well doing … Well, about … Well, about like well doing a bad thing.  But *I mean … So actually like well texted him, um, so almost – so almost like right after, um,* [*Doe*] *had, um, left.*  Um, I – when I didn't – so I didn't … So I didn't … So I didn't … So I didn't … I'll have to type.  Um.…
>
> *I didn't want to address what had happened to me and I was in no position yet to accept that it had been rape.  So, in my text messaging to DR, I only said things about the hook-up as if it had been consensual.*  Cp., Ex. 3, pp. 136-137 (emphasis added).

After the presentation of evidence, Jones and Doe were offered the opportunity to make closing comments.  Jones stated:

---

[15]     A Board Member also questioned RM about a Facebook message that she had sent to Doe, in which she stated, "I know that [Jones] hooked up with another guy after you left that same night," which was included in the investigator's Report.  Cp., Ex. 2, p. 34; Ex. 3, pp. 119-120.  RM said that she had heard it from "other friends," adding, "But I didn't hear it directly from [Jones] so I guess it's all hearsay."  Cp., Ex. 3, p. 120.

I think it is clear there's not a lot of discrepancy between what we have to say about that night.  The one difference is the area during which he blacked out and I was forced to remember forever.  Regardless of whether he remembers the night or not, he is still forever responsible for the harm he caused.  Maybe he is telling the truth when he says he doesn't remember raping me but I do viscerally remember being raped and that's something that has caused me pain and I've had to live with it since then.  Cp., Ex. 3, p. 144.

Doe stated:

*I apologize to everyone* in the room for having to be here today.  *I feel remorse for Sandra Jones*, the witnesses, and everyone else involved in this process because it will never be pretty.  *I don't doubt or dismiss Sandra Jones's feelings*.  I wish I could have given more to this case today.  However, I have given and presented everything I have, which are only the things that were given to me by others…. *I am certain that it is out of my character to conduct myself in the ways that were alleged today*.  Therefore, I should be found not responsible.  Cp., Ex. 3, p. 145 (emphasis added).

## H.    The Hearing Board's Decision

The Hearing Board then deliberated and, on December 13, 2013, issued its decision.  Cp., Ex. 4.  The Hearing Board informed Doe that "[b]ased on the evidence presented and after deliberating, the Board found [him] **responsible**, by a preponderance of the evidence, for violating *the Statement on Respect for Persons* specifically the *Sexual Misconduct Policy: Sexual Assault*," and that he was expelled from the College.  Cp., Ex. 4 (original emphasis).  The Board stated that they had "carefully considered the evidence" and identified the following factors as being "influential" in their finding of responsibility:

- Your account of being "blacked out" is credible.  However, as stated in the Student Handbook: "Being intoxicated or impaired by drugs or alcohol is never an excuse for sexual misconduct and does not excuse one from the responsibility to obtain consent." [Cp., Ex. 1, p. 9]
- Ms. Jones's account of withdrawing consent after it had initially been given – as evidenced by Ms. Jones saying "no" and "I don't want to keep going" and by her asking you to leave and pushing you away – is credible and supported by a preponderance of the evidence.  *Id.*

15

The Hearing Board apprised Doe of his rights of appeal under the College's Misconduct

Procedure. *Id.*

### I.      Doe's Appeal

The Misconduct Procedure states that "[e]ither party may request an appeal within

seven days from the time of notification of the decision by the Dean of Students Office."

Cp., Ex. 1, p. 27.  Doe submitted his written appeal on December 20, 2013.  Cp., ¶61;

Roberts Aff., Ex. A; Ex. B, p. 2.  In his appeal, Doe argued, among other things, that LR

had "orchestrated" Jones's Assault Complaint and "convinced" her to file it (a contention

he based on information allegedly received from an "outside party," whom he did not

identify), and that there were contradictions and discrepancies in the testimony provided

by Jones and LR.  Roberts Aff., Ex. A, pp. 1-2.

On December 27, 2013, the College's Provost denied Doe's appeal.  Cp., ¶61;

Roberts Aff., Ex. B.  The Provost's decision noted that Jones had filed the Assault

Complaint, and that Doe had the opportunity to address any differences in testimony

during the hearing before the Hearing Board, which "made its decision on careful

deliberation of the evidence presented by those who testified before them."  Roberts Aff.,

Ex. B, p. 1.

Under the College's Misconduct Procedure, "Appeal decisions are final."  Cp.,

Ex. 1, p. 28.

### J.      Doe's Submission of Additional Information to the College

Nearly four months after his appeal was final, Doe submitted to the College two

affidavits, one from EK and one from ML (the student whom Jones invited to her room after Doe

had left).  In her affidavit, EK largely reiterated what she had told the investigator and the

Hearing Board (Cp., Ex. 6, ¶¶1-13), but added two new contentions, namely: (1) that Jones allegedly had a "regular weekend practice [of] meeting men and having brief sexual encounters with them" that she would recount "with dramatic detail" (Cp., Ex. 6, ¶4)[16]; and (2) that EK had "conveyed to [the investigator] the information about the text message exchange between Sandra Jones and DR," which she appended to her affidavit.  (Cp., Ex. 6, ¶18).[17]  In his affidavit, ML stated that he met Jones in her room at approximately 2:45 a.m. on February 5, 2012, that she appeared "friendly, flirtatious, and spirited," and that they had "consensual sexual relations" several hours later, and he appended to his affidavit copies of text messages with Jones from that evening.  Cp., Ex. 5.  Based on these affidavits and texts, Doe requested that the College "reinstate" Doe or "reopen either the hearing or the investigation."  Cp., ¶¶72, 73.  The College declined those requests, which were not supported by the College's Policy or Misconduct Procedure. Cp., ¶¶72, 73.

More than a year went by, and Doe filed this suit.

---

[16]     Doe submitted this information about Jones's prior sexual history through EK's affidavit, even though such information generally is not admissible in disciplinary proceedings under Amherst's Misconduct Policy.  Cp., ¶46; Ex. 1, p. 24.

[17]     While this Court need not address or resolve the issue, it should be noted that EK's assertion in her affidavit that she "conveyed" information to the investigator about the text messages between DR and Jones is not accurate.  The audio-recording of EK's interview with Attorney Kurker reflects that EK never said any such thing to the Investigator, despite Attorney Kurker's invitation to EK to provide any additional information in the following exchange at the end of the interview:

| Attorney Kurker: | *Is there anything else I haven't asked you about that you think would be important for me to know?* |
| EK: | *I don't think so.   Not that I can think of.* |
| Attorney Kurker: | Okay.  Well, I think you've given me a lot of helpful information… |

See Defendants' Answer, ¶36.

## ARGUMENT

### A.      Standard of Review

A defendant's motion for judgment on the pleadings under Rule 12(c) "is treated much

like a Rule 12(b)(6) motion to dismiss." *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st

Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet

this standard, a plaintiff must allege facts showing "more than a sheer possibility that a defendant

has acted unlawfully."  *Id.*  In reviewing the sufficiency of a complaint, a court may disregard

"bald assertions, unsupportable conclusions, and opprobrious epithets."  *In re Citigroup, Inc.*,

535 F.3d 45, 52 (1st Cir. 2008).  A complaint is insufficient if it offers "labels and conclusions"

or a "formulaic recitation of elements of a cause of action."  *Twombly,* 550 U.S. at 555.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

### B.      Doe's Breach of Contract Claim Fails Because Amherst Met His Reasonable Expectations under the College's Misconduct Procedure (Count I)

In Count I of his Complaint, Doe asserts a claim for breach of contract, contending that

the College violated the policy and procedures found in Amherst's *Student Handbook* for

addressing complaints of sexual misconduct.  Even assuming that the Misconduct Procedure

constituted a contract, Doe's allegations demonstrate that the College met the objective,

reasonable expectations under that procedure, and his claim for breach of contract thus fails.

The Supreme Judicial Court established the standards for interpreting a contract claim

based on a private university's student handbook in *Schaer vs. Brandeis University,* 432 Mass.

474 (2000).  In such actions, courts employ "the standard of 'reasonable expectation—what

meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Id.* at 478 (quoting *Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir.1983)). It is not what the student's "expectations of the proceeding were, but whether the proceedings fell 'within the range of reasonable expectations of one reading the relevant rules,' an objective reasonableness standard." *Walker v. President & Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014) (quoting *Cloud*, 720 F.2d at 725). The courts will not adopt a student's interpretation of a student handbook simply because he or she prefers it or claims to have subjectively understood the handbook's terms in that manner. *Sullivan v. Boston Architectural Ctr., Inc.*, 57 Mass. App. Ct. 771, 775 (2003). Nor will the courts add additional words or provisions to a handbook that are not there. *See id.* at 774 (courts "do not second-guess or supplement the processes developed by the [college]").

The reasonable expectation standard reflects a judicial reluctance to intrude on internal decisions by private colleges. Indeed, "[g]reat deference is extended to university decision-making on academic and disciplinary matters," *see Morris v. Brandeis Univ.*, 60 Mass. App. Ct. 1119, *1 (2004) (unpublished disposition) (citing cases), and "[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Schaer*, 432 Mass. at 482. *See Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150-51 (D. Mass. 1997) ("'[C]ourts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline'") (internal quotations omitted).

In asserting that the College violated a contractual obligation, Doe groups his arguments into four categories: (1) "Insufficiency of the Evidence and Findings of the Board," (2) "Failure to Provide a Fair or Reliable Investigative and Fact-finding Process," (3) "Discrimination," and

(4) "Refusal to Reopen" his disciplinary proceeding.  Cp., ¶¶83-86.  Each is deficient as a matter of law.

> ### 1.    The Hearing Board Found Doe Responsible for Violating the College's Sexual Misconduct Policy by a Preponderance of the Evidence and Properly Applied the College's Policy.

Doe contests the sufficiency of the evidence before the Hearing Board, arguing that the evidence at the hearing "clearly showed" and the Board "found" that Doe was "blacked out," and that he "therefore could not have had the requisite knowledge" to violate Amherst's Policy.  Cp., ¶83. [18]  As the foundation for his challenge, Doe erroneously argues that "knowledge" is an element of sexual misconduct under the Policy, and that if a respondent is so intoxicated that he no longer has "conscious awareness," he cannot have "knowledge" and thus cannot commit sexual misconduct under the Policy.  Cp., ¶83.  This troubling "interpretation" of the College's Policy, which misapplies the criminal concept of *mens rea* to a college's private disciplinary proceeding, is flatly wrong and is not premised on any reasonable expectation created by the Policy itself.

Doe argues that using an "assum[ed]" and "broadest plausible interpretation of Amherst's policy" – *not* one justified by an objective, reasonable expectation – a complainant must "prove[] by a preponderance of the evidence at least: (a) that the respondent *knew* that the complainant did

---

[18]    In his Complaint, Doe repeatedly states that the Hearing Board "found" that he had "blacked out," evidently hoping that repetition will make this allegation true when it demonstrably is not.  Cp., ¶¶74, 83.  As the Hearing Board's written decision makes clear, the Board stated only that Doe's "account of being 'blacked-out' was *credible*," but the Board made no "finding" that Doe was blacked out.  Cp., Ex. 4, p. 2 (emphasis added).  Rather, the only "finding" made by the Board was that Doe had violated the College's sexual assault policy.  "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."  *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014).  As such, Doe's inaccurate allegations that the Hearing Board "found" that he was "blacked out" and "incapacitated" are entitled to no consideration.  Also, although Doe argues that the evidence "clearly showed" that Doe was blacked out, there was ample evidence presented at the disciplinary hearing that he was *not* blacked out during the Incident, including Doe's testimony reflecting multiple recollections of the night's activities and his roommate NK's explicit testimony that Doe did not appear blacked out.

not consent; or (b) that he *knowingly* used force beyond that necessary to performance the sexual

act….” Cp., ¶83 (emphasis added).  Doe does not identify any provision of the Policy

supporting these arguments.

Under the College’s Policy, it is not enough that a respondent in a sexual misconduct

proceeding *thought* a complainant had consented to sexual activity.  Nor is a respondent

absolved of responsibility by alleged *unawareness* that a complainant had not consented.  As the

Policy emphasizes, “[t]here must be mutually understandable communication that clearly

indicates willingness to engage in sexual activity each time such activity occurs,” and “consent

may be withdrawn by either party at any time.”  Cp., Ex. 1, p. 8.  The Policy defines sexual

assault (for which Doe was found responsible) as “[p]hysical sexual acts *perpetrated against a*

*person’s will* or where a person is incapable of giving consent,” including “[h]aving or

attempting to have sexual intercourse with another individual *without consent*.”  Cp., Ex. 1, p. 7

(emphasis added).  The Policy contains a detailed “Statement on Consent, Coercion,

Incapacitation and Alcohol,” which requires consent through “an *outward demonstration*

indicating that an individual has freely chosen to engage in sexual activity,” except in instances

where the complainant was incapacitated.  Cp., Ex. 1, p. 8 (emphasis added).  *See also id.* (“In

the absence of an outward demonstration, consent does not exist.”).  Simply put, the objective

conduct of the complainant is dispositive on the issue of consent; the respondent’s subjective

state of mind is not.

Doe’s disturbing “interpretation” of the Policy – that drinking to the point of “blacking

out” somehow insulates a student from a finding of sexual misconduct – is neither “plausible”

nor reasonable.  Indeed, the College’s Policy explicitly rejects Doe’s “interpretation,” stating

unequivocally, “Being intoxicated or impaired by drugs or alcohol is *never* an excuse for sexual

21

misconduct and does not excuse one from the responsibility to obtain consent," and also stressing that the College considers sexual contact while intoxicated "to be risky behavior." *Id.* (emphasis added). Doe could not have had any reasonable expectation that drinking heavily and escalating his level of intoxication to the point to that he no longer possessed "knowledge" of his actions (and was, in his words, "out of control") would immunize him from any responsibility for sexual misconduct under the College's policy. Indeed, such an interpretation is patently *unreasonable*, as it would serve to foster the very "risky behavior" that the Policy explicitly warns against.[19]

In finding Doe responsible for sexual assault, the Hearing Board stated that Jones's account of "*withdrawing consent* after it had been given – as evidenced by Jones saying 'no' and 'I don't want to keep going' and by asking [Doe] to leave and pushing [him] away – is credible and supported by a preponderance of the evidence." Cp., Ex. 4, p. 2 (emphasis added). The Hearing Board's finding of sexual misconduct was thus supported by evidence presented to the Board, and the College's Policy does not permit Doe to escape responsibility by asserting that he did not remember or was unaware that Jones had withdrawn her consent.

Does also fails to identify any provision of the Policy supporting his argument that a respondent can escape liability if he or she does not "knowingly use[] force beyond that necessary to perform the sexual act." Cp., ¶83. Not only does Doe's definition suggest that a respondent may avoid violating the Policy by using just enough force to perform a sexual act (even if the respondent has not obtained consent), it also runs counter to the Policy's definition

---

[19]     With respect to incapacitation *only*, the Policy states that "relevant standard" is "whether the Respondent knew, or a sober reasonable person in the same position should have known, that the other party was incapacitated and therefore could not consent to the sexual activity"). Cp., Ex. 1, p. 9. Thus, even in cases of incapacitation, the Policy incorporates an objective reasonableness standard, explicitly excluding the respondent's subjective unawareness due to alcohol consumption from consideration. *See id.*

of "coercion," a term that encompasses not just "physical force" but also threats of force, intimidation, and pressuring behavior that "eliminate[s] an individual's ability to exercise his or her own free will to choose whether or not to have sexual contact."  Cp., Ex. 1, p. 8.  Doe's contention that "[his] *movements*, *according to Doe's testimony*, were consistent with the type of sexual conduct involved alone, without greater force" is utterly unfounded.  Cp., ¶83 (emphasis added).  In fact, Doe *never* provided *any* testimony regarding his "movements" during the sexual encounter with Jones; to the contrary, he persistently claimed that he could not remember what had happened or what he had done.  The *only* evidence presented to the Hearing Board regarding Doe's "movements" during the Incident *came from Jones*, and she stated that after she had withdrawn her consent to performing oral sex, Doe forced his penis into her mouth until she choked, held her head, and relented only after he ejaculated.

In sum, the evidence provided to the Hearing Board supported its finding that Doe violated the College's sexual misconduct policy, and nothing in the College's Policy permits Doe to seek this Court's intervention in re-evaluating the evidence presented to the Hearing Board. The proper focus for Doe's breach of contract claim is whether the College adhered to its Misconduct Procedure.  Amherst did, and Doe's claim thus fails.  *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 36 (1st Cir. 2007) ("In the absence of any probative evidence that the appeal officer ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures limned in the handbook, or made her decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted.") (Rhode Island law).

23

**2.** ***The Investigation and Hearing Met the Reasonable Expectations under the Policy.***

Doe also contends that the College failed to provide a "fair or reliable investigative and fact-finding process" and "did not follow its own rules." Cp., ¶84. Doe seeks support this claim with seven arguments, each of which fails to identify any way that the College contravened reasonable expectations created by the Misconduct Procedure.

*First*, Doe asserts that the "case was put on a fast track," and that, upon being informed of Jones's Assault Complaint, he was "informed that he had less than a week to respond to the Complaint and identify an advisor," and that he was "rushed into a hearing." Cp., ¶¶29, 84. Under the plain language of the Misconduct Procedure, Doe's assertion that his process was hurried is baseless. The Misconduct Procedure expressly required Doe to submit his response to the Assault Complaint "within three business days of [its] receipt," making it appropriate for him to select an advisor promptly, and, in accordance with the Misconduct Procedure, Doe was "offered an Advisor at the time he … [was] notified of the complaint." Cp., Ex. 1, pp. 19, 21. With respect to the overall timing of the process, Jones filed her Assault Complaint on October 28, 2013, Plaintiff's disciplinary hearing was conducted on December 12, 2013, and the decision on his appeal was issued on December 27, 2013, or 60 days from commencement to conclusion. Cp., ¶¶27, 47; Roberts Aff., Ex. B, p. 1. This timetable comported with the College's Policy, which states that "[t]he investigation and resolution (including appeal) of all reports will generally be completed within 60 to 90 days." Cp., Ex. 1, p. 18.

*Second,* Doe complains that the investigation was "totally inadequate and incompetently performed" because Attorney Kurker did not interview DR (a student whom EK "heard" had communicated with Jones via text "after her sexual interaction with John Doe"), did not interview an unidentified "[]other guy" who had supposedly "hooked up" with Jones after her

encounter with Doe (who was referenced in an electronic message provided to Attorney Kurker), and "did not collect text messages from Jones or anyone else who had exchanged text messages with her at or about the time of the relevant events."  Cp., ¶¶36, 37, 38, 84.  Leaving aside Doe's characterizations of the quality of the investigation, the actual *facts* alleged by Doe demonstrate that the investigation comported with the College's Misconduct Procedure.

The Misconduct Procedure mandates only that the investigator "*will interview the Complainant and the Respondent* separately."  Cp., Ex. 1, p. 22 (emphasis added).  Attorney Kurker did so.  Cp., ¶¶32, 34.  The Misconduct Procedure further provides that the investigator "*will make a good-faith effort* to contact and interview any witnesses identified by the parties or in the documentation," and "*may … interview* any other individual *he or she finds to be potentially relevant* to the allegations."  *Id.*, Ex. 1, p. 22 (emphasis added).  Doe acknowledges that Attorney Kurker interviewed each of the six witnesses identified by the parties.  Cp., ¶31.  While Attorney Kurker did not interview DR or the so-called "other guy," she did not contravene any reasonable expectation that Doe may have had, particularly given that neither Jones nor Doe requested that she interview DR or the "other guy," and neither DR nor the "other guy" was identified in any documentation provided to Attorney Kurker.  In any event, outside of complainant and respondent, the College's Misconduct Procedure vests the investigator with discretion in determining what other witnesses to interview, and neither complainant nor respondent has any basis to challenge that discretion.

Regarding Attorney Kurker's alleged failure to "collect" text messages from Jones, the Policy provides only that the investigator "*will try* to obtain" evidence "relevant to the investigation as the Investigator *determines, in his or her judgment, to be necessary*."  Cp., Ex. 1,

pp. 21-22.[20]  Here, Doe alleges that Attorney Kurker asked Jones during the investigation whether she had "text[ed] or otherwise reduce[d] what happened with Mr. Doe to writing" (Jones said she had not).  Cp., ¶33.  Under the Misconduct Procedure, it was left to the investigator's discretion to ascertain whether any text messages were "necessary" and "relevant," and, if so, what she would "try" to do to obtain that information.  Again, Attorney Kurker's exercise of that discretion could not run counter to any objective, reasonable expectation under the Misconduct Procedure. While Doe argues that the investigation could have and should been performed better, courts do not dive into evaluating the quality of a private college's performance in disciplinary matters when reasonable, procedural expectations are satisfied, as they were here.  *See Schaer*, 432 Mass. at 480 (where college's disciplinary procedure required preparation of "[a] record of each hearing," court noted that while the prepared record was "extremely brief" and "better practice would have been to produce a more complete report," college nevertheless satisfied "reasonable expectations" created by its disciplinary procedure).

*Third*, Doe claims that he was "denied the advice of a trained lawyer."  Cp., ¶84.  This is not correct.  The Misconduct Procedure expressly advised Doe that "[t]he Complainant and Respondent have the right to consult private attorneys, at their own expense," and that attorneys "may be present on campus during a hearing" but "cannot participate in the hearing board process."  Cp., Ex. 1, p. 19.  Thus, Doe had the right and ability to obtain advice from an attorney, and the College was not obligated to permit any attorney to attend the hearing.  *See Coveney v. President & Trustees of Coll. of Holy Cross*, 388 Mass. 16, 22 (1983) ("Because the college is a private institution, [the accused student] had no constitutional right to have an

---

[20]      Of course, an investigator at a private college does not have subpoena power to facilitate any effort to gather documents.

attorney present.").  The Misconduct Procedure advised Doe of his right to consult with counsel, and the College never denied his ability to exercise that right.

*Fourth*, Doe asserts that he was "denied the advice of a competent advisor" and not "trained [n]or counseled on how to … competently defend himself."  Cp., ¶84.  The Misconduct Procedure states only that an advisor "serves to guide the student through the pre-hearing and hearing process and may accompany the student to any meeting with a college employee and to the hearing."  Cp., Ex. 1, p. 19.  Doe's allegations reflect that Dean Moore communicated with him about the hearing process, accompanied him to his interview with Attorney Kurker, and accompanied him to the disciplinary hearing, which met any reasonable expectation that Doe may have had about Dean Moore's shepherding role.  Nothing in the Misconduct Procedure created any reasonable expectation that Dean Moore would "train" and "counsel" Doe on how to "competently defend himself."  As explained above, Doe had the right and opportunity to retain legal counsel for advice on defending against Jones's Assault Complaint.

*Fifth*, Doe alleges that Jones "lied about and concealed material exculpatory evidence."  Cp., ¶84.  Doe bases this allegation on his contention that Jones told Attorney Kurker during the investigation that she had not texted about "what happened" with Doe, but then later testified to the Hearing Board that she had texted with DR about her encounter with Doe.[21]  The premise of Doe's argument – that any discrepancy in testimony compels the conclusion that Jones was lying – is simply wrong as a matter of law and, more importantly, provides no basis for Doe to seek the court's intervention into a college's private disciplinary proceeding.  Here, it was up to the Hearing Board to determine whether any discrepancy existed between what Jones told the

---

[21]     Specifically, Jones told the Hearing Board that she had texted with DR, and that she "only said things about the hook-up [with Doe] as if it had been consensual" because she "didn't want to address what had happened" to her and "was in no position yet to accept that it had been rape."  Cp., ¶56.

investigator and later told the Hearing Board, whether any discrepancy was the result of a lapse in memory or a falsehood, and what impact, if any, a discrepancy had upon the Board's overall assessment of Jones's credibility.[22]  Ultimately, it was up to the Hearing Board to evaluate the credibility of Jones, Doe, and the other witnesses who testified, based on the evidence at the hearing.  As the Supreme Judicial Court has made clear, "It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject."  *Schaer,* 432 Mass. at 481.  That was the function of the Hearing Board.

*Sixth*, Doe claims that he was "physically quarantined" during the hearing, presumably referring to the barrier placed between Doe and Jones.  Cp., ¶¶49, 84.  The Misconduct Procedure, however, expressly provides that "[a] Complainant or Respondent may also request participation in the hearing by other suitable means that would not require physical proximity to the other," such as "partitioning a hearing room."  Cp., Ex. 1, p. 25.  The partitioning comported with the Misconduct Procedure and was permissible as a matter of law.  *See Cloud*, 720 F.2d at 725 (witness's "anonymous testimony … out of [the respondent's] sight … did not render the hearing unfair or violate any contractually required procedures").

*Seventh*, Doe states that there was "no attempt, *nor was there even any procedure*, for him to obtain material evidence not disclosed by [Jones] until the hearing."  Cp., ¶84 (emphasis added).  Because Doe acknowledges that there was "no procedure" for obtaining evidence referenced during the hearing, Doe effectively concedes that the College could not have

---

[22]    *See Commonwealth v. Thomas*, 439 Mass. 362, 365-66 n.4 (2003) (court approved jury instruction regarding evaluation of witness credibility, which provided: "Keep in mind that people sometimes forget things or get confused or remember an event differently.  Memory is not always reliable and when someone recounts a story twice it will seldom be identical in every detail unless it is a memorized lie or the witness is possessed of extraordinary perception and recall.  It is for you to decide whether any contradictions in a witness's testimony are innocent lapses of memory or intentional falsehoods.  That may depend upon whether important facts or small details are at issue and how important the facts might have appeared to the witness at the time they were perceived.").

contravened any reasonable expectation under its Misconduct Procedure.  While the Procedure

recognizes that "[r]elevant, substantive and new information, not available at the time of the

hearing" may surface following the hearing's culmination and be presented on appeal (Cp., Ex.

1, p. 27), the Misconduct Procedure creates no reasonable expectation that the College is charged

with seeking to obtain any such evidence on behalf of any party.[23]

### 3. The College Responded to Jones's Assault Complaint against Doe in Accordance with Its Misconduct Procedure, and the College Did Not Treat Doe in a Discriminatory Manner.

Doe claims that he was "discriminated" against because, following his hearing and

expulsion, the College did not "investigat[e]" or "address" Jones's alleged "misconduct" in

having sex with Doe.  Cp., ¶85.  Doe's claim of "discrimination" is a red-herring and fails for

three reasons.

*First*, there can be no debate that the College properly pursued a disciplinary hearing

against Doe in response to Jones's Assault Complaint.  The Misconduct Procedure permits a

"person who has experienced an incident of sexual misconduct" to "*file a complaint* against the

Amherst College student responsible for that conduct" under the "Student Conduct Process."

Cp., Ex. 1, pp. 18, 20 (emphasis added).   When a complaint of sexual misconduct is "filed," the

College is required to take certain actions to facilitate "adjudicating a sexual misconduct

complaint *through the Student Conduct Process*." *Id.* (emphasis added).[24]  Here, it is undisputed

that Jones "filed a complaint" against Doe seeking a "disciplinary referral" under the Student

---

[23]      In his appeal, Doe did not contend that he wanted to seek to obtain any "material evidence" that had been referenced by Jones during the hearing, nor did he state that he wanted the College to do so. Roberts Aff., Ex. A, p. 1- 4.

[24]      Among other things, the Misconduct Procedure provides that the College will notify both parties of their rights to advisors, explain the Hearing Board Process, and designate an investigator to conduct an investigation regarding the complaint, and (absent withdrawal of the complaint) conduct a hearing before the Hearing Board to "address [a] complaint[] of sexual misconduct."  Cp., Ex. 1, pp.  20, 21, 23.  Beyond dispute, the College did all of those things.

Conduct Process.  Cp., ¶27; Cp., Ex. 2, p. 18.  Once that complaint was filed, the College was obligated to take, and did take, the required steps to move the complaint through the Student Conduct Process.

*Second*, within the context of adjudicating Jones's Assault Complaint, the College had investigated and addressed the sole sexual encounter between Jones and Doe, including their conduct during the encounter, their prior alcohol consumption, and their respective versions of events.  *See* Cp., Ex. 2; Cp., Ex. 3.

*Third*, Doe has no basis to allege that Jones was treated differently because Doe, *unlike Jones*, never filed a disciplinary complaint alleging that Jones had engaged in sexual misconduct. To the contrary, Doe's theme during the disciplinary proceeding was that his interactions with Jones were consensual, i.e., that *neither* he nor Jones engaged in sexual misconduct.  *See, e.g.*, Cp., Ex. 3 at 105 (Doe offered testimony of NK, who stated that Doe's interactions with Jones appeared "*very consensual on both ends*"); Cp., Ex. 3, pp. 113-114 (while questioning RM, who said that Doe had "flung himself at" Jones and begun kissing her, Doe asked, "Did it seem *friendly and consensual* from your perspective?") (emphasis added).  Doe echoed that premise again in his Complaint in this action, alleging in its opening paragraph that he and Jones "*engaged in consensual sex*."  Cp., ¶1 (emphasis added).  Thus, while Doe may now find it expedient for the purposes of litigation to portray himself as a "victim" who was "incapable of forming consent" (Cp., ¶¶99, 100), the fact remains that, *unlike Jones*, Doe never filed a disciplinary complaint, which is the triggering event for the Student Conduct Process.  As such, Doe has no basis to allege that he was the subject of differential, much less discriminatory, treatment.

As demonstrated above, the College complied with the reasonable expectations under its Misconduct Procedure throughout the disciplinary proceeding against Doe, from the filing of Jones's Assault Complaint through the final appeal of the decision upholding Doe's expulsion, and nothing that occurred thereafter in any way alters the propriety of the College's conduct in moving Jones's Assault Complaint through the Student Conduct Process.

> **4.      Amherst's Misconduct Procedure Did Not Create Any Reasonable Expectation that the College would "Reopen" Disciplinary Proceedings for Any Reason after the Expiration of the Final Appeal.**

Doe contends that once Amherst was presented with "new evidence" months after the appeal period had ended, the College should have "vacated" the finding by the Hearing Board, "reopen[ed]" the disciplinary proceedings, and "reinvestigate[ed]" the matter.  Cp., ¶¶86, 90. Fatally, Doe does not and cannot point to any provision of the Misconduct Procedure that would create any reasonable expectation that the College would take any of these actions after the decision on his appeal became final.

The College's decision on Doe's appeal was issued on December 27, 2013, at which point, under the Misconduct Procedure, the decision was "final."  Cp., Ex. 1, p. 28; Roberts Aff., Ex. B, p. 1.  Doe did not present additional evidence to the College until April 2014, nearly four months after that final decision.  There is nothing in the College's Misconduct Procedure that permits *any* student – whether a complainant or respondent – to submit new evidence after a disciplinary proceeding has finally concluded, and there is nothing that provides any basis for the College to vacate findings, reopen proceedings, or reinvestigate matters upon the submission of such evidence after a final appeal.

Amherst and all students who participate in sexual misconduct proceedings have a justifiable interest in the finality of those proceedings.  Otherwise, disciplinary decisions would

have no permanence, with students seeking to challenge them months or even years later based on new evidence or arguments.  The College's unwillingness to take the actions requested by Doe fully comported with its Misconduct Procedure, and there is thus no basis for Doe to claim that they were "arbitrary and capricious."  Cp., ¶86.[25]  Indeed, it is a certainty that Doe would be offering a very different argument if the Hearing Board had found him "not responsible," and it was Jones who was coming forward with "new evidence" after the final expiration of the appeal period in an effort to alter the Hearing Board's decision.

### 5.   The College's Disciplinary Process Comported with Basic Fairness.

In addition to reviewing compliance with provisions of student handbooks, courts consider whether the disciplinary process afforded by a private college was conducted with "notions of basic fairness."  *Schaer*, 432 Mass. at 481.  Here, the College's disciplinary process was fundamentally fair.  Doe's own allegations and the College's Policy establish that the College:

- Notified Doe of the charges against him in the Assault Complaint;

- Reviewed the charges with him;

- Offered and provided the assistance of an trained advisor of his choosing;

- Offered him the opportunity to submit a written response to the Assault Complaint;

- Advised him of his right to consult with a private attorney;

---

[25]     The "arbitrary or capricious" standard applies only where a contract does not govern the student-college relationship.  *Compare Coveney*, 388 Mass. at 22 (applying arbitrary and capricious standard to student discipline) *with Schaer*, 432 Mass. at 482 (stating that *Coveney* "applies in cases where there is no contractual relationship").  *See also Cloud*, 720 F.2d at 725 (stating that "differential standard" applied in *Coveney* applies when "there is no contractual right to a hearing").  In any event, a college satisfies the "arbitrary or capricious" standard by acting "in good faith and on reasonable grounds."  *Coveney*, 388 Mass. at 19.  For the reasons discussed above, Amherst had a reasonable and good faith basis for its actions.

- Afforded him equal opportunity to submit evidence for consideration by an independent investigator and hearing board composed of persons from outside the Amherst community;

- Provided him a copy of the investigator's report (three weeks before his disciplinary hearing);

- Granted him equal opportunity to call witnesses to testify at the disciplinary hearing, to present evidence, and to respond to the evidence;

- Promptly notified him of the hearing board's decision and the sanction assigned by the board;

- Apprised him of his appellate rights under the College's policies; and

- Considered his written appeal, which was ultimately denied.

As a matter of law, this process comported with basic fairness. *See Cloud*, 720 F.2d at 725-26 (disciplinary hearing resulting in law student's expulsion comported with basic fairness, even though transcript from prior rape trial introduced into evidence, where student "was provided the opportunity to present his own witnesses and to cross-examine the university's witnesses"); *Schaer*, 432 Mass. at 481-82 (disciplinary proceeding conducted in "atmosphere of hysteria and misinformation" in which the college heard testimony that would have violated the rules of evidence nonetheless satisfied basic fairness).

### C.    Doe's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails Because Amherst Complied with its Misconduct Procedure (Count II)

The implied covenant of good faith and fair dealing requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237-38 (1st Cir. 2013).   A claim for breach of implied covenant also requires "evidence of bad faith or an absence of good faith." *Id.* at 238.   The focus is on "the manner of performance"; the implied covenant cannot

33

"create rights and duties not otherwise provided for in the existing contractual relationship."  *Id.*

Here, Doe's claim for breach of the implied covenant of good faith and fair dealing is premised on the same events that serve as the foundation for his infirm breach of contract claim, namely the College's investigation and response to Jones's Assault Complaint, the hearing process and sanction, and the College's response to the "new evidence" presented by Doe after his appeal had concluded.  Cp., ¶90.  Because the College complied with its Misconduct Procedure and met the reasonable expectations thereunder, Doe's claim for breach of the implied covenant necessarily fails.  *See Bleiler v. Coll. of Holy Cross*, No. 11-cv-11541, 2013 WL 4714340, *17 (D. Mass. Aug. 26, 2013) (finding no breach of implied covenant where there was "no evidence that the College has not met the 'reasonable expectations' underlying the terms of the [student handbook]"); *Sullivan*, 57 Mass. App. Ct. at 774 (holding that a student had not shown a breach of the implied covenant where "[t]he policies and procedures contained well-defined processes for addressing [the student's] grievance [were] made ... available ... and applied ... as articulated").

> ### D.    Doe's Claim for Tortious Interference with Contract Against the Individual Defendants Fails Because Doe Merely Recites The Elements of the Claim, without Any Plausible, Factual Support (Count III)

To support a claim of tortious interference with contractual relations, a plaintiff must prove that "(1) he had a contract with a third party; (2) the defendant *knowingly interfered with that contract* … ; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the *defendant's actions*."  *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 304 (1st Cir. 2014) (emphasis added).  "In order for the acts to be intentional and willful, the actor must have *knowledge of the contract* and must *know that he is interfering with its performance*."  *Yiakas v. Savoy*, 26 Mass. App. Ct. 310, 315 (1988)

(emphasis added).  In his Complaint, Doe mechanically but incompletely recites elements of the claim, alleging that he had "a contract" with the College "under the *Student Handbook*," that the Individual Defendants "were aware of the contractual relationship," and that the Individual Defendants "intentionally and malicious interfered" with that relationship by "*failing to ensure that plaintiff received a fair, unbiased, and non-discriminatory investigative and disciplinary process.*"  Cp., ¶¶93-94 (emphasis added).  His claim is insufficient and fails in every particular.

*First,* as explained above, Doe cannot point to any contractual obligation that was breached by the College.  To establish "interference," Doe must allege that the Individual Defendants "knowingly induced the [C]ollege to break the contract."  *Shea v. Emmanuel Coll.*, 425 Mass. 761, 764 (1997).  Because Doe cannot identify any obligation that was breached, his tortious interference claim fails for this reason as well.  *See Kibbe v. Potter*, 196 F. Supp. 2d 48, 71 (D. Mass. 2002) (dismissing tortious interference claim where there was no "broken contract").

*Second*, Doe does not identify any *action* by any Individual Defendant that could have constituted "knowing interference."  Instead, Doe erroneously purports to premise his claim on alleged *inaction* by the Individual Defendants (e.g., "failure to ensure" that the College complied with the Student Handbook), which does not provide the foundation for a claim of intentional interference.  The law is clear that "[a] plaintiff must prove that it was *the act* of the defendant which brought about the breach of the contract with the plaintiff."  *Beekman v. Marsters*, 195 Mass. 205, 213 (1907) (emphasis added).  Doe does not allege any action on the part of any Individual Defendant, let alone an action that caused the College to breach any contract.

*Third*, Doe fails to allege that any Individual Defendant acted (if he or she "acted" at all) with improper motive or means.  This element requires "improper conduct, beyond the

35

interference itself." *Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 54 Mass. App. Ct. 416, 427 (2002). "Where the defendant is a corporate official acting in the scope of his corporate responsibilities, a plaintiff has a heightened burden of showing the improper motive or means constituted 'actual malice,' that is, 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 716 (2011) (quoting *Blackstone v. Cashman*, 448 Mass. 255, 260-261 (2007)). Nowhere in the Complaint does Doe allege that any of the Individual Defendants acted with improper means or motive, much less "spiteful, malignant purpose." To the extent Doe claims that Individual Defendants played any role in the events that ultimately culminated in the expulsion decision by an independent Hearing Board, his allegations demonstrate that they were acting in their administrative roles to effectuate the College's sexual misconduct policy, a legitimate interest of the College, which refutes the notion of improper or malicious motive. *See Synergistics Tech., Inc. v. Putnam Investments, LLC*, 74 Mass. App. Ct. 686, 690 (2009) (stating that the "[p]ursuit of a legitimate business interest, without more, fails to qualify as an improper means or motive").[26]

### E.   Doe Cannot Sustain His Title IX Claim Because He Fails to Allege Sex-Based Discrimination, An Essential Component of Any Title IX Claim (Count IV)

Title IX provides: "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Title

---

[26]      It must be noted that Doe simply lumps the Individual Defendants together, without making particularized allegations of intentional or knowing misconduct against *any* of them. Doe has not alleged that President Martin or Ms. Frankl played *any* role in the sexual misconduct proceedings against him. His allegations concerning Dean Larimore, Dean Mitton Shannon, and Dean Moore reflect that they acted in accordance with the College's Misconduct Procedure, with Dean Larimore serving as the Hearing Board chair, Dean Mitton Shannon notifying Doe that Jones had filed an Assault Complaint against him, and Dean Moore serving as his advisor. Cp., ¶¶11, 29, 42, 45. These allegations provide no foundation for suing any of them for tortious interference. *See In re Spookyworld, Inc.*, 266 B.R. 1, 16 (Bankr. D. Mass. 2001), *aff'd*, 346 F.3d 1 (1st Cir. 2003) (no tortious interference where "no evidence that the [defendant town officials] intended anything other than to enforce the building code as they understood it").

IX's prohibition against sex-based discrimination extends to "the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Doe v. Univ. of Massachusetts-Amherst* ("*UMass-Amherst*"), No. 14-cv-30143, 2015 WL 4306521, *8 (D. Mass. July 14, 2015) (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)). To state a Title IX claim, "a plaintiff must allege facts sufficient to give rise to an inference that the school intentionally discriminated against the plaintiff because of his or her sex—that the school acted 'at least in part 'because of,' not merely 'in spite of,' its adverse effects upon [the protected] group.'" *Doe v. Columbia Univ.* ("*Columbia Univ.*"), No. 14-cv-3573, 2015 WL 1840402, *15 (S.D.N.Y.) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). A Title IX claim challenging university discipline must contain particularized, non-conclusory allegations demonstrating a "causal connection to gender bias." *UMass-Amherst*, *supra* at *8 (internal quotations omitted). A plaintiff's "subjective belief that he was the victim of discrimination – however strongly felt – is insufficient to satisfy his burden at the pleading stage." *Id.* at 9 (quoting *Columbia Univ.*, *supra* at *11).

Doe asserts that the College[27] violated Title IX by (1) "fail[ing] to apply 'equitable' procedures during the disciplinary process" and (2) "selectively enforc[ing]" its sexual misconduct policies against him. Cp., ¶99. Under either theory, Doe's Title IX claim fails.

---

[27]     Doe entitled Count IV of his complaint "20 U.S.C. § 1681 (Title IX) (v. *All Defendants*)." *See* Cp., ¶¶97-102 (emphasis added). Title IX only "allows an aggrieved party to seek money damages against an educational institution that receives federal funds but not against individuals who merely work for such an institution." *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011). *See also Thomas v. Springfield Sch. Comm.*, 59 F. Supp. 3d 294, 301 (D. Mass. 2014) (dismissing Title IX claims asserted against the individual defendants, none of whom were federal recipients of federal education funding). On September 29, 2015, Doe's counsel informed Defendants' counsel that Doe no longer intends to pursue Title IX claims against the Individual Defendants.

   **1.**  ***Doe Has No Private Right of Action to Enforce the Regulations and Guidance of the Department of Education, with Which the College Complied in Any Event.***

  Doe alleges that Amherst violated regulations and guidance of the U.S. Department of Education (the "Department") by not providing him with an "equitable" grievance procedure, as referenced in 34 C.F.R §106.8(b) and the Department's April 4, 2011 "Dear Colleague" letter.[28] Cp., at ¶¶98-99.  Doe's claim fails for two reasons.

  *First*, alleged failure to comply with Department regulations by providing an "equitable" grievance procedure does not give rise to a private right of action, as the Supreme Court explained in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998):

> [T]he failure to promulgate a grievance procedure does not itself constitute *"discrimination" under Title IX.*  Of course, the Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the [Title IX's] nondiscrimination mandate, even if those requirements do not purport to represent a definition of discrimination under the statute.  *We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.*

*Id.* at 291-92 (emphasis added and internal citations omitted).  Relying on *Gebser*, courts have uniformly held that there is no private right of action to enforce section 106.8(b) or the Dear Colleague letter.  *See Doe v. Case W. Reserve Univ.* ("*Case Western*"), No. 14-cv-2044, 2015 WL 5522001, *4 (N.D. Ohio Sept. 16, 2015) (no private cause of action for "fail[ure] to promulgate a grievance procedure or comply with other Title IX administrative requirements"); *Columbia Univ., supra* at *9 n.5 (plaintiff cannot base Title IX claim on "*statutory* due process— namely, the process due to him under Title IX and related regulations and guidance") (emphasis

---

[28]  Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (April 4, 2011) (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

in original); *Doe v. University of the South*, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009) (no

private right of action for "alleged violation of the U.S. Department of Education's guidelines").

*Second*, even if the Department's regulations and guidance were enforceable by a private

right of action, which they are not, Doe's Complaint demonstrates that the College provided him

with a prompt and equitable disciplinary proceeding regarding Jones's Assault Complaint.  As

described in detail above, the disciplinary process afforded Doe numerous, procedural

safeguards, including notification of the charges against him, an opportunity to submit evidence

to an independent investigator and Hearing Board, an equal opportunity to call and cross-

examine witnesses at the hearing, prompt notification of the Hearing Board's decision, appraisal

of his right to appeal, and consideration of his written appeal.  *See* Defendants' Memorandum of

Law ("Memo"), *supra* at 32-33.

### 2. *Doe Fails to State a Claim for Selective Enforcement*.

Doe also contends that the College "selectively enforced" provisions of the Policy against

him "in spite of evidence that the allegations against him were not credible" and by not

"consider[ing] or investigat[ing]" whether Jones had violated the College's policies by

"knowingly engaging in sexual activity with [Doe] when he was incapable of forming consent

due to incapacitation."  Cp., ¶99.  His claim for selective enforcement is baseless.

A selective enforcement claim is premised on the contention that the decision to initiate

the proceeding "was affected by the student's gender."  *Yusuf*, 35 F.3d at 715.[29]  To sustain a

claim for selective enforcement, a student must allege facts plausibly demonstrating "that the

conduct of the university in question was motivated by a sexual bias."  *Bleiler, supra* at*5.

Doe's Complaint, despite its volume, contains no allegations that plausibly suggest that his

---

[29]     This Court has looked to *Yusuf* for guidance in interpreting Title IX's parameters.  *See UMass-Amherst*, *supra* at *8.

disciplinary proceeding was "selective" or motivated by his gender.  As detailed above, the
College commenced the Student Conduct Process against Doe only after Jones filed her Assault
Complaint against him, at which point the College was *obligated* to pursue an investigation and
disciplinary proceeding; Doe's gender played no role in the commencement of that *mandatory*
process.  Notably, Doe has not pled any facts indicating that the College ever received a
complaint of sexual misconduct from a male student against a female student and then declined
to commence the disciplinary process.  Doe's conclusory allegation "[o]n information and
belief" that the College "targeted male students of color" is insufficient to sustain a claim of
selective enforcement.  *See Case Western*, *supra* at *6 (plaintiff's "conclusory statements" and
allegations "[u]pon information and belief" were "not factual allegations" supporting conclusion
that defendant's actions "were motivated by sexual bias"); *Palmer v. Champion Mortgage*, 465
F.3d 24, 28 (1st Cir. 2006) ("refrain[ing] from crediting … bald assertions, unsupportable
conclusions, and opprobrious epithets") (internal quotations omitted).

Unable to plead facts demonstrating any actual instance of differential treatment based on
gender, Doe attempts to create the specter of disparate treatment by comparing how the College
handled his *actual* disciplinary proceeding to how the College should have handled a
*hypothetical* disciplinary proceeding against Jones.  Cp., ¶¶99-100.  This comparison fails
because Doe's allegations establish that he and Jones were not similarly situated.  "A selective
enforcement claim demonstrating gender bias must be supported with evidence that a female was
in circumstances sufficiently similar to [plaintiff's] and was treated more favorable by the
University."  *Case Western*, *supra* at *6 (internal quotations omitted).  To establish a valid
comparison, a plaintiff must allege facts showing that a person was "similarly situated to [him] in
*all relevant respects*" and was "treated differently."  *Garcia v. Bristol-Myers Squibb Co.*, 535

F.3d 23, 31 (1st Cir. 2008) (interpreting Title VII) (emphasis added).  In the Title IX context, this requires that the plaintiff identify "a comparator of the opposite sex who was treated more favorably by the educational institution *when facing similar disciplinary charges*."  *Case Western*, *supra* at *6.

The comparison that Doe seeks to set up is fatally flawed from its inception, as courts have concluded that a male respondent in a sexual misconduct proceeding is not similarly situated to a female complainant in the same proceeding.  *See id.* (reasoning that "the complainant against Plaintiff in the disciplinary proceedings is not a counterpart for the purposes of a selective enforcement claim"); *Sterrett v. Cowan*, 85 F. Supp. 3d 916, 937 (E.D. Mich. 2015) (rejecting Title IX claim where male student "fail[ed] to identify any female counterpart, other than [the complainant in the sexual misconduct proceeding], who was treated more favorably").  Even more importantly, as discussed in detail above, Jones and Doe were not similarly situated in any respect, let alone "all relevant respects."  *See* Memo, *supra* at 29-30. Specifically, Jones *filed a disciplinary complaint* against Doe contending that he had engaged in sexual activity *without her consent*, and, as a result, the College was required to initiate disciplinary proceedings in response to that complaint.  Doe, by contrast, *never filed a complaint* against Jones alleging that she was responsible for sexual misconduct, and he claimed then (and continues to claim now) that his interactions with Jones *were consensual*.  Cp., ¶1.  Simply put, Jones did not face "similar disciplinary charges" because neither Doe, nor anyone else, ever filed any disciplinary charge alleging that she had engaged in sexual misconduct.[30]

---

[30]     Doe also claims that Amherst did not "consider or investigate" whether Jones had violated the Honor Code by "making a false statements (sic)" and "concealing material evidence."  Cp., ¶99.  These do not provide the foundation for a valid comparison because Doe was never charged with engaging in similar activity.

Finally, Doe tries to bolster his claim of selective enforcement by alleging that his "disciplinary action was undertaken during a period of relentless and well publicized accusations against Amherst for failing to protect female students from sexual assault, and while the College was under intense pressure to demonstrate that it was now willing and capable of prosecuting sexual assailants." Cp., ¶1. Doe alleges, among other things, that: (a) "students protested against the College's failure to adequately respond to complaints of sexual misconduct" after the Department's issuance of the Dear Colleague letter in 2011; (b) following a student newspaper's publication of a letter by a former female student regarding the College's handling of her allegations of rape, President Martin stated in October 2012 that "the administration's responses to reports [of sexual misconduct] have left feeling survivors that they were badly served"; and (c) the College then formed a Special Oversight Committee on Sexual Misconduct "to review the College's atmosphere, sexual education programs, and polices relating to sexual misconduct," which later recommended that the College "focus on 'empowering victims.'" Cp. ¶¶17, 19, 22, 24. Even accepting these allegations as true, they do not provide the foundation for a Title IX claim. Rather than revealing any discriminatory animus, these statements demonstrate the College's commitment to supporting sexual assault victims, *without regard to gender*.[31] A plaintiff does not raise a plausible inference of sex-based discrimination by alleging that a college desired "to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity," even if that desire stemmed from "the fear of negative publicity or Title IX liability to the victims of sexual assault." *See Columbia, supra* at *12. Indeed, even if the College were biased against students accused of sexual assault (which it is not), that does not

---

[31] Notably, before filing his lawsuit, Doe stated in his appeal, "I want to be clear that I applaud Ms. Jones's and others' work to reform Amherst's culture of disrespect. I would never discount the work that she and LR engage in to enhance rights for campus survivors of sexual assault." Roberts Aff., Ex. A, p. 1.

provide the foundation for a claim of impermissible gender bias under Title IX. *See also UMass-Amherst*, *supra* at *8 (concluding that a "regrettable bias against any person merely accused [of sexual misconduct] … would not, on its own, violate Title IX"). In sum, Doe has failed to allege any facts demonstrating that the College was biased against him due to his gender, and his Title IX claim fails.

### F.    Doe Alleges Neither Racial Discrimination Nor an Impaired Contract, Rendering His Section 1981 Claim Meritless (Count V)

To state a Section 1981 claim, a plaintiff must allege that "(1) [he] is a member of a racial minority; (2) the defendant discriminated against [him] on the basis of [his] race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts." *Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013). Doe's claim fails for two reasons: he alleges neither racial discrimination nor an impaired contractual relationship.

*First*, Doe fails to raise a plausible inference that racial animus was "a substantial or motivating factor" for the Defendants' actions. *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004). Doe attempts to suggest racial discrimination by employing the same flawed comparison to Jones that he drew in his Title IX claim. Cp., ¶¶74-75, 105-106. As discussed above, *see* Memo, *supra* at 29-30, 39-42, neither Doe, nor anyone else, ever filed any disciplinary charge against Jones, and she is therefore an invalid comparator. And, as with Doe's Title IX claim, Doe cannot establish a valid comparison to Jones by "simply" alleging that "they were both involved in the same incident." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 20 (1st Cir. 1989), *overruled on other grounds*, 367 F.3d 61 (1st Cir. 2004). [32] Rather, Doe must

---

[32]     *See also Goodman*, 380 F.3d at 43 (rejecting comparison between discipline imposed on two students in aftermath of fight); *Rodriguez v. New York Univ.*, No. 05-cv-7374, 2007 WL 117775, *5 (S.D.N.Y. Jan. 16, 2007)

establish that he is similarly situated to Jones in "all relevant aspects." *See id.* at 19 (elaborating

that comparators must be "fair congeners" and "roughly equivalent" because "apples should be

compared to apples"). That Jones was never the subject of a sexual misconduct complaint filed

by another student forecloses any comparison to Doe, who undeniably was the subject of such a

complaint. For reasons previously explained, the College's enforcement of its disciplinary

procedures was obligatory, not discriminatory.

Doe's other racial discrimination theories also fall far short. Not only is his conclusory

assertion "on information and belief" that the College "targeted male students of color" baseless

and inflammatory, it is also unsupported by any particularized allegations and thus legally

insufficient to sustain a claim. Cp., ¶77.[33] Nor does Doe establish racial animus by his

misleading reference to an edited snippet from a January 2013 report submitted to the College by

its Special Oversight Committee on Sexual Misconduct (the "Committee"). In characterizing the

content of that report, Doe claims that it reflected the Committee's "*observation*" that the

College had "*a prior reputation* for taking 'a more punitive toward non-white perpetrators,

especially if the victim is white.'" *Id.* (emphasis added). What the report actually states is as

follows:

> Race complicates the situation still further. *Many students of color*, both male and
> female, *and some international students, believe* that the College takes a more punitive
> attitude towards non-white perpetrators, especially if the victim is white. Roberts Aff.,
> Ex. D, p. 2.[34]

(concluding that a "[white] student who accused [a Hispanic student] of sexual harassment was not similarly situated
to [the accused, Hispanic student] in the disciplinary proceedings that stemmed from her accusation").

[33]      The allegation is also irrational, particularly when read in the context of Doe's other allegations. Doe states
that he is a "first generation Asian-American," and that Amherst provided him "substantial financial aid" to enable
him to attend the College. Cp., ¶1. There is no plausible reason that Amherst would provide significant assistance
to enable Doe to attend the College and then "target" him for dismissal.

[34]      To the extent that Doe claims disparate impact, that theory of liability is inapplicable to section 1981
claims. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). *See also Bennett v. Nucor
Corp.*, 656 F.3d 802, 817 (8th Cir. 2011) ("A showing of disparate impact through a neutral practice is insufficient
to prove a violation of § 1981").

The report is clear that "this view" reflected only the subjective "belie[f]" of an unidentified number of students of color and international students, not the Committee's "observation" about the College's prior "reputation."  Indeed, the Committee made clear that it could not vouchsafe the accuracy of this belief, stating, "It is impossible at this remove to know if this has ever been true, and the records that would tell us are closed or have been destroyed." *Id.*  Regardless, this subjective view of some unidentified students does not support an allegation of discriminatory animus.  *See Burns v. Johnson*, No. 13-cv-12155, 2015 WL 3952748, *6 (D. Mass. June 29, 2015) (rejecting "subjective belief of [Plaintiff and her] co-workers" that employer discriminated against Plaintiff in violation of Title VII as an insufficient "elucidation of specific facts from which a jury could conclude discriminatory animus was at play here").[35]

*Second*, Doe also fails to allege an impaired contract, as he must to state a claim under Section 1981.  *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 470 (2006) (to state a Section 1981 claim, plaintiff must "initially identify an impaired 'contractual relationship,' … under which the plaintiff has rights"); *Hammond*, 733 F.3d at 364 (Section 1981 is not "a catch-all remedy to racial discrimination").  As discussed in Section B above (addressing Doe's claim for breach of contract), the College complied with the reasonable expectations under its policies and procedures, and his Section 1981 claim fails for that reason alone.  *See* Memo, *supra* at 18-33.

---

[35]     Doe asserts his Section 1981 claim against the College and the Individual Defendants.  Although the First Circuit has yet to formulate a standard for imposing personal liability under section 1981, other jurisdictions generally require the plaintiff to demonstrate "some affirmative link to causally connect the actor with the discriminatory action."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal quotations omitted).  Doe has failed to allege racial discrimination here, much less each Individual Defendant's "personal involvement" in that discriminatory conduct.  *Id.*  For that reason alone, the claim against the Individual Defendants is subject to dismissal.

G.     **Doe's Conclusory Allegation that Defendants "Capitulated" to Pressure from Student Activists Fails to State a Cognizable Claim under the MCRA (Count VI)**

To state a claim under the Massachusetts Civil Rights Act ("MCRA"), Doe must allege that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Glovsky v. Roche Bros. Supermarkets*, 469 Mass. 752, 762 (2014).

Critically, Doe fails even to allege any "threats, intimidation, or coercion" *by the Defendants themselves*. Rather, he asserts that the Defendants "capitulated" to "threatening, intimidating, and coercive pressure from student activists" in expelling him for sexual misconduct and issuing a notification to the campus community about the expulsion of an unnamed student (the "Notification"). Cp., ¶¶110-111, 114. His overarching theory – that a plaintiff may impute "threats" by third-parties to the defendants – is simply not cognizable under the MCRA. *See* M.G.L. c. 12, § 11H (prohibiting "any person …. [from] interfer[ing] *by* threats, intimidation or coercion"); *Glovsky*, 469 Mass. at 762 (evaluating "whether a *defendant's conduct* constitutes such threats, intimidation, or coercion") (emphasis added). The MCRA was "not intended to create, nor may it be construed to establish a vast constitutional tort," and the legislature therefore "explicitly limited" its reach to "to situations where the derogation of secured rights occurs by threats, intimidation or coercion." *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012) (internal quotations omitted). Doe alleges no "threats, intimidation, or coercion" by the Defendants. His MCRA claim fails accordingly.

Moreover, even with respect to the behavior of "student activists," Doe has not alleged conduct that constitutes threats, intimidation or coercion. As used in the MCRA:

a "threat" consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm; "intimidation" involves putting in fear for the

46

> purpose of compelling or deterring conduct; and "coercion" is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

*Glovsky*, 469 Mass. at 763 (internal quotations omitted).  Doe merely alleges that "student activists" held "on-campus demonstrations and vigils" and published "essays" – social discourse that is common, even encouraged, on college campuses throughout the country.  Cp., ¶¶18, 111-112.  There is no basis for asserting the "student activists" placed the College or its administrators in fear of injury or compelled them to engage in conduct against their will when they expressed their views about the College's prior handling of allegations of sexual misconduct.  This is simply not conduct that implicates threats, coercion, or intimidation within the meaning of the MCRA.  *See Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 476 n.9 (1994) (leaving undisturbed trial court's finding that "lecturing, counseling, picketing, signing and praying" is not coercive, intimidating, or threating conduct).[36]

Doe also fails to identify a constitutional or statutory right with which Defendants interfered.  As discussed in the sections addressing Doe's claims under Title IX and Section 1981, Doe has failed to allege any viable claim for gender or racial discrimination.  *See Dean v. City of Worcester*, 924 F.2d 364, 370 (1st Cir. 1991) (dismissing MCRA claim predicated on previously dismissed constitutional and statutory violations).  Nor did the College violate any "right to privacy" by issuing the Notification because the College had a "legitimate, countervailing interest" in reporting on the findings of the Hearing Board: the cultivation of sexual respect on its campus.  *See Dasey v. Anderson*, 304 F.3d 148, 153-54 (1st Cir. 2002).

---

[36]    Indeed, the courts have declined to find that even more strident conduct satisfied this objective standard.  *See, e.g.*, *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 514, 520 (1st Cir. 2009) (no MCRA claim even though manager "slammed her hands on the table and screamed" at subordinate).

**H.    Doe's Defamation Claim Fails Because the College's Notification Regarding His Expulsion was True, and Because Doe Does Not and Cannot Allege that the Notification was Motivated by Ill Will or Malevolent Intent (Count VII)**

On January 16, 2014, Amherst sent the Notification to the Amherst College Community,

stating as follows:

> We write to inform you that in accordance with Amherst's College Sexual Misconduct Policy and after a full hearing on the matter in December, a hearing board found, by a preponderance of the evidence, that an Amherst College student violated Amherst College's Sexual Misconduct Policy by committing sexual assault.
>
> As a result of this finding, the Hearing Board determined that the student be expelled from Amherst College.
>
> In the spring of 2013, Amherst College implemented a revised sexual misconduct policy; this is the first case under the revised policy that has resulted in the sanction of expulsion. It is now Amherst College's practice to notify the community when a student has been expelled for committing sexual violence.  In addition to notice concerning expulsion, the Dean of Students Office and Title IX Coordinator will produce an annual report to provide transparency about the resolution of cases that involve sexual misconduct.
>
> Expulsion means the permanent termination of student and degree-candidate status at Amherst College.  Expelled students are not allowed on campus.
>
> We remind the community that everyone deserves respect, and that retaliation against any person who participates in the Sexual Misconduct process is prohibited.
>
> Amherst College is committed to providing an environment free from discrimination. The college provides support and resources to students, faculty and staff to address concerns related to sex discrimination.

Roberts Aff., Ex. C, p. 1.

Doe acknowledges that the Notification did not identify him by name, but he alleges that

it was "widely known" he was the student referenced in the Notification.  Cp., ¶¶62, 122.  Even

assuming that the Notification was understood to be about Doe, his claim for defamation fails

because he cannot demonstrate that the College was *at fault* for publishing the Notification, the content of which was true.[37]

To prevail on a claim for defamation, a plaintiff must establish that the defendant was *at fault* for the publication of a statement regarding the plaintiff.  *White v. Blue Cross & Blue Shield of Massachusetts, Inc.,* 442 Mass. 64, 66 (2004).  "As a matter of constitutional bedrock, a plaintiff must show fault in order to impose liability upon a defendant for defamation."  *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012).  The framework for establishing fault in Massachusetts is as follows:

> If a statement is true, the plaintiff must prove that the defendant acted with "actual malice" to recover.  If, however, a statement is false, the plaintiff still must show that the defendant acted negligently.  Either way, *some* showing of fault is essential.  *Id.* (internal quotations omitted) (italics in original).[38]

Although Doe conclusorily claims that "[t]he statements in the alert were false" (Cp., ¶121), there can be no debate that the assertions in the Notification are true, and, indeed, Doe's own allegations establish that the statements in the Notification are true.  The Notification states that "a hearing board found, by a preponderance of the evidence, that an Amherst College student violated Amherst College's Sexual Misconduct Policy by committing sexual assault," and that the student was "expelled."  Roberts Aff., Ex. C, p. 1.  As Doe admits, this is precisely what the Hearing Board found, and precisely what happened.  *See* Cp., ¶58 (alleging that the Hearing Board "found John Doe 'responsible, by a preponderance of the evidence, for violating

---

[37]      Doe asserted the claim for defamation against not just the College, but the Individual Defendants as well.  While Doe's defamation claim is meritless, there was no good faith basis for Doe to assert that claim against all of the Individual Defendants.  Although the Notification was sent under the signature of Dean Larimore and Ms. Frankl (which Doe's Complaint does not even mention), he includes no allegation so much as linking any of the remaining Individual Defendants to the Notification.  On September 28, 2015, Doe's counsel informed Defendants' counsel that Doe does not intend to pursue the defamation claim against Dean Moore "at this time," but he continues to pursue the claim – baselessly – against the remaining Defendants.

[38]      *See also* M.G.L. c. 231, § 92 (stating that "the truth shall be a justification unless actual malice is proved").

*the Statement on Respect for Persons* specifically the *Sexual Misconduct Policy: Sexual Assault*'" and that he was "expelled").

Because the content of the Notification is true, Doe must allege that the College issued the Notification with "actual malice," that is "ill will or malevolent intent." *Piccone v. Bartels*, 40 F. Supp. 3d 198, 207 (D. Mass. 2014) *aff'd*, 785 F.3d 766 (1st Cir. 2015). Here, Doe does not allege that the College acted with "ill will or malevolent intent" in publishing the Notification, and there is no basis for such an allegation.[39] As the College's Policy makes clear, "[s]exual misconduct of any form is a violation of a person's rights, dignity and integrity," and the College "seeks to foster a climate free from sexual misconduct through a coordinated education and prevention program." Cp., Ex. 1, p. 2. Amherst's Notification served the legitimate purpose, in accordance with the College's current practice, of reminding the College community that sexual misconduct may have serious consequences and assisting in cultivating a climate where sexual misconduct is not condoned or encouraged. Further underscoring the absence of malevolent intent towards Doe, the College did not name Doe in the Notification, even though it permissibly could have.[40] Indeed, even when a college's notification fosters the interest of the larger community *and identifies a student by name*, a claim for defamation fails. *See Havlik*, 509 F.3d at 33 (concluding that college administrator who issued crime alert containing student's name and fraternity affiliation did not act maliciously where administrator believed that disclosure

---

[39]     Instead, Does alleges that "[t]he defendants' reliance on the investigation and disciplinary process to publish the defamatory statements was negligent or in knowing or reckless disregard of the truth." Cp., ¶125. That standard does not apply to the protections for truthful statements under Massachusetts law. *See Piccone*, 40 F. Supp. 3d at 207 (explaining that the term "actual malice" has different meaning under M.G.L. c. 231, § 92 than under the First Amendment, where reckless disregard for the truth is sufficient).

[40]     Under the Family Educational Rights & Privacy Act, the College could have disclosed "personally identifiable information" about Doe, including his name, in connection with the issuance of the Notification about the outcome of his disciplinary hearing. 34 CFR § 99.31(a)(14). It did not do so.

would assist campus community in preventing future incidents) (Rhode Island law).  The College

was without fault in the issuance of the Notification.  Accordingly, his defamation claim fails.

I.      **Doe's Intentional Infliction of Emotional Distress Claim is Meritless Because He Alleges Neither Extreme and Outrageous Conduct Nor Severe Emotional Distress (Count VIII)**

To state a claim for intentional infliction of emotional distress ("IIED"), Doe must allege

facts establishing (1) that each Defendant "intended, knew, or should have known that his

conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3)

that the conduct caused emotional distress; and (4) that the emotional distress was severe."

*Polay v. McMahon*, 468 Mass. 379, 385 (2014).  Doe merely recites these elements in

mechanical fashion in his IIED count.  Cp., ¶¶127-129.  Even when those barebones recitals are

read in light of the remaining allegations in the Complaint, Doe fails to state a cognizable IIED

claim.

*First*, Doe fails to allege any extreme and outrageous conduct, which is a question of law

for the court.  *Polay*, 468 Mass. at 386.  "Conduct qualifies as extreme and outrageous only if it

go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly

intolerable in a civilized community."  *Id.* at 385 (internal quotations omitted).  To state this

element, "the defendants' conduct must be so abhorrent that a civilized community simply

cannot tolerate it."  *Godette v. Stanley*, 490 F. Supp. 2d 72, 80-81 (D. Mass. 2007).

Massachusetts courts only intervene in rare instances, when faced with "profoundly shocking

conduct" or "a high order of reckless ruthlessness or deliberate malevolence that … is simply

intolerable."  *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8 (1994).

No allegations in the Complaint allege conduct that meets this "very high" threshold. *Polay*, 468 Mass. at 385.  Rather, the Complaint establishes that the College[41] responded to a sexual misconduct complaint filed by another student, investigated the complaint and provided Doe a hearing on the charges, and ultimately expelled Doe after an independent Hearing Board concluded by a preponderance of the evidence that Doe had committed sexual assault.  While Doe decries the College's actions as "inadequate" and "flawed," characterizations with which the Defendants disagree, the fact remains that the College's conduct cannot reasonably be viewed as exceeding all bounds of decency and utterly intolerable in society.  The courts in Massachusetts and elsewhere have found as much.  *See Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994) (concluding that "[a] College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim" under Vermont law); *Harvard Univ. v. Goldstein*, No. 96-cv-1020, 2000 WL 282537, *3 (Mass. Super. Feb. 15, 2000) (dismissing graduate student from university while ill not extreme and outrageous, even though university may have misrepresented its position on her academic requirements that led to dismissal).[42]

---

[41]     As detailed above, several of the Individual Defendants played various roles in administering the proceedings that led to his expulsion, but none decided to expel Doe.  *See* Memo, *supra* at 4-5, 8-9.  Doe fails to allege that the Individual Defendants inflicted emotional distress upon him through their own conduct, much less that they did so intentionally or recklessly.  *See DiGiovanni v. Latimer*, 390 Mass. 265, 273 (1983) (dismissing IIED claim where "the assertion of intentional conduct is no more than an aspect of the claim of negligence").  Doe's failure to allege intentional conduct thus provides an additional ground to dismiss the IIED claim with respect to the Individual Defendants.

[42]     *See also Russell v. Salve Regina Coll.*, 890 F.2d 484, 488 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225 (1991) (asking overweight student to withdraw from nursing program not extreme and outrageous conduct, even when coupled with nearly two years of harassment about her weight, under Rhode Island law); *Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252, 267 (D.N.H. 2009) (discharging student with eating disorder from private high school came "nowhere near th[e] formidable standard" for extreme or outrageous conduct under New Hampshire law).

*Second*, Doe alleges no facts to support his bare assertion that he "suffered severe emotional distress." *See* Cp., ¶¶87, 129. *See Polay*, 46 Mass. at 388 ("recitation of the element of severe emotional distress" insufficient to survive a motion to dismiss). This element requires emotional distress "that no reasonable man could be expected to endure, as opposed to mere emotional responses including anger, sadness, anxiety, and distress, which, though blameworthy, are often not legally compensable." *Kennedy v. Town of Billerica*, 617 F.3d 520, 530-31 (1st Cir. 2010) (internal quotations omitted) (wrongfully-arrested fourteen year-old minor's nightmares, anxiety, and nervousness around policy did not constitute severe emotional distress). Nowhere in the Complaint has Doe sufficiently alleged severe emotional distress, and his IIED claim fails on this ground as well.

**J.      Doe's Negligent Infliction of Emotional Distress Claim Fails Because He Alleges Neither Negligence Nor Physical Harm Manifested by Objective Symptomatology (Count IX)**

To state a negligent infliction of emotional distress ("NIED") claim, Doe must allege "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Rodriguez v. Cambridge Hous. Auth.*, 443 Mass. 697, 701 (2005). As with his IIED claim, Doe simply recites the elements of an NIED, but fails to set forth particularized allegations in support.

*First*, Doe fails to allege a negligent act by any Defendant that caused him emotional distress. Doe alleges that he was "emotionally distraught over being charged with sexual assault" and also that he suffered "extreme emotional distress" due to the College's alleged breach of contract. Cp., ¶¶44, 87. Neither allegation identifies a cognizable, tort-based duty of care that Defendants owed Doe. "It is fundamental that there must be a showing of a duty of

care owed to the plaintiff, because [t]here can be no negligence where there is no duty." *Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004).  Absent allegations that the Defendants owed and breached a duty of care, Doe's NIED claim fails.

*Second*, even if Doe had adequately pled negligence (which he did not), Doe fails to support his boilerplate assertion that he suffered "emotional distress with physical manifestations" with any particularized allegations.  Cp., ¶132.  Nowhere in the Complaint does Doe identify any "physical harm manifested by objective symptomatology" that arose from Defendants' conduct, and his NIED claim therefore fails to adequately allege this essential element.  *See Wilmot v. Tracey*, 938 F. Supp. 2d 116, 143 (D. Mass. 2013) (dismissing NIED claim for failure to allege "any physical harm arising from the … allegedly negligent conduct"); *Schofield v. Clarke*, 769 F. Supp. 2d 42, 50 (D. Mass. 2011) (dismissing NIED that failed "to allege any physical harm manifested by 'objective symptomatology' of the emotional distress").

### K.    Because All His Claims Lack Merit, Doe Cannot Seek Injunctive Relief (Count X)

As a stand-alone count, Doe seeks injunctive relief, including his reinstatement at the College and the modification of his transcript.  Cp., ¶135.  But "injunctive relief is not a stand-alone cause of action under Massachusetts or federal law."  *Payton v. Wells Fargo Bank, N.A.*, No. 12-cv-11540, 2013 WL 782601, *6 (D. Mass. Feb. 28, 2013).  It is "a remedy not a claim." *Id.* (quoting *Wentworth Precious Metals, LLC v. City of Everett*, No. 11-cv-10909, 2013 WL 441094, *15 (D. Mass. Feb.4, 2013)).  As all Doe's claims are subject to dismissal, his request for injunctive relief is subject to dismissal as well.  *See Case Western*, *supra* at *8 (reasoning that "injunctive relief is not available where a plaintiff's underlying claims lack merit" in dismissing expelled student's request for reinstatement).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss

Plaintiff's Complaint in its entirety.

**AMHERST COLLEGE, CAROLYN MARTIN, JAMES LARIMORE, TORIN MOORE,  SUSIE MITTON SHANNON, and LAURIE FRANKL,**

By their attorneys,

/s/ Scott A. Roberts
Scott A. Roberts (BBO No. 550732)
    sroberts@hrwlawyers.com
Tobias W. Crawford (BBO No. 678621)
    tcrawford@hrwlawyers.com
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
Tel. (617) 348-4300 / Fax. (617) 348-4343

Dated: October 5, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 5, 2015.

/s/ Scott A. Roberts
Scott A. Roberts