UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETT S

JOHN DOE,                                              *
                                                       *
        Plaintiff,                                     *
                                                       *        Civil Action No. 15-30097-MGM
              v.                                       *
                                                       *
AMHERST COLLEGE, CAROLYN MARTIN,                       *
JAMES LARIMORE, TORIN MOORE, SUSIE                     *
MITTON SHANNON, and LAURIE FRANKL,                     *
                                                       *
        Defendants.                                    *

MEMORANDUM AND ORDER ON

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

(Dkt. No. 37)


February 28, 2017


MASTROIANNI, U.S.D.J.


## I.    INTRODUCTION


Plaintiff, an individual proceeding under the pseudonym "John Doe"[1] and the son of Asian-

American immigrants, enrolled at Amherst College (the "College") as a first-year student in the fall of

2010. In October of 2013 he was informed that another student, Sandra Jones, had filed a complaint

accusing him of sexual misconduct on the night of February 4-5, 2012. Jones alleged that she engaged

in consensual sexual activities with Doe, but that Doe continued the activity even after she withdrew

her consent. Doe has consistently claimed he had consumed so much alcohol that he "blacked out"

and could not remember a large portion of the night, including the time during which he interacted

---

[1] Plaintiff's Motion to Proceed Under Pseudonym (Dkt. No. 6) was previously granted by Judge Michael A. Ponsor (Dkt. No. 15). By agreement of the parties, the student who filed the complaint against Doe is identified in this litigation under the pseudonym "Sandra Jones," and all other students of the College are identified by their initials.

with Jones. The College initiated an expedited disciplinary proceeding against Doe under a set of recently amended policies incorporated in its student handbook (the "*Student Handbook*"). As part of that process, the College hired an independent attorney to conduct an investigation. On December 13, 2013, the day after a hearing before the College's Sexual Misconduct Hearing Board (the "Hearing Board"), the Hearing Board found Doe "responsible, by a preponderance of the evidence, for violating *the Statement on Respect of Persons* specifically the *Sexual Misconduct Policy: Sexual Assault.*" (Dkt. No. 102-4, Dec. 13, 2013 Hr'g Bd Dec. ("Hr'g Bd Dec.").) Among the factors "influential in their finding" was that Doe's "account of being 'blacked out' [was] credible," but did not excuse his failure to stop when Jones withdrew consent. (*Id.*) The Hearing Board imposed sanctions on Doe, including immediate expulsion from the College. (*Id.*)

Doe appealed his expulsion, identifying new evidence, which he believed was relevant to establishing that Jones and her witness had a political agenda which motivated Jones to be less than fully honest in her complaint and testimony. He further asserted there were material procedural errors which prejudiced him and demonstrated the existence of gender-based bias in the process culminating in his expulsion. The College denied his appeal, stating, in part, that "[w]hatever broad political agenda [Jones and her witness] may have had or not is immaterial to the panel's decision." (Dkt. No. 39-2, Dec. 27, 2013 Email from Peter Uvin.) Several months later, Doe received copies of text messages sent by Jones to another student shortly after he had departed from her room after the incident at issue. These texts can be read in a way that raises additional questions about the credibility of the version of events Jones gave during the disciplinary proceeding against Doe. These text messages had not been provided to the investigator and the investigator had not interviewed the individual who received them. Doe asserts the discovery of these text messages raises questions about the adequacy of the investigation.

Based in part on the existence and content of the text messages, Doe requested the College reopen his disciplinary proceedings. The College declined to do so and on May 29, 2015 Doe filed a complaint stating claims against the College and various individuals. (Dkt. No. 1, Compl.) The crux of Doe's complaint is that he was subjected to a biased disciplinary process set into motion and conducted to ensure the College would expel a male student accused of sexual misconduct, regardless of the specific facts, and this process violated his contract with the College and his rights under both federal and state law.

The College and the individual defendants filed a Motion for Judgment on the Pleadings on October 5, 2015. Doe subsequently filed a Motion for Leave to File an Amended Complaint (Dkt. No. 59.). Following several motions for extension of time, the court held a hearing on both Defendants' Motion for Judgment on the Pleadings and Plaintiff's Motion for Leave to File an Amended Complaint on May 27, 2016. The court allowed the motion for leave to amend and Doe filed his Amended Complaint on June 15, 2016 (Dkt. No. 102). On June 24, Defendants' requested the court clarify whether it required Defendants to file additional briefing to address new claims made in the amended complaint. (Dkt. No. 104). The court subsequently clarified that Defendants had the option of relying on their prior briefing or submitting an updated memorandum following the filing of the Amended Complaint. (Dkt. No. 105.) Defendants have elected to rely on the existing briefing.

In his Amended Complaint, Doe asserts claims against both the College and individual defendants, Carolyn Martin, President of the College ("Martin"); James Larimore, chair of the Hearing Board which conducted Doe's disciplinary hearing and the College's Dean of Students at the time of the disciplinary hearing ("Larimore"); Susie Mitton Shannon, the College's Interim Dean of Student Conduct and Deputy Title IX Coordinator at the time of the disciplinary proceedings against Doe ("Mitton Shannon"); and Laurie Frankl, who became the College's Title IX Coordinator on December 3, 2013 ("Frankl"), all in their individual capacities. With respect to the College Doe claims breach of

contract (Count I); breach of covenant of good faith and fair dealing (Count II); violation of Title IX

of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") (Count IV); violation of

42 U.S.C. § 1981 (Count V); violation of the Massachusetts Civil Rights Act, Mᴀss. Gᴇɴ. Laws. ch. 12

§§ 11H, 11I ("MCRA") (Count VI); defamation (Count VII); and negligent infliction of emotional

distress (Count IX). As to the individual defendants, Doe asserts claims for tortious interference with

contract (Count III); violation of 42 U.S.C. § 1981 (Count V); violation of the MCRA (Count VI);

defamation (Count VII); negligence (Count VIII); and negligent infliction of emotional distress (Count

IX). In Count X, Doe seeks injunctive relief, but does not make out an additional substantive claim.

For the reasons set forth below, the court will allow Defendants' motion as to counts III, V, VI, VII,

VIII, and IX and deny it as to counts I, II, IV, and X.


## II.   Jᴜʀɪsᴅɪᴄᴛɪᴏɴ

This court has subject matter jurisdiction over the claims in Counts IV and V, which allege

violations of federal law pursuant to 28 U.S.C. § 1331. The remainder of Doe's claims (Counts I-III

and VI-X) arise under state law. Federal courts may exercise supplemental jurisdiction over state law

claims brought together with claims arising under federal law. 28 U.S.C. § 1367. In addition, federal

courts have jurisdiction over suits brought pursuant to state law where there is complete diversity of

citizenship between the adversaries and the amount in controversy exceeds a threshold amount of

$75,000. 28 U.S.C. § 1332; *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006). Plaintiff is a resident of

New York while the individual defendants are residents of Connecticut (Mitton Shannon), Iowa

(Larimore), or Massachusetts (Martin and Frankl) and the College is located in Massachusetts. Plaintiff

asserts he is entitled to damages in excess of the statutory threshold amount. In the absence of any

challenge from Defendants, the court finds it has jurisdiction over the state law claims in this case

pursuant to both 28 U.S.C. § 1367 and 28 U.S.C. § 1332.

### III.   STANDARD OF REVIEW

Having previously filed an answer, Defendants proceed on a motion for judgment on the pleadings under Rule 12(c), rather than the more typical motion to dismiss for failure to state a claim brought under Rule 12(b)(6). Fed. R. Civ. P. 12. "'A motion for judgment on the pleadings [under Rule 12(c)] is treated much like a Rule 12(b)(6) motion to dismiss,' with the court viewing 'the facts contained in the pleadings in the light most favorable to the nonmovant and draw[ing] all reasonable inferences therefrom.'" *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549 (1st Cir. 2016) (alterations in original) (quoting *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008)). A complaint must survive a motion for judgment on the pleadings if it alleges sufficient facts "to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is "plausible on its face" if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). As in the case of a motion under Rule 12(b)(6), the court is permitted to consider documents central to the plaintiff's claims where the authenticity of the documents is not disputed and the complaint adequately references the documents. *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Additionally, "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54-55 (1st Cir. 2006).

### IV.   BACKGROUND[2]

A.   <u>Recent History of the College's Approach to Handling Sexual Misconduct on Campus</u>

On April 4, 2011, the Assistant Secretary of the Office of Civil Rights of the U.S. Department of Education ("DOE") issued a "Dear Colleague" letter addressed to recipients of federal funding who operate "educational programs and activities" ("Dear Colleague Letter"). Dear Colleague Letter

---

[2] Except where noted, facts are drawn from the Amended Complaint. (Dkt. No. 102.)

(April 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. The DOE determined the Dear Colleague Letter is a "'significant guidance document,'" which "does not add requirements to applicable law, but provides information and examples to inform recipients about how [the DOE Office of Civil Rights] evaluates whether covered entities are complying with their legal obligations." (*Id.* at n.1.) The College is a recipient of federal funding. In the Dear Colleague Letter, the DOE explains "that the requirements of Title IX pertaining to sexual harassment also cover sexual violence" and defines sexual violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." *Id.* at 1. The Dear Colleague Letter also directs schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," and to promptly investigate any case in which a school "knows, or reasonably should know, about possible harassment." (*Id.* at 4.) Schools are advised to weigh requests from claimants to remain anonymous, requests that may limit a school's options to respond to the complaint, against the school's "responsibility to provide a safe and nondiscriminatory environment for all students." (*Id.* at 5.) Consistent with that responsibility, the Dear Colleague Letter clarifies that schools investigating complaints in order to comply with their obligations under Title IX should apply a "preponderance of the evidence" standard when determining whether sexual harassment (including sexual misconduct) has occurred, because it is the appropriate standard to use when resolving discrimination claims. (*Id.* at 10-11.)

After the Dear Colleague Letter was released, the College's Title IX Committee recommended changes to its disciplinary procedures for sexual misconduct cases and in September of 2012 the College adopted the changes. On October 17, 2012 an essay by Angie Epifano, a former member of Doe's entering class at the College, was published in a student publication. The essay was highly critical of the way the College had responded to her distress following a sexual assault on campus. A significant amount of media attention was directed at the College following the publication of

Epifano's essay. The day after it was published, Martin issued a statement pledging to investigate the handling of Epifano's allegations and acknowledging the College's handling of complaints had left "survivors feeling that they were badly served." (Am. Compl. at ¶ 19.)

On October 31, 2012, Amherst formed a Special Oversight Committee on Sexual Misconduct (the "Oversight Committee") to review the atmosphere, programs, and policies at the College. The Oversight Committee was comprised of five members of the faculty and staff, two trustees, and two students – including one, LR, who was later a witness against John Doe. The Oversight Committee published a report in January 2013. In that report, the Oversight Committee discussed concerns that "the College takes a more punitive attitude toward non-white perpetrators, especially if the victim is white." (Dkt. No. 39-4, (Excerpt) Toward a Culture of Respect: The Problem of Sexual Misconduct at Amherst College 21.) The perceived mechanism for the disparity described in the report was that white perpetrators had more access to "expensive lawyers" able to effectively advocate for their clients, rather than any concern the College initially responded to complaints differently depending on the races of the individuals involved. (*Id.*) The Oversight Committee described being unable to determine whether there was any basis for the collective belief among many students regarding racial disparities in the College's response to sexual misconduct complaints. (*Id.*) Though the Oversight Committee was unable to substantiate the perception of past racial disparities, even with specific anecdotal evidence, the concern was included in the report along with the caution that "the College needs to be scrupulous in making sure that all procedures relating to sexual assault and misconduct are fair, consistent, and equitable, and seen to be so by the whole community." (*Id.*) Following release of the report, two new appendices were added to the *Student Handbook* to address allegations and investigations regarding sexual harassment and sexual misconduct: Appendix B contained the College Sexual Misconduct Policy (the "*Policy*") and Appendix C contained the Procedures for Addressing

Sexual Misconduct Complaints Under the Student Conduct Process (the "*Procedures*"). The *Policy* and *Procedures* went into effect in May of 2013.

B.        Student Handbook Provisions

Combined, the *Policy* and *Procedures* run approximately 25 pages. The *Policy* "articulates the [C]ollege's set of behavioral standards, common understandings of definitions and key concepts and descriptions of prohibited conduct." (Dkt. No. 102-1, *Procedures* at § I.) The *Procedures* set forth the process used "for adjudicating a sexual misconduct complaint against a student." (*Id.*) Both are part of the *Student Handbook*. In the *Policy*, the College states it will "respond[] to all reports [of sexual misconduct] in a timely, effective and consistent manner." (Dkt. No. 102-1, *Policy* at § VI.) A report is clearly something less than the filing of a formal complaint. (*Id.*) The *Policy* also obligates the College to "provide for fair and impartial evaluation and resolution" of all reports of sexual misconduct. (*Id.* at § I.1.) Where the College, through a member of the College's Title IX team, determines an investigation will be conducted, the College promises such investigation "will be thorough, impartial and fair." (*Id.* at § VIII.4.)

The *Policy* also defines various forms of sexual misconduct and provides examples. Sexual violence is defined as "[p]hysical sex acts perpetrated against a person's will or where a person is incapable of giving consent." (*Id.* at § IV.3.) The *Policy* goes on to state that "[b]eing intoxicated or impaired by drugs or alcohol is never an excuse for sexual misconduct and does not excuse one from the responsibility to obtain consent." (*Id.* at § IV.4.)  At the same time, the Policy also states that "[a]n individual who is incapacitated . . . is incapable of giving consent" and "[i]ncapacitation is the inability, temporarily or permanently, to give consent, because the individual is mentally and/or physically helpless due to drug or alcohol consumption, either voluntarily or involuntarily, or the individual is unconscious, asleep, or otherwise unaware that the sexual activity is occurring." (*Id.*) The *Policy* goes

on to state that "[w]here alcohol is involved, incapacitation is a state beyond drunkenness or intoxication" and that "[a]n individual may experience a blackout state in which he/she appears to be giving consent but does not actually have conscious awareness or the ability to consent." (*Id.*) The *Policy* does not directly address whether a student in "a blackout state," as opposed to merely drunk or intoxicated, is considered responsible for their conduct while in such a state, such as failing to obtain consent in the course of a sexual encounter.

The *Procedures* set forth the specific processes the College agrees to use when adjudicating a sexual misconduct complaint. (*Procedures* at § I.) As a general matter, the *Procedures* describe the rules for (1) the filing of complaints; (2) the notification of and response from a respondent; (3) the investigation by a third party, hired by the College; (4) the hearing held by a hearing board consisting of three trained individuals from the community and chaired by the Dean of Students or designee; and (5) the appeals process. No time limits are imposed for the filing of a complaint, though the *Procedures* encourage timely reports "to maximize the [C]ollege's ablility to obtain evidence and conduct a thorough, impartial and reliable investigation." (*Id.* at § II.1.) Time limits are imposed on respondents. A respondent must meet with the Dean of Student Conduct within three days of receiving notice of a complaint against them and submit a written response to the complaint "within three business days of receipt." (*Id.* at § VIII.2.) Both the complainant and respondent are granted "the right to be assisted by an Advisor provided by the [C]ollege" and may select their advisor from "the list maintained by the Dean of Students of trained Advisors." (*Id.* at § II.6.) They also "have the right to consult private attorneys," but their attorneys are "required to remain outside of any hearing room," though "[a]n attorney may be present to provide legal counsel to the Chair and to the Hearing Board members." (*Id.* at § II.7.)

When the College conducts an investigation, the Dean of Student Conduct or designee selects an investigator who has "specific training and experience investigating allegations of sexual

misconduct." (*Procedures* at § IX.1.) The *Procedures* describe in some detail what actions an investigator is required to take and establishes that certain decisions are left to the discretion of the investigator. For example, the *Procedures* do not promise an investigator will obtain all relevant evidence. They only obligate an investigator to try to obtain such evidence as the investigator "determines, in his or her judgment, to be necessary." (*Id.* at § IX.2.a.) The investigator is required to prepare an investigative report "summarizing and analyzing relevant facts." (*Id.* at § IX.3.a.) While the investigator is permitted to "provide a summary of his/her impressions including context for the evidence," the investigator is not permitted to "make a determination as to whether a violation occurred." (*Id.*)

"Those who may be present at the hearing are the Complainant, the Respondent, their respective Advisors, the Investigator, witnesses and other [C]ollege officials." (*Id.* at § X.2.D.1.) The *Procedures* empower the Dean of Students to allow either a complainant or respondent to participate in the hearing in a way that does not require physical proximity to one another, provided the method does not prevent the process from being "fair and equitable." (*Id.* at § X.2.D.2.b.) A student seeking to present documentation or evidence at the hearing that was not provided to the investigator must submit a detailed request at least three days prior to the hearing date and obtain consent from the Dean of Students or designee. (*Id.* at § X.2.C.3.a).) At the hearing "information concerning prior sexual history, bad acts or pattern evidence" may be introduced only if the Dean of Students or designee determines its inclusion is appropriate. (*Id.* at § X.2.C.3.b.)

As with investigators, the three hearing board members are required to "have prior experience in, and [] receive annually training regarding, the dynamics of sexual misconduct, the factors relevant to a determination of credibility, the appropriate manner in which to receive and evaluate sensitive information, the manner of deliberation and the application of the preponderance-of-the-evidence standard, as well as the [C]ollege's policies and procedures." (*Id.* at § X.2.A.) The hearing board is to deliberate in private; "the Chair and the [C]ollege's legal counsel may remain for deliberations, but

may not participate in the deliberations and may not vote." (*Id.* at § X.2.E.8.) When determining a respondent's responsibility, the hearing board is required to apply "a preponderance-of-the-evidence standard which is whether the information provided at the hearing supports a finding that 'more likely than not' the Respondent is responsible for the alleged violations." (*Id.* at § X.2.D.3.) If the hearing board finds a respondent responsible for sexual misconduct, the hearing board also determines what sanctions to impose from among the "range of sanctions outlined in the Student Conduct Process." (*Id.* at § X.2.E.9.) The hearing board is permitted to consider a number of factors when determining the appropriate sanction, "including the harm suffered by the Complainant; any ongoing risk to either the Complainant or the community posed by the Respondent; the impact of the violation(s) on the community, its members or its property; any previous conduct violations; any mitigating or aggravating circumstances; and the information contained in any impact statements submitted by the parties." (*Id.*)

Within three days of concluding their deliberations, the hearing board is generally required to communicate its decision in writing. (*Id.* at § X.2.E.10.) Either the complainant or the respondent has seven days from the date when they receive notice of the hearing board's decision to file an appeal. (*Id.* at § X.2.F.1.) "The appeal may be based only on one or more of the following grounds: Material procedural error; Bias by the Chair or a member of the Hearing Board; Relevant, substantive and new information, not available at the time of the hearing." (*Id.* at § X.2.F.2.) The Provost or designee determines whether any of these grounds has been met. (*Id.* at § X.2.F.4.) The *Procedures* do not provide for review of the Provost's decision or for any additional proceedings after the appeal.

C.    The Complaint Against Doe

The events relevant to this litigation began during Doe's second year at the College. On the night of February 4, 2012, Doe consumed a significant quantity of alcohol before returning to his residence hall. His last memories of the night are his preparations to go to bed shortly after arriving

11

back at his room. However, rather than going to bed, he and his roommate, NK, left their room during the very early hours of February 5th, and joined a small group of classmates socializing in a common room. Two of the students they met in the common room were Sandra Jones and RM. At the time, Jones and RM were friends and Jones was the roommate of EK, a woman Doe was then casually dating. EK was away from campus that night.

It is undisputed that while Doe was in the common room he was very intoxicated. He has consistently claimed he was "blacked out" and retains no memory of the night, subsequent to preparing for bed before going to the common room. At the disciplinary hearing, RM described Doe as "very drunk" and "barely able to stand on [his] own." (Dkt. 102-3, Hrg. Trans. 111.) However, Doe's roommate, NK, stated he did not recognize Doe as being intoxicated to the point of being blacked out that night. (*Id.* at 104.) There is also no dispute that Jones, who had also been drinking, was far less intoxicated than Doe. At the hearing, she described herself as "buzzed or tipsy or a bit drunk." (*Id.* at 49.)

While in the common room, Jones and Doe began kissing. After some period of time, they left and went to Jones's room. While in Jones's room, Jones began to perform oral sex on Doe. During the investigation and at the hearing, Jones described this sexual activity as beginning consensually, but later becoming non-consensual when Doe held her head down after she told him to stop. When he later left her room to use the bathroom, Jones took his clothes, identification, and phone and put them outside her door and locked her door.

After Doe left her room, Jones exchanged text messages with another student, DR, who lived on the same floor as Jones and EK and served as a residential counselor. In the course of the text message exchange, Jones stated that she "fucked" Doe and proposed lying to others about what happened, expressing concern about the fact that others, including RM, had seen her kissing Doe in the common room, and her belief that Doe "was too drunk to make a good lie out of shit." (Dkt. No.

102-6, AK Aff. & Jones and DR Text Exchange 9.) Jones also told DR that another student, ML, was coming to her room. (*Id.* at 7.) After ML arrived, she complained to DR that ML was "just talking" rather than initiating sexual contact. (*Id.* at 13.) Later, Jones complained to DR that "action did not happen til 5 in the . . . morning." (*Id.*) She also mentioned that Doe had come to her room in search of his phone, but that she had told him to go away because ML was still in her room. (*Id.* at 14.) The text messages contain a significant back and forth between DR and Jones about what Jones would tell her roommate EK, who had been casually dating Doe. (*Id.* at 16-23.) DR took the position that word would get out, stating Doe had told someone else and reminding Jones she too had also told someone, to which Jones responded that DR did not count. (*Id.* at 17.)

When he woke up on the morning of February 5, 2012, Doe was unable to find his phone. (Dkt. No. 102-2, Kurker Report 10.) His roommate NK suggested Doe ask Jones if he had left his phone in her room. (*Id.*) Based on Doe's confused response, NK concluded Doe had no memory of his recent interactions with Jones. (*Id.*) NK then told Doe that Jones and Doe had been kissing in the common room before going to her room. (*Id.*) Doe went to Jones's room to search for his phone and they had a very brief exchange, making no mention of the previous night. (*Id.* at 5-6.) The following day Doe sent Jones a text message letting her know he had no memory of the night, apologizing if he had been "too weird," and asking if Jones planned to tell EK. Jones responded that she had already told EK. (*Id.*)

Approximately two months later, while intoxicated and upset, Jones told a graduating senior, JM, that Doe had sexually assaulted her. (*Id.* at 5.) The following month, Jones also told two other friends. (*Id.* at 6.) Jones spent the fall 2012 semester in London. (*Id.*) While in London, Jones published an essay in an online student publication in which she wrote about her encounter with Doe, stating "[i]t began consensually, but evolved into something that was decidedly not." (Dkt. 102-2, Culture of Silence, Kurker Report, Ex. E.) Shortly after the piece was published, Doe learned from RM that Jones

was describing her experience with Doe in February of 2012. (Kurker Report at 7.) Despite the publication of the essay, the College took no action at that time to investigate the incident described.

In April of 2013, Doe approached LR, a student who had been on the Oversight Committee and the editor who had supervised the publication of Jones's essay. (*Id.*; Hrg. Trans. at 84.) He explained that while he still had no memory of his interaction with Jones, he hoped to get some guidance on what he could do to make amends to Jones. (Kurker Report at 7-8.) LR understood Doe to be confessing to having sexually assaulted Jones. (*Id.* at 11-12.) She told Doe to continue to avoid Jones and to seek counseling. (*Id.* at 8.) LR then told Jones that Doe had confessed to her and advised Jones that LR would testify in her favor if Jones filed a complaint against Doe. (*Id.* at 11.) Around that time, LR also reported the February 2012 incident to the College's Title IX Team. With the encouragement of LR, Jones made a report to the College, which was memorialized in an email sent by the Deputy Title IX Coordinator. Mitton Shannon advised Jones that she could file a formal complaint, but Jones elected not to file a complaint at that time and the College took no action to investigate based on the report it had received. Prior to this litigation, the College did not provide Doe with the email summarizing Jones's initial statement. Jones eventually filed her complaint with the College on October 28, 2013.

In the complaint, Jones stated she asked Doe to leave several times while he tried to convince her to perform oral sex on him, but that when he did not go she suggested they continue kissing. (Dkt. 102-2, Oct. 28 Compl., Kurker Report, Ex. B.) She continued to suggest Doe leave while Doe instead removed her clothes before trying again to compel her to perform oral sex on him. (*Id.*) At that point she said no, but he ignored her, pushed his penis into her mouth, and held her head down. (*Id.*) Eventually, Doe left the room because he was feeling nauseated. (*Id.*) While he was gone, Jones threw his clothes, phone, and ID out into the hall and locked her door so he could not return. (*Id.*) Jones's

complaint does not allege that Jones willingly performed oral sex on Doe before withdrawing her consent. (*Id.*)

D.     The Investigation and Disciplinary Hearing

On November 1, 2013, Mitton Shannon notified Doe that he was the subject of a complaint. She informed Doe he would have less than a week to provide a written response to the complaint and he could select an advisor, who was not an attorney, to give guidance, but not advocate for him during the course of the investigation and hearing. Mitton Shannon told Doe the College planned to hold the hearing prior to the Thanksgiving break. She also informed him that he could provide a list of relevant witnesses to the investigator hired by the College, explaining that a relevant witness was one who was "directly involved in the event." (Dkt. No. 102, Am. Compl. ¶ 29.) Mitton Shannon also advised Doe that before he, himself, spoke to anyone about the allegations against him, he would need to obtain the investigator's authorization.

The College retained an attorney, Allyson Kurker, to conduct an investigation, establishing a $5,000 budget which corresponded with an estimate that the investigation would take no more than fifteen hours. Both Jones and Doe provided Kurker with lists of witnesses. Jones identified two: LR, the student who had been on the Oversight Committee, edited Jones's essay, and talked with Doe about the incident, and JM, the graduating senior Jones had told about the sexual assault in the spring of 2012. Doe identified four: EH, a friend with whom he had discussed the allegations; EK, the woman who, at the time of the incident had been casually dating Doe and was Jones's roommate; NK, Doe's roommate at the time of the incident; and RM, a student who had been friends with Jones at the time of the incident, was in the common room that night, and who spoke to Doe about Jones's essay after it was published. Neither Jones nor Doe named as witnesses DR, the residential counselor with whom Jones exchanged text messages on the night of the incident, or ML, the student who texted

with Jones and spent time in her room that night after Doe had left. On November 11, 2013, Kurker interviewed Jones, Doe and all the witnesses except RM. (Kurker Report at 2.) She interviewed RM several days later. (*Id.* at n. 2.)

After conducting these interviews, Kurker wrote a report (the "Report"). She provided a draft of the Report to Mitton Shannon and then revised the draft to remove her findings regarding the credibility of the witnesses. (Dkt. No. 78, Kurker Aff. ¶¶ 19-20.) The Report was also provided to Doe, Jones, and the members of the Hearing Board. In the Report, Kurker summarized her interviews, including many direct quotations from her interviews. According to the Report, during her interview with Kurker, Jones stated she had begun kissing Doe in the common room, having decided that she did want to kiss him after initially resisting his efforts to kiss her. She then described Doe's friends "chanting 'whore'" at her and that since she "was being blamed already," she "didn't see any reasons not to" kiss Doe. (Kurker Report at 3.) Jones stated that she took Doe back to her room and "at first it was okay" and that she "was okay with what was happening," until Doe began saying things about Jones and her roommate EK, including that "hooking up" with Doe made Jones a bad friend to EK. (*Id.*) In response to a question from the investigator, Jones clarified that she had consented when she began performing oral sex on Doe, but that during a break she withdrew her consent by telling him "no," that she did not want to continue, and that he should leave. (*Id.* at 3-4.) Following this, she said Doe held her head down until he ejaculated. (*Id.* at 4.)

In the Report, the investigator described the communications between Jones and Doe following the night of February 4, 2012, including quoting from the text messages the two exchanged. (*Id.* at 5-6.) The investigator also wrote that Jones "did not keep a journal; did not email, text or otherwise reduce what had happened with [Doe] to writing." (*Id.* at 6.) Nothing in the Report is inconsistent with this statement; however, citing an affidavit from EK, Doe asserts that EK told Kurker that she believed Jones had texted with DK about her interaction with Doe.

The Report next states that two months later, in April of 2012, Jones disclosed "what had happened with [Doe]" to JM, one of the two witnesses Jones identified for the investigator. (*Id.* at 5-6.) Jones also reported talking about "about what happened with [Doe]," with two other students, who had been angry she had "'hooked up'" with Doe because her roommate, EK, had been dating him. (*Id.* at 6.)

During his interview with Kurker, Doe reported he had "blacked out" and never had any memory of his interaction with Jones and that all he knew of the interaction came from what others had told him. (*Id.* at 6, 8.) Doe insisted he was not capable of the behavior attributed to him by Jones and would not have treated a sexual partner that way. (*Id.* at 8-9.) He provided Kurker with copies of various electronic communications he had with others concerning the allegations. (*Id.* at Ex. D and Ex. G.) These communications included messages between Doe and RM in which RM stated that Jones had engaged in sexual activity with another individual shortly after Doe had left her room. (*Id.* at Ex. G.) No mention is made of this information in the Report, though the exchange was attached to the report.

The Report does include summaries of Kurker's interviews with other witnesses. (*Id.* at 9-13.) These summaries were two to four short paragraphs in length, with the exception of the summary of her interview with LR, which extended for two pages. (*Id.* at 11-12.) Much of the summary excerpts portions of Kurker's interview with LR in which LR described Doe as thinking he had sexually assaulted Jones based on his own memories. (*Id.*) Kurker attempted to determine the specifics of what Doe had told LR and why LR concluded that his concerns were based on his own memories, rather than the allegations made by Jones. (*Id.*) Ultimately, Kurker described herself as questioning LR's testimony because it conflicted with the testimony of others, including Doe's testimony that "he could not recall the events of that evening." (*Id.* at 13-14.)

Doe relied on the investigation conducted by Kurker as he prepared for the hearing. No College employees, including his advisor, Torin Moore, Assistant Dean of Students and Director of Residential Life, advised him to conduct his own investigation. Indeed, based on his conversations with Moore and Mitton Shannon, he believed a confidentiality policy prevented him from conducting his own investigation or even seeking emotional support from other students. Doe had no knowledge or experience with disciplinary hearings, let alone the experience or knowledge necessary to effectively advocate on his own behalf, and he was emotionally distraught. Doe also asserts he was told he could not have the assistance of legal counsel, though it is unclear whether Doe claims he was advised that he could not consult with an attorney at all or merely informed that an attorney could not accompany him during the hearing. While he had an advisor, that person had little training or experience with the new rules and, consistent with the *Procedures*, was not permitted to advocate for Doe.

As he prepared for the hearing, Doe asked his advisor if he could present any evidence related to Jones's interactions with the student, whom he had learned from RM had allegedly been intimate with Jones shortly after Doe had left her room. Although Doe wanted to present evidence about this interaction, his advisor told him that such evidence would be inadmissible and he should not pursue it. Doe followed that advice and made no request that the hearing include evidence related to that student, whom Doe later learned was ML.

The hearing was held on December 12, 2013, during the reading period for the fall semester exams. Defendant Larimore, the Dean of Students, chaired the hearing. In his capacity as chair, Larimore disallowed questions from both Doe and members of the Hearing Board on several occasions. The hearing was attended by Jones; her advisor; another student who acted as an assistant to Jones; Doe; Doe's advisor; Hearing Board members; the College's Title IX coordinator, defendant Frankl; the investigator; and, for the duration of their testimony, the witnesses LR, EK, NK, and RM.

During the hearing a physical barrier prevented Doe and Jones from seeing one another and Jones was permitted to type her responses and have the student assisting her read those responses out loud.

Twice during the hearing, references were made to Jones's text message exchanges after Doe had left her room; text exchanges that were not obtained and reviewed by the investigator or otherwise presented to the Hearing Board. (Hrg. Trans. at 128, 135-36.) When asked by a member of the Hearing Board about her conduct after Doe left her room, Jones replied she texted with a friend and invited the friend over to spend the night because she did not want to be alone. (*Id.* at 45-46.) During her testimony, EK stated she had heard Jones sent a text to DR saying she, Jones, "had like done something bad." (*Id.* at 128.) The Hearing Board followed up with Jones, asking her about the content of those text messages, to which Jones replied: "I think I did say like . . . something . . . about . . . well doing a bad thing . . . I didn't want to address what had happened to me and I was in no position yet to accept that it had been rape. So in my text messaging to [DR] I only said things about the hook-up as if it had been consensual." (*Id.* at 135-36.) Jones was not asked to produce the text messages and the *Procedures* did not provide a way for the Hearing Board, complainant, or respondent to request that newly disclosed evidence be provided during the hearing. Members of the Hearing Board did ask Doe's witnesses if they could think of any reason why Jones would have fabricated her allegations. (*Id.* at 107, 119, 131.)

On the day after the hearing, Doe received the Hearing Board's decision. The Hearing Board found that Doe was "responsible, by a preponderance of the evidence, for violating *the Statement on Respect for Persons* specifically the *Sexual Misconduct Policy: Sexual Assault*." (Hr'g. Bd. Dec. at 1.) The decision stated that "[t]he [Hearing] Board carefully considered the evidence, and identified" factors that were "influential in their finding." (*Id.*) One of those factors was that Doe's "account of being 'blacked out' is credible," but that pursuant to the *Student Handbook*, "[b]eing intoxicated or impaired by drugs or alcohol is never an excuse for sexual misconduct and does not excuse one from the

responsibility to obtain consent." (*Id.* at 2.) Doe was expelled and his transcript was marked with the words "Disciplinary Expulsion." He was given seven days to appeal the decision, but was required to vacate his on-campus housing immediately.

E.     Post-Hearing Appeal, Campus-wide Email, and Doe's Post-Appeal Submissions

On December 20, 2013, Doe submitted his appeal of the Hearing Board's decision. He argued there was relevant, substantive and new information which had not been available at the time of the hearing. Specifically, Doe referenced an essay published by Jones days after the hearing which discussed the proceeding and the sanction imposed on Doe; his own discovery, after the hearing, that LR, the campus activist who had edited Jones's essay, had played a role in the filing of Jones's complaint, and LR's very public campaign to see a male student expelled for sexual assault. (Dkt. No. 39-1, Doe Appeal.) Taken together, these facts suggested to Doe; EK, Jones's former roommate; and RM, Jones's former friend, that Jones may have been motivated to fabricate claims against Doe as part of an activist campaign orchestrated by LR. (*Id.* at 1.) As the Hearing Board had asked questions about Jones's possible motives to fabricate her allegations, Doe argued this new evidence was relevant and substantive. (*Id.*)

Doe also appealed the Hearing Board's rulings based on alleged material procedural errors in the conduct of the hearing. He first argued there was evidence that Jones had withheld information when filing her complaint and while being interviewed by the investigator, and that the failure of the Hearing Board to explore the inconsistencies created by those omissions constituted a procedural error. (*Id.* at 3-4.) Second, Doe argued he had been asked questions at the hearing about his prior sexual history, in direct violation of the *Procedures*. (*Id.* at 4.) The decision denying Doe's appeal stated these questions were permissible inquiries into Doe's patterns of behavior. (Dkt. No. 39-2, Resp. to Doe's Appeal.) With regard to Doe's allegations concerning discrepancies between Jones's complaint

and testimony, the decision stated Doe had an adequate opportunity to address them during the hearing and the discrepancies did not constitute procedural errors. (*Id.*) Finally, with respect to Doe's proffer of new and substantive evidence, the decision stated Doe's allegation concerned "personal motives," had no basis in fact, and was immaterial to the case. (*Id.*)

Approximately a month after Doe submitted his appeal, the College sent a campus-wide email stating a student had been found responsible for committing sexual assault. The email also stated the student had been expelled and was not allowed on campus. Although Doe was not identified by name in the email, he was widely known on campus as the student to whom the email referred.

Following the denial of his appeal, Doe retained legal counsel. Doe also learned the identity of the student, ML, whom Jones invited to her room after Doe had left on the night at issue. From ML, Doe obtained the sexually-charged text messages which ML and Jones exchanged that night. Doe also obtained the text messages between Jones and DR from that night. The text messages Jones and DR exchanged directly discuss the interactions between Jones and Doe. (Dkt. No. 102-6, Jones and DR Text Messages.) On their face, the text messages suggest that Jones viewed herself as the initiator of the sexual activity. (*Id.*) They also include expressions of hatred of Doe, initiated by DR, to which Jones agreed. (*Id.*) In April of 2014, Doe provided the College with affidavits from ML and EK and the text messages Jones exchanged with ML and DR and asked the College to reopen the disciplinary proceeding. The College declined and this suit followed.

F.   Specific Actions Attributed to Individual Defendants

1.   Susie Mitton Shannon

After Jones made her initial report to the College regarding the interaction she had with Doe on the night of February 4, 2012, Mitton Shannon told Jones she could decide for herself when to file a formal complaint. Doe also asserts that Mitton Shannon told him the investigation and adjudicatory

processes were confidential and he, therefore, could not speak to anyone about it. Mitton Shannon also discussed the draft of the Report with the investigator, and advised the investigator to remove assessments as to the credibility of the individuals she interviewed. Doe also learned from Mitton Shannon, directly or indirectly, that he would not be permitted to offer any evidence from ML.

2.    James Larimore

Larimore was the non-voting chair of the Hearing Board. Doe asserts Larimore impermissibly interfered with the hearing process, disallowing questions and directing the hearing to a close even after the Hearing Board learned about the undisclosed text messages between Jones and DR. Though he did not vote, Larimore also presided over the deliberations and, Doe asserts, was likely involved in advising the Hearing Board members that under the *Policy* Doe could be found responsible even if the Hearing Board found it credible that he was blacked out for the entirety of his interactions with Jones. Larimore also was one of the senders of the campus-wide email which notified the College community that a disciplinary hearing had been held, a student was found responsible for sexual misconduct, and the student was expelled.

3.    Laurie Frankl

Frankl presided over Doe's hearing and under the *Policy* she was the College employee primarily responsible for ensuring the College complied with the requirements of Title IX. As such, she was tasked with ensuring the College responded in a "timely, effective and consistent manner" to all reports of sexual misconduct, regardless of whether a formal complaint had been filed. (*Policy* at VI.) She also joined in sending the campus-wide email.

4.      Carolyn Martin

Doe asserts Martin became directly involved with his case in the spring of 2014, at the same time the College was considering what action to take with regard to his submission to the College containing, among other things, Jones's text messages with DR on the night of the incident. Doe supports his assertion that Martin was specifically involved in preparing the College's response to his submission with copies of notifications from the social networking website, LinkedIn, indicating that Martin had accessed Doe's LinkedIn profile on several occasions.

V.      DISCUSSION

A.      Count I- Breach of Contract by the College

Doe claims he had a contractual relationship with the College and the terms of that relationship were set forth, at least in part, in the *Student Handbook* published by the College. More specifically, Doe argues the College (1) issued a Hearing Board decision that was not supported by sufficient evidence, (2) failed "to provide a fair and reliable investigative and fact-finding process," (3) discriminated against him based on his gender, race, and national origin, and (4) refused to reopen the disciplinary proceeding against Doe after he presented the College with additional relevant evidence not obtained during the investigation or the Hearing.

Massachusetts courts have repeatedly treated student handbooks as establishing contractual terms binding on the school, though it is unclear whether "such a document always constitutes a contract." *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61 n.5 (1st Cir. 2016) (citing *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724 (1st Cir. 1983) and *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000)); *see also Driscoll v. Bd. of Trs. of Milton Acad.*, 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007). At this stage in the litigation, the College has not argued the *Student Handbook* did not constitute a

contract between itself and Doe. Accordingly, the court treats the *Student Handbook* as setting forth terms in a contract binding on the College.

Under Massachusetts law, courts apply the standard of reasonable expectation when considering a breach of contract claim brought against a private school by a student or former student. *Walker*, 720 F.2d at 61. The reasonable expectation standard requires courts to interpret the terms of the contract by giving them the "'meaning the party making the manifestation, the [college], should reasonably expect the [student] to give it.'" *Schaer*, 735 N.E.2d at 378 (quoting *Cloud*, 720 F.2d at 724. "A breach of contract is established if the facts show that the [college] has 'failed to meet [the student's] reasonable expectations.'" *Walker*, 840 F.3d at 61-62 (second alteration in the original) (quoting *Schaer*, 735 N.E.2d at 378). At this stage in the litigation, the court must accept as true the factual allegations made by Doe and must make any reasonable inferences favorable to his position both with respect to determining what a student may have reasonably expected terms in the *Student Handbook* to mean and whether the College failed to meet those expectations. *See id.* at 62. While "'[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities'" and will not step in to require adherence with "the standards of due process guaranteed to criminal defendants" or the "rules of evidence adopted by courts," the reasonable expectation standard insures that students receive the benefit of the contractual promises made to them by private colleges and universities. *Schaer*, 720 F.2d at 482 (indirectly citing *Russell v. Salve Regina Coll.*, 890 F.2d 484, 489 (1st Cir. 1989)).

The court, therefore, looks at each type of contractual violation alleged by Doe and determines whether the factual allegations before the court—those alleged in Doe's Amended Complaint, supplemented by the documents attached to the Amended Complaint or sufficiently referenced therein—provide a sufficient basis for a breach of contract claim.

1.      Sufficiency of the Evidence

With his first claim, Doe asserts the College violated its contract with him because the Hearing Board's decision was not supported by a preponderance of the evidence. Specifically, Doe asserts that since "the evidence clearly showed and the board found that he was 'blacked out' there was insufficient evidence that, under the terms of the *Student Handbook*, he was responsible for sexual misconduct." (Am. Compl. at ¶83.)  In making this argument, Doe suggests a student reading the *Student Handbook* would reasonably expect that in order for a respondent to be found responsible for sexual misconduct, the Hearing Board would need to find, by a preponderance of the evidence, "(a) that the respondent knew that the complainant did not consent; or (b) that he knowingly used force beyond that necessary to perform the sexual act; or (c) that he knew the complainant was incapacitated and was unable to consent." (*Id.*) He asserts the evidence did not support any of these conclusions because (1) there was no evidence that Jones was incapacitated and (2) the Hearing Board's decision to credit Doe's evidence that he was "blacked out" established that Doe lacked the requisite level of knowledge as to Jones's withdrawal of consent and his own conduct.

The College takes issues with two aspects of Doe's argument. First, the College asserts Doe's premise that the Hearing Board had found he was "blacked out" deliberately misrepresents the Hearing Board's decision because "the only 'finding' made by the Hearing Board was that Doe had violated the College's sexual assault policy." (Dkt. No. 38, Def. Mem. Supp. Mot. for J. on the Pl'gs, at 20, n.18.) The court finds nothing deceptive about Doe's claim. Under a strictly literal reading of the Hearing Board's decision, the Hearing Board's only "finding" was that Doe was "responsible, by a preponderance of the evidence" for violating the *Policy*. However, the Hearing Board describes its decision as influenced by "factors" which include conclusions about the credibility of certain claims made at the hearing. The first of these factors is that Doe's "account of being 'blacked out' is credible." (Hr'g Bd. Dec. at 2). In the context of the Hearing Board's decision, these "factors" appear to be the

factual findings on which their ultimate finding of responsibility is based. Indeed, the other factor is that Jones's account of withdrawing consent during her sexual encounter with Doe was credible. At this stage of the litigation the court is required to credit Doe's reading of the Hearing Board's decision on this issue, provided, as the court here concludes, the reading is plausible.

Second, the College asserts the Hearing Board correctly understood the *Policy* does not include a knowledge requirement and does not absolve a student intoxicated or impaired by drugs or alcohol, including to the point of blackout, from responsibility for failing to obtain consent. There is no dispute the Hearing Board correctly quoted the language of the *Policy* stating that "[b]eing intoxicated or impaired by drugs or alcohol is never an excuse for sexual misconduct and does not excuse one from the responsibility to obtain consent." (*Policy* at IV.4.) However, the *Policy* distinguishes between "drunkenness or intoxication" and "incapacitation," describing the latter as a state beyond the former, which can manifest as "a blackout state" in which a person "appears to be giving consent but does not actually have conscious awareness or the ability to consent." (*Id.*) Doe argues that because he was "blacked out" at the time of his interactions with Jones, he was not capable consenting to any sexual activity with her and the *Policy* did not require that he, while incapacitated, obtain consent from Jones, a non-incapacitated individual.

The *Policy* does not explicitly address the problem of an incapacitated individual failing to obtain consent from a non-incapacitated person, nor does it address the related problem of sexual activity between two incapacitated individuals. This omission is understandable as the Dear Colleague letter does not sort through these problems. The inherent difficulty posed by such situations is magnified when past practices have led to legitimate concerns about victim blaming because these problems cannot be considered without questioning who occupies the role of victim. Against the existing history of inadequate response to allegations of sexual misconduct, any effort to question whether a self-identified victim is the only victim or is a victim at all is, understandably, a developing

area to be approached carefully. The College may be able to point to extrinsic evidence rendering Doe's reading of the *Policy* unreasonable. However, at this stage of the litigation, the court concludes a student reading the *Policy* could reasonably expect that while "blacked out" they could be victims of sexual misconduct, but their own actions could not violate the *Policy*. The court, therefore, denies Defendants' Motion for Judgment on the Pleadings as to this theory.

2.      Sufficiency of the Investigative and Fact-Finding Process

Doe's second basis for his breach of contract claim is that the investigation and fact-finding process conducted by the College was neither fair nor reliable. Specifically, Doe asserts the investigation conducted by Kurker fell short of being "thorough, impartial and fair" as promised in both the *Policy* and the *Procedures*.[3] Doe also asserts the College did not follow its own rules and conducted the hearing in a manner that was inconsistent with the general promises of fairness contained in the *Policy* and *Procedures*. With respect to the investigation, Doe's main assertion is that the investigator declined to investigate evidence regarding Jones's activities after Doe left her room. Such evidence, he asserts, could have proved exculpatory, as, indeed, Doe believes the text messages Jones exchanged with DR and ML to be.

In its motion, the College argues it is entitled to judgment on the pleadings with respect to this claim because the College's conduct with respect to the investigation and hearing complied with the specific terms of the *Procedures*. Doe's central claim is not limited to violations of particular requirements set out in the *Procedures*. Instead, he asserts the College obligated itself to conduct a fair investigation and fact-finding process, but did not do so. Specifically, Doe asserts the investigation did

---

[3] The *Policy* and *Procedures* contain express promises that investigations regarding alleged sexual misconduct will be "thorough, impartial and fair." Doe's claim is based on this language rather than the type of "'generalized representations' to treat students with 'fairness and beneficence'" that are "'too vague and indefinite to form an enforceable contract'" between a student and college. *Shin v. Mass. Inst. of Tech.*, No. 020403, 2005 WL 1869101 at *7 (Mass. Super. Ct. June 27, 2005).

not uncover significant, existing exculpatory information and the process employed by the College provided no reasonable opportunity for him to remedy that deficit, thus rendering both the investigation and the fact-finding process less than "thorough, fair and impartial."

Given the facts alleged by Doe, his proposed reading of the *Policy* and *Procedures* is not unreasonable. He asserts that a student reading the *Policy* and *Procedures* would expect the College to conduct its investigation and fact-finding process in such a manner that potentially exculpatory information would be obtained and presented to the Hearing Board in the same manner as inculpatory information, and that this was not done in his case. Whether such a reading of the *Policy* and *Procedures* was, in fact, objectively reasonable given the specific facts in this case turns on evidence extrinsic to the *Policy* itself. Doe alleges the investigator took inadequate steps to uncover Jones's contemporaneous written communications, even though such communications could have been relevant and exculpatory. He further asserts the content of Jones's text message exchanges were, in fact, relevant and exculpatory. For purposes of the motion before the court, Doe has alleged sufficient facts, from which the court can plausibly infer the investigation and fact-finding process was inadequate. Therefore, the court denies Defendants' Motion for Judgment on the Pleadings as to this theory of the breach of contract claim.

### 3.    Discrimination

The third basis Doe alleges to support his breach of contract claim is that the College conducted its disciplinary proceeding against Doe in a discriminatory manner due to his gender, race, national origin, or some combination. With respect to gender, Doe asserts the difference between the way the College handled Jones's report of sexual misconduct by Doe and what it did upon learning that Jones may also have committed sexual misconduct with respect to Doe is evidence of discrimination based on gender. As alleged by Doe, the College was informed that Jones, a female

student, had been subjected to nonconsensual sexual contact by a male student. In response, the College, through Mitton Shannon or others, encouraged Jones to file a formal complaint. Upon receiving the formal complaint, the College initiated an investigation and disciplinary proceeding against Doe, a male student. In the course of the investigation of the charges made by Jones, the College was informed that the male student, Doe, may have been subjected to sexual contact by Jones, the female student, while he was incapacitated. The College continued to pursue the adjudication regarding the initial complaint, but did not encourage the male student to file a formal complaint, nor did the College undertake an investigation or initiate a disciplinary proceeding of the female student. These are specific factual allegations that the College responded differently to similar reports when the genders of the potential victims and aggressors were different. They provide a foundation from which a court can infer gender-based discrimination may have played a role in the College's responses. *Cf. Doe v. Univ. of Mass.* (*UMass*), 2015 WL 4306521 at *9 (D. Mass. July 14, 2015).

Doe's allegations regarding racial discrimination do not provide a sufficient basis for similar inferences. He directs the court to the 2013 report of the Oversight Committee, but that report does not lay a foundation from which the court can plausibly infer race-based discrimination played a role in the decisions the College made after it adopted the *Policy* and *Procedures*, including when it applied them to Doe. The Oversight Committee was unable to substantiate student perceptions that male students of color were more likely to be disciplined or to be punished more harshly than other male students accused of similar conduct. Despite finding no basis for these concerns, the Oversight Committee still cautioned the College to take steps to ensure that, going forward, its actions would be neither discriminatory nor perceived as such. In the context of the Oversight Committee's report, the fact that a warning was conveyed cannot, by itself, provide the court with a basis to infer the College disregarded the warning.

Doe additionally asserts, "on information and belief," only men of color have been punished with separation from the College (forced leave, suspension, or expulsion), since the new *Policy* and *Procedures* were put in place in May of 2013, but this also falls short of providing the court with a basis from which it can infer race-based discrimination contributed to the actions of the College or individual defendants.[4] Considering the complaint as a whole, there is simply no information, circumstances, or overall context from which a plausible inference of racial discrimination can be drawn. While he alleges that only members of a disfavored group, male students of color, were subjected to a particular type of punishment, he has not alleged that other male students have been accused of similar conduct and received less severe punishments. These allegations are more similar to the allegations of gender discrimination this court considered in *UMass*, than Doe's allegations of gender discrimination in this case. In *UMass*, the plaintiff alleged "'male respondents in sexual misconduct cases at [the University] are discriminated against solely on the basis of sex' and are 'invariably found guilty, regardless of the evidence, or lack thereof,[]'" but failed to allege that there were other students who had been treated differently. *UMass*, 2015 WL 4306521 at *9 (alteration in original). In order for there to be discrimination, members of a disfavored group must be treated differently or experience an outcome different from others.

---

[4] The notice-pleading standard does not require Doe to identify the source or basis for his factual assertion that only male students of color have been separated from the college under the *Policy* and *Procedures* since they became effective in May of 2013. As these are factual allegations, they are proper under the pleading standard articulated in *Iqbal* and *Twombly*. However, Rule 11 does require attorneys, or, if proceeding *pro se*, the parties themselves, to certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Under Rule 11, this certification is made upon the "signing, filing, submitting, or later advocating" for the complaint. In light of the requirements of Rule 11, the court regards specific use within the complaint of the phrase "on information and belief" as surplusage which does nothing to make or support a claim.

The court can only infer that male students or male students of color have been treated in a particular way because of discrimination based on sex or race if there are allegations that other students facing the same types of allegations were treated differently. With respect to his claims for discrimination based on race or national origin, Doe has alleged members of one group received a particular result, but he has not alleged, even anecdotally, that anyone from any other group received a different outcome. Further there are no attendant facts to plausibly support such an inference. Defendants are, therefore, entitled to judgment on the pleadings as to Doe's breach of contract claim based on racial or national origin discrimination, but not as to gender discrimination.

4.      Refusal to Reopen the Disciplinary Proceeding

Finally, Doe asserts the College breached its contract with him by failing to reopen his disciplinary proceeding when he presented evidence he believed to be relevant following the denial of his appeal. Doe has not, however, identified any provision of the *Policy* or *Procedures* which would entitle him to have a concluded disciplinary proceeding reopened following the appeal period. There can be no breach in the absence of relevant terms in a binding contract. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 232 (1st Cir. 2013). As Doe has not pointed to a provision within the *Student Handbook* entitling him to have a disciplinary process reopened due to the discovery of new evidence following the appeal, the College is entitled to judgment on the pleadings as to this basis for Doe's breach of contract claim.

B.      Count II - Breach of Covenant of Good Faith and Fair Dealing by the College

In Massachusetts, "[e]very contract implies good faith and fair dealing between the parties to it." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 820 (Mass. 1991) (quotations omitted). This implied covenant prohibits both parties from doing anything to destroy or injure the other party's

right to receive the benefits to which they are entitled under the contract. *Id.* Doe has alleged facts from which a jury could reasonably infer the College acted in a manner that prevented him from receiving the "thorough, impartial and fair" investigation promised in the *Student Handbook* and thereby also denied him a fair adjudication of the complaint against him. The College's motion for judgment on the pleadings as to Count II is, therefore, denied.

C.    Count III – Tortious Interference with Contract by the Individual Defendants

Under Massachusetts law, "[t]o prevail on a claim of tortious interference with a contract, a plaintiff must establish that '(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'" *Psy-Ed Corp. v. Klein*, 947 N.E. 2d 520, 536 (Mass. 2011) (citing *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 571 N.E. 2d 1363 (Mass. 1991)). When the defendants are "'corporate officials' acting 'within their employment responsibilities,'" Massachusetts courts apply a heightened standard and plaintiffs are required to show "the defendant acted with 'actual malice,' or with 'a spiteful, malignant purpose, unrelated to legitimate corporate interest.'" *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Blackstone v. Cashman*, 860 N.E.2d 7, 12-13 (Mass. 2007)). The actual malice standard requires a single analysis that subsumes the otherwise separate analyses required to determine whether motive or means were improper. *Blackstone*, 860 N.E. 2d at 269-70. Under the actual malice standard, the relevant question is "whether the controlling factor in the defendant's interference was . . . a spiteful, malignant purpose unrelated to legitimate corporate interest." *Id.* at 270.

Defendants contend (1) Doe's complaint fails to allege sufficient "knowing interference" on the part of the individual defendants, (2) any actions the individual defendants took were within the scope of their employment with the College, and (3) Doe's complaint lacks specific allegations

suggesting any of the individuals acted with actual malice. (Def. Mem. Supp. Mot. for J. on the Pl'gs, 35-36.) In his initial response, Doe conceded his original complaint did "not adequately allege affirmative conduct on the part of the individual defendants." (Dkt. No. 43, Pl.'s Opp. To Def. Mot. for J. on Pl'gs ("Pl.'s Opp.") 43.) Doe retained the claim in his Amended Complaint, asserting each of the individual defendants (1) was aware he had a contractual relationship with the College, the terms of which were set out in the *Student Handbook*; (2) took actions which prevented Doe from receiving a fair, unbiased, and non-discriminatory investigation and hearing; (3) their actions were intentional and malicious; and (4) their actions caused him to be expelled from the College. Notably, Doe has not objected to the individual defendants' argument that the heightened standard for corporate officials was applicable to them, instead asserting their actions were malicious. The court therefore accepts, without deciding, the heightened standard applies to all individual defendants in this case. *See Rando*, 826 F.3d at 557 (ruling plaintiff waived argument that regional loss prevention manager was not a "corporate official" to whom the heightened standard applied); *Caverno v. Fellows*, 15 N.E.2d 483, 487-88 (Mass. 1938) (finding heightened standard applied to department chair, principal, and superintendent in suit by former high school teacher), *Blackstone*, 860 N.E. 2d at 13 (citing corporate officials' obligations to direct corporate purposes without fear of personal liability as the reason to apply the actual malice standard to them).

Doe's conclusory allegation that the individual defendants each acted maliciously is insufficient to satisfy the actual malice standard. Importing the standard into the context of administrators at a non-profit college, the actual malice standard requires some demonstration by the plaintiff that the actions of the individual defendants were motivated by malicious purposes rather than the desire to serve the College's legitimate interests. Plaintiff has articulated no facts from which the court can infer such motives. The motion for judgment on the pleadings as to Count III is allowed.

D.     Count IV – Violation of Title IX by the College

"Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions."[5] *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002). One of the purposes of Title IX is "to provide individual citizens with effective protection against [discriminatory] practices." *Cannon v. Univ. of Chi.,* 441 U.S. 677, 704 (1979). Separate lines of cases have established individuals' rights to damages from a school under Title IX where they can establish differential treatment on the basis of sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005), or deliberate indifference to allegations of sexual harassment, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).

Courts increasingly see claims brought pursuant to Title IX by male students who have been found responsible and disciplined for violating the sexual misconduct policies colleges use to deter and respond to sexual misconduct. *See, e.g., Doe v. W. New Eng. Univ.,* C.A. No. 15-30192-MAP, 2017 WL 113059 (D. Mass. Jan. 11, 2017); *Doe v. Trustees of Bos. Coll.*, C.A. No. 15-10790, 2016 WL 5799297 (D. Mass. Oct. 4, 2016); *Doe* v. *Brown Univ.*, 166 F.Supp.3d 177, 184-85 (D.R.I. 2016); *UMass*, 2015 WL 4306521. Lacking direct guidance from the First Circuit, district courts analyzing these Title IX claims in this circuit have applied the framework developed by the Second Circuit in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). *See, e.g. Brown Univ.*, 166 F. Supp. 3d at 184-85; *UMass*, 2015 WL 4306521 at *8; *Bleiler v. Coll. of Holy Cross*, C.A. No. 11-11541-DJC, 2013 WL 4714340, *5 (D. Mass. Aug. 26, 2013). In *Yusuf*, the Second Circuit described two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX cases. In one category are

---

[5] Though Title IX prohibits discrimination "on the basis of sex," the First Circuit's substitution of the word gender indicates its understanding that Title IX, like Title VII, prohibits discrimination on the basis of either a person's biological sex or the person's gender identity. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) (using gender and sex interchangeably in the context of Title IX); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (using gender and sex interchangeably in the context of Title VII); *Miller v. New York Univ.*, 979 F. Supp. 248 (S.D.N.Y. 1997) (ruling Title IX prohibition on discrimination on the basis of sex applied in case where plaintiff's biological sex and gender identity differed).

claims alleging bias in the disciplinary process led to an erroneous outcome. *Yusuf*, 35 F.3d at 715. The other category includes claims asserting selective enforcement. *Id.* To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances causally connecting gender bias to the erroneous outcome. *Id.* A selective enforcement claim requires a plaintiff to establish "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* Unlike an erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding. *Id.*

In his Amended Complaint, Doe makes both an erroneous outcome and a selective enforcement claim. In addition, the facts he alleges regarding his incapacitation during sexual activity described as consensual by Jones give rise to a deliberate indifference claim. The court reviews each of these claims in turn.

### 1.    Erroneous Outcome

Doe alleges gender bias on the part of the College and individual defendants infected the investigation and adjudication process, ultimately causing the Hearing Board to reach an erroneous outcome with respect to the claims against him. In his Amended Complaint, Doe alleges a number of procedural flaws, including, for example, the investigator's failure to seek out contemporaneous text messages sent by Jones; the College's failure to provide him with the initial statement Jones made to the College in the spring of 2013; improper involvement of individual defendants in directing the hearing, instructing the Hearing Board as to the *Policy* and *Procedures*, and interfering with the Hearing Board's deliberations; and the denial of his appeal despite the new information provided therein. He asserts two different theories about how these procedural flaws led the Hearing Board to reach an erroneous outcome. Under one theory, he alleges he is factually innocent because the conduct

attributed to him was fabricated by Jones and procedural flaws prevented the Hearing Board from considering all of the evidence inconsistent with Jones's allegations and her possible political motives for filing the complaint. His other theory asserts the Hearing Board reached an erroneous result because they were misadvised about the requirements under the *Policy* and *Procedures*. Though Doe alleges the Hearing Board reached an erroneous outcome, under neither theory does he actually challenge the Hearing Board's exercise of discretion in weighing the credibility of the evidence that was actually before it.

To prevail on a Title IX erroneous outcome claim, in addition to alleging a flawed proceeding and an adverse outcome, a plaintiff must also demonstrate the existence of "particularized circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* In *Yusuf*, the Second Circuit found the plaintiff's allegations of specific facts tending to show the complaint against him was filed in retaliation for his decision to pursue criminal charges against a third student, combined with his assertions of historical bias against men, provided a sufficient causal connection between the alleged erroneous outcome and gender bias. *Id.* at 715-16. Following *Iqbal* and *Twombly*, conclusory allegations of gender bias, "unsupported by even minimal data or credible anecdotal references," are insufficient evidence of gender bias. *UMass*, 2015 WL 4306521 at 9; *see also Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016)(describing sufficient allegations).

While Doe certainly makes such conclusory allegations, he also alleges that at the time Jones filed her complaint she was involved in a student-led movement to compel the College to change the way it handled sexual assault allegations, including by expelling a male student accused of sexual misconduct. He further asserts the College was actively trying to appease the student-led movement and was aware both Jones and LR were involved with the student-led movement. These facts supply the necessary nexus between gender bias and the hearing outcome to support Doe's erroneous outcome claim.

36

2.      Selective Enforcement

In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of punishment to impose upon him. Doe has alleged sufficiently specific facts to support both types of claims. He alleges the College took proactive steps to encourage Jones to file a formal complaint against Doe when it learned he may have been subjected her to nonconsensual sexual activity. But, when the College learned Jones may have initiated sexual activity with Doe while he was "blacked out," and thus incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate. Doe also alleges the severity of his punishment was due to his gender because the College intended his punishment to appease campus activists who sought the expulsion of a male student. These factual allegations are sufficient to survive a motion for judgment on the pleadings.


3.      Deliberate Indifference

Since sexual harassment can create a sexually hostile educational environment, Title IX provides a remedy for students, regardless of their sex or gender, who can establish a school's response to their allegations of sexual harassment, including claims of sexual violence, demonstrates deliberate indifference. *See Davis,* 526 U.S. at 653-54; *see also Frazier,* 276 F.3d at 65-66. The College's obligations, as clarified in the *Dear Colleague* letter, do not commence only upon the filing of a formal complaint, but whenever a school "knows, or reasonably should know, about possible harassment" of a student, regardless of whether the harassed student actually makes a complaint. Thus, while Doe never filed a formal complaint, the College certainly learned that Jones may have engaged in sexual activity with Doe while he was "blacked out" and yet, Doe asserts, the College did not take even minimal steps to determine whether Doe should have been viewed as a victim under the terms of the *Policy.* These

allegations provide a sufficient basis for Doe to proceed with a Title IX deliberate indifference claim against the College.

As Doe has made sufficient, specific factual allegations as to each type of Title IX claim alleged, the court denies Defendants' motion for judgment on the pleadings as to Doe's entire Title IX claim.


E.   Count V – Violation of 42 U.S.C. § 1981 by All Defendants

Count V alleges the College and individual defendants discriminated against Doe due to his race in violation of 42 U.S.C. § 1981. To establish a claim of racial discrimination under § 1981, a plaintiff must establish the defendant intentionally discriminated against the plaintiff on the basis of race and discrimination motivated the defendant's actions. *Goodman v. Bowdoin Coll.*, 380 F.3d. 33, 43 (1st Cir. 2004) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)). "[I]n a civil rights action as in any other action subject to notice pleading standards, the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why-although why, when why means the actor's state of mind, can be averred generally." *Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 68 (1st Cir. 2004). While a plaintiff can plead the "why" generally, the plaintiff must allege specific facts from which the court can infer the "what."

The "what" Doe identifies is disproportionate punishment. The punishment he received was within the range contemplated under the *Policy* and *Procedures* for the type of misconduct for which he was found responsible following the hearing. Doe asserts the court should infer the punishment was disproportionate because since the *Policy* and *Procedures* were adopted only male students of color have been punished with separation from the College in connection with sexual misconduct allegations. However, Doe has not alleged there are other students who were found responsible for similar violations and received lesser punishments. Even when all the relevant factual allegations Doe has made are credited, the facts do not give rise to a reasonable inference that Doe's punishment was

disproportionate or the result of any consideration other than the adverse finding made by the Hearing Board. *See Goodman*, 380 F.3d at 44. The Oversight Committee's caution about racial disparities in disciplinary proceedings cannot fill this gap because, as discussed *supra* Section V.A.3., the Oversight Committee issued the caution despite being unable to document past instances of racial disparities in disciplinary proceedings. The court will, therefore, grant Defendants' motion for judgement on the pleadings as to Count V.

F.      Count VI – Violation of Massachusetts Civil Rights Act by All Defendants

"To establish a claim under the act, 'a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion.'" *Glovsky v. Roche Bros. Supermarkets, Inc.*, 17 N.E.3d 1026, 1035 (Mass. 2014) (quoting *Currier v. Nat'l Bd. of Med. Examiners*, 965 N.E.2d 829, 837-38 (Mass. 2012). The legislature passed the MCRA, in part, "to redress 'the derogation of secured rights [that] occurs by threats, intimidation or coercion.'" *Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 409 (Mass. 2003) (quoting *Bally v. Northeastern Univ.*, 532 N.E.2d 49, 52 (Mass. 1989)) (alteration in original). The MCRA "was not intended to create, nor may it be construed to establish a 'vast constitutional tort.'" *Id.* (quoting *Bell v. Mazza*, 474 N.E.2d 1111, 1115 (Mass. 1985)). As a result, direct actions that violate secured rights are not actionable under the MCRA unless they include "threats against, or intimidation or coercion of, a particular individual or individuals" and "such threats, intimidation, or coercion interfered with that individual's exercise or enjoyment of rights secured by law." *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 989 (Mass. 1994).

Doe asserts he had a right, secured by Title IX, to an education free of discrimination based on gender and, in order to placate student activists, Defendants interfered with his exercise of this right by subjecting him to a biased disciplinary proceeding preordained to result in his expulsion from

the College. Defendants assert Doe has not alleged the College or individual defendants used threats, intimidation, or coercion to interfere with Doe's secured rights. This is certainly true with respect to the individual defendants. None of the conduct Doe attributes to the individual defendants could be considered threatening, intimidating, or coercive. As to the College, Doe has alleged the College expelled him after first breaching its contract with him. Massachusetts courts have "recognized that coercion may take various forms," including economic coercion, which can potentially "be found where one party deprives another of rights due under a contract." *Buster*, 783 N.E.2d at 410-11 (citing *Redgrave v. Bos. Symph. Orch., Inc.*, 502 N.E.2d 1375 (Mass. 1987). In order for the breach of a contract to be coercive for purposes of the MCRA, the party breaching the contract must not simply deprive a plaintiff of a secured right, but must also be trying to interfere with the plaintiff's own exercise of a secured right. *See Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) ("On its face, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do."). The facts alleged by Doe do not indicate that the College or any of the individual defendants, or even the student activists, sought to pressure Doe to forego exercising a secured right. The court therefore allows Defendants' motion for judgment on the pleadings as to Doe's MCRA claim against the College and the individual defendants.

G.     Count VII – Defamation by All Defendants

The tort of defamation "seek[s] to impose liability on a defendant for harm sustained by a plaintiff as a result of the publication of a false statement about the plaintiff to others." *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 762 (Mass. 2013). "Modern defamation law is a complex mixture of common-law rules and constitutional doctrines." *Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015). Under Massachusetts law, a plaintiff "must ordinarily establish five elements: (1) that

the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). Despite the general requirement of falsity, by statute, Massachusetts purports to allow a plaintiff to recover even when a written statement was true, if the statement was made with actual malice. MASS. GEN. LAWS ch. 231, § 92.

"On the constitutional side, the Supreme Court—reading the First Amendment (made binding on the states through the Fourteenth)—'has hedged about defamation suits' with lots of 'safeguards designed to protect a vigorous market in ideas and opinions.'" *Pan Am Sys.,* 804 F.3d at 65 (quoting *Desnick v. Am. Broad. Co.*, 44 F.3d 1345, 1355 (7th Cir. 1995)); *see also Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) ("[T]he Supreme Court has read the First Amendment . . . to impose additional limitations on defamation cases, whether or not they are also part of state law."). Among the safeguards recognized by the Supreme Court are two requirements relevant here. First, the challenged statement must be "capable of being proved true or false," or, in the case of an opinion statement, must "imply 'false assertion[s] of fact." *Pan Am Sys.*, 804 F.3d at 65 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (alteration in original). Second, "if misstatements involve issues of public concern, plaintiffs must shoulder the burden of showing that the comments are false." *Id.* at 66. Thus, despite the statute, the Massachusetts "exception to the truth defense is not constitutional when applied to matters of public concern." *Noonan*, 556 F.3d at 28 n.7 (citing *Shaari v. Harvard Student Agencies, Inc.*, 691 N.E.2d 925, 927 (Mass. 1998)).

Doe asserts Defendants defamed him by (1) sending out the campus-wide email and (2) placing the words "Disciplinary Expulsion" on his transcript. As a preliminary matter, there are no factual allegations personally connecting Martin or Mitton Shannon to either of these publications. The court therefore allows the motion for judgment on the pleadings as to this count with respect to those two individual defendants. Similarly, there are no factual allegations personally connecting

Larimore or Frankl to the notation on Doe's transcript, and the court allows the motion as to those individual defendants with respect to the notation on the transcript.

The court next considers the defamation claim based on the campus-wide email. Though "locating particular statements along the public/private continuum is sometimes a surpassingly difficult task," the "content, form and context" of the campus-wide email, easily demonstrate that it addressed campus safety, an issue of obvious public concern. *Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997) (internal citations omitted). Doe is, therefore, required to demonstrate the statements in the campus-wide email were false.

Doe directs the court to two statements contained within the email:

- "after a full hearing on the matter in December, a hearing board found, by a preponderance of evidence, that an Amherst College student violated Amherst College's Sexual Misconduct Policy by committing sexual assault. As a result of the finding, the Hearing Board determined that the student be expelled from Amherst College;" and

- "[i]t is now Amherst College's practice to notify the community when a student has been expelled for committing sexual violence."

He contends the statements imply he received a "thorough, impartial, and fair" proceeding and convey an impression at odds with the truth, known to the College and the individual defendants who sent the email, Larimore and Frankl, that Doe had been incapacitated at the time of the alleged assault. He asserts a jury should decide whether a reasonable recipient of the email would have understood the statements to erroneously imply the Hearing Board reached its decision following a "thorough, impartial, and fair" proceeding. Defendants argue these statements were objectively true: a hearing had been held; the Hearing Board had determined Doe was responsible for violating the Sexual Misconduct Policy: Sexual Assault; and he had been expelled based on the finding that he had

committed sexual violence. The court agrees with Defendants; quite simply, the email accurately stated what had occurred. This is not a case where a party has stated an opinion or set forth the facts in a manner that implies the existence of other, defamatory facts. Only an impermissibly tortured reading of the email could lead a reader to infer a defamatory meaning from the statement. *Damon v. Moore*, 520 F.3d 98, 105 (1st Cir. 2008) ("Forced or strained construction of the statement will not suffice to state a claim for defamation.").

This is equally true with regards to the notation regarding the disciplinary expulsion the College placed on Doe's transcript. At the time the notation was placed on the transcript it was accurate. Whether the notation on the transcript addressed a matter of private or public concern is not as clear as in the case of the email. However, even if the court treats the statement as limited to an issue of private concern and, therefore, potentially defamatory under Massachusetts law even though true,[6] Doe has not pleaded facts directly suggesting, or from which the court could infer, the notation was appended to the transcript with ill will or malevolent intent.[7] *Walker v. President & Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 532 (D. Mass. 2014), *aff'd*, 840 F.3d 57 (1st Cir. 2016). The court, therefore, also allows defendants' motion for judgment on the pleadings as to the defamation claims asserted against the College, Larimore, and Frankl.

---

[6] Despite having grave doubts as to whether there are any circumstances in which the Massachusetts statute can be applied without offending the First Amendment, the court refrains from finding the statute unconstitutional in all cases, as the court need not make such a determination to resolve this case. *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) ("Our usual practice is to avoid the unnecessary resolution of constitutional questions.")

[7] Had the court reached a different conclusion and continued to consider other elements of Doe's defamation claim based on the transcript notation, the court is unsure it would have found Doe's simple allegation that the transcript was "published to College employees and others," sufficiently pleaded "publication." (Am. Compl. at ¶ 123.) Colleges prepare and disseminate academic transcripts in connection with their core educational functions and "Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." *Bratt v. Int'l Bus. Machines Corp.*, 467 N.E.2d 126, 131 (1984). Additionally, schools typically disseminate academic transcripts at the request of the student and Massachusetts courts have rejected the doctrine of "self-publication" as an alternative avenue for establishing publication. *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1044-45 (Mass. 2004).

H.     Count VIII – Negligence by the Individual Defendants

"To state a negligence claim under Massachusetts law, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached that duty; (3) damage resulted; and (4) the defendant's breach caused that damage." *Saldivar v. Racine*, 818 F.3d 14, 20–21 (1st Cir. 2016). Plaintiff bears the burden of establishing each element, including the existence of a duty arising under Massachusetts tort law. *See Jorgenson v. Mass. Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990) (applying Massachusetts law).

Doe asserts each of the individual defendants had an obligation "to ensure that [he] received a disciplinary process that was basically fair and met the College's own guidelines, and . . . had an obligation not to ignore but to consider relevant, exculpatory evidence when brought to their attention within a reasonable time." (Pl.'s Opp. at 33.) Defendants contend Massachusetts imposes neither a common-law nor statutory duty on administrators to enforce the policies of the college or university. *Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 515 (D. Mass. 2015), In *Emerson*, the court considered whether a college had a legal duty to protect a student from criminal acts occurring at a party on another college's campus, and whether that duty extended to individual employees. *Id.* Recognizing that under Massachusetts law a duty to prevent against the criminal conduct of a third party only arises where there is a special relationship between the parties and the criminal conduct is reasonably foreseeable, the court found the college had not owed the student a duty to protect her once she left the boundaries of the college. (*Id.*) As to college administrators, the court ruled "Massachusetts does not . . . impose a common-law or statutory duty on administrators to enforce university policies." *Id.* (citing *Bash v. Clark Univ.*, No. 06745A, 2006 WL 4114297, at *5 (Mass. Super. Ct. Nov. 20, 2006) (declining to rule college administrators had a legal duty to prevent student from ingesting illegal drugs because such a duty is inconsistent with the expanded right of privacy college students now enjoy).

While there are significant factual differences between the claims in this case and those in *Emmerson* and *Bash*, these differences do not suggest the existence of a legal duty applicable here.

Under Massachusetts law, "a duty finds its 'source in existing social values and customs'" or where a defendant has voluntarily assumed a duty. *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 335-36 (Mass. 1983) (quoting *Schofield v. Merrill*, 435 N.E.2d 339, 341 (Mass. 1982)). While expectations of colleges and their administrators may be evolving, the court does not find that currently existing social values or customs are consistent with imposing a legal duty on college administrators, which would be owed directly to students, relating to the implementation of student disciplinary proceedings. This is especially true because the specific rules regarding student disciplinary proceedings are created by contractual relationships between students and colleges. *See Trs. of Bos. Coll.*, 2016 WL 5799297 at *27 ("[T]ort obligations 'are imposed by law, independent of the promises' of contractual duties.") (quoting *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 289 (D. Mass. 1987)). Defendants' motion for judgment on the pleadings is, therefore, allowed as to Doe's negligence claim against the individual defendants.

I.     Count IX – Negligent Infliction of Emotional Distress by All Defendants

"In order to recover for negligently inflicted emotional distress, a plaintiff [has] to prove '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.'" *Rodriguez v. Cambridge Housing Auth.*, 823 N.E.2d 1249, 1253 (Mass. 2005) (quoting *Payton v. Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982)). As discussed above, the individual defendants did not owe a duty to Doe with respect to the terms of the student handbook. Nor did the College owe Doe a duty in tort, as opposed to under its contract with students, to ensure compliance with the terms in the *Student Handbook*. Therefore their actions or inactions were not negligent and the

court allows Defendants' motion for judgment on the pleadings as to Doe's claim for negligent infliction of emotional distress.

J.     <u>Count X – Injunctive Relief from the College</u>

Though listed separately, Doe's Count X does not state an additional basis for liability, but instead requests injunctive relief as a remedy in the event Doe prevails on other counts. As several of Doe's claims survive this motion, his request for injunctive relief also survives.

## VI. Conclusion

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is hereby ALLOWED as to counts III, V, VI, VII, VIII, and IX and DENIED as to counts I, II, IV, and X.

It is So Ordered.

      <u>/s/ Mark G. Mastroianni</u>
      MARK G. MASTROIANNI
      United States District Judge